**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMANDA ADAMKAVICIUS, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>        Defendant. | Case No. 1:23-cv-03571-ABJ |

**PLAINTIFFS' MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT**

## TABLE OF CONTENTS

I.    BACKGROUND ........................................................................................ 3

    A.    LEGAL FRAMEWORK ....................................................................... 3

        1.    *Personal Jurisdiction* ................................................................ 4

        2.    *Subject-Matter Jurisdiction* ...................................................... 4

        3.    *Federal Cause of Action* ........................................................... 5

        4.    *Damages* .................................................................................. 5

    B.    EVIDENTIARY STANDARDS ............................................................. 6

II.   THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE FACTS AND FINDINGS IN *CABRERA* .......................................................... 7

    A.    JUDICIAL NOTICE IN FSIA TERRORISM-EXCEPTION CASES ............ 7

    B.    *CABRERA* OVERVIEW ...................................................................... 9

III.  PERSONAL JURISDICTION .............................................................. 11

IV.   THE EVIDENCE IN CABRERA ESTABLISHES PLAINTIFFS' CLAIMS ............... 12

    A.    SUBJECT-MATTER JURISDICTION (GENERAL ELEMENTS) ............... 12

        1.    *Iran Provided Material Supports for the Attacks in This Action* ............. 13

        2.    *Plaintiffs Seek Money Damages for Death or Personal Injury* ............... 14

        3.    *Iran's Material Support Caused Plaintiffs' Injuries* .............. 14

        4.    *Iran Was a State Sponsor of Terrorism at All Relevant Times* ............... 16

    B.    SUBJECT-MATTER JURISDICTION (ATTACK-SPECIFIC ELEMENTS) ......... 16

V.    THE 14 BELLWETHER PLAINTIFFS HAVE ESTABLISHED THE PLAINTIFF-SPECIFIC ELEMENTS AND DAMAGES. ............... 19

    A.    FEDERAL CAUSE OF ACTION ......................................................... 19

    B.    THEORIES OF RECOVERY .............................................................. 20

        1.    *Family-Member Plaintiffs* ....................................................... 21

        2.    *"Functional Equivalents" of Family Members* ........................ 23

C.     DAMAGES AWARDS .................................................................. 24

     1.      *Solatium Damages* .................................................... 24

         a.     Children .................................................... 25

             i.     D.C. and M.C. .................................... 25

             ii.     Connor Larson .................................... 27

             iii.     Samantha Ulrich.................................... 28

         b.     Parents .................................................... 29

             i.     Nancy Ann Morgado.................................... 30

             ii.     Sandra Lee Hackenberg .................................... 31

             iii.     Letha and Ronnie Dodge .................................... 32

         c.     Siblings.................................................... 33

             i.     Hollie Towle .................................... 33

             ii.     Tammy Bowden.................................... 34

             iii.     Jennifer Mabus .................................... 35

             iv.     Monica Smith.................................... 36

             v.     Deborah Trimble .................................... 36

             vi.     Anthony Trimble.................................... 37

     2.      *Prejudgment Interest*.................................... 39

     3.      *Punitive Damages* .................................... 41

VI.     MISCELLANEOUS ITEMS .................................... 43

VII.     CONCLUSION.................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acosta v. Islamic Republic of Iran,*
  574 F. Supp. 2d 15 (D.D.C. 2008) .................................................................. 41

*Akins v. Islamic Republic of Iran*
  332 F. Supp. 3d 1 (D.D.C. 2018) ................................................................. 8, 9

*Argentine Republic v. Amerada Hess Shipping Corp.,*
  488 U.S. 428 (1989) ......................................................................................... 3

*Belkin v. Islamic Republic of Iran,*
  667 F. Supp. 2d 8 (D.D.C. 2009) .................................................................. 21

*Ben-Yishai v. Syrian Arab Republic,*
  642 F. Supp. 3d 110 (D.D.C. 2022) .............................................................. 21

*Cabrera v. Islamic Republic of Iran,*
  2022 WL 2817730 (D.D.C. July 19, 2022) ............................................. *passim*

*Cabrera v. Islamic Republic of Iran,*
  2023 WL 3496303 (D.D.C. May 16, 2023) .................................................... 11

*Cabrera v. Islamic Republic of Iran,*
  2024 WL 864092 (D.D.C. Feb. 29, 2024) ...................................................... 11

*Cabrera v. Islamic Republic of Iran,*
  2024 WL 3225942 (D.D.C. June 28, 2024) .................................................... 11

*Campuzano v. Islamic Republic of Iran,*
  281 F. Supp. 2d 258 (D.D.C. 2003) .............................................................. 41

*Colvin v. Syrian Arab Republic,*
  363 F. Supp. 3d 141 (D.D.C. 2019) ......................................................... *passim*

*Est. of Doe v. Islamic Republic of Iran,*
  808 F. Supp. 2d 1 (D.D.C. 2011) .................................................................. 20

*Est. of Doe v. Islamic Republic of Iran,*
  943 F. Supp. 2d 180 (D.D.C. 2013) ......................................................... 40, 42

*Est. of Fouty v. Syrian Arab Republic,*
  2024 WL 3443591 (D.D.C. July 17, 2024) ............................................... 20, 22

*Est. of Heiser v. Islamic Republic of Iran*,
    659 F. Supp. 2d 20 (D.D.C. 2009) ...................................................................... 23, 27, 30

*Est. of Hirshfeld v. Islamic Republic of Iran*,
    330 F. Supp. 3d 107 (D.D.C. 2018) ...................................................................... 15, 21, 26

*Est. of Johnson v. Islamic Republic of Iran*,
    2024 WL 3225954 (D.D.C. June 28, 2024) ........................................................ 8, 9

*Est. of Parhamovich v. Syrian Arab Republic*,
    2021 WL 6843587 (D.D.C. June 23, 2021) ........................................................ 15

*Ewan v. Islamic Republic of Iran*,
    466 F. Supp. 3d 236 (D.D.C. 2020) ...................................................................... 6, 24, 39, 42

*Foley v. Syrian Arab Republic*,
    249 F. Supp. 3d 186 (D.D.C. 2017) ...................................................................... 8

*Force v. Islamic Republic of Iran*,
    464 F. Supp. 3d 323 (D.D.C. 2020) ...................................................................... 5, 15, 20

*Force v. Islamic Republic of Iran*,
    617 F. Supp. 3d 20 (D.D.C. 2022) ...................................................................... 24

*Forman v. Korean Air Lines Co.*,
    84 F.3d 446 (D.C. Cir. 1996) .............................................................................. 40

*Fraenkel v. Islamic Republic of Iran, Ministry of Foreign*,
    892 F.3d 348 (D.C. Cir. 2018) ............................................................................ 21

*Fritz v. Islamic Republic of Iran*,
    324 F. Supp. 3d 54 (D.D.C. 2018) ...................................................................... *passim*

*Fuld v. Islamic Republic of Iran*,
    2024 WL 1328790 (D.D.C. Mar. 28, 2024) ........................................................ 29

*GSS Grp., Ltd. v. Nat'l Port Auth.*,
    680 F.3d 805 (D.C. Cir. 2012) ............................................................................ 11-12

*Hamen v. Islamic Republic of Iran*,
    401 F. Supp. 3d 85 (D.D.C. 2019) ...................................................................... 15

*Han Kim v. Democratic People's Republic of Korea*,
    774 F.3d 1044 (D.C. Cir. 2014) .......................................................................... 6, 7, 18

*Harrison v. Republic of Sudan*,
    882 F. Supp. 2d 23 (D.D.C. 2012) ...................................................................... 8

*Holland v. Islamic Republic of Iran,*
    496 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................... 25

*Karcher v. Islamic Republic of Iran,*
    396 F. Supp. 3d 12 (D.D.C. 2019) ................................................................... 20

*Khaliq v. Republic of Sudan,*
    33 F. Supp. 3d 29 (D.D.C. 2014) ............................................................. 6, 39-40

*Kilburn v. Islamic Republic of Iran,*
    699 F. Supp. 2d 136 (D.D.C. 2010) .............................................................. 5, 20

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
    376 F.3d 1123 (D.C. Cir. 2004) ................................................................. 14, 15

*Lee v. Islamic Republic of Iran,*
    518 F. Supp. 3d 475 (D.D.C. 2021) ................................................................. 18

*Lee v. Islamic Republic of Iran,*
    2022 WL 20444119 (D.D.C. Apr. 11, 2022) .................................................... 26

*Murphy v. Islamic Republic of Iran,*
    740 F. Supp. 2d 51 (D.D.C. 2010) ............................................................. 14, 22

*Mustard v. Islamic Republic of Iran,*
    2023 WL 1778193 (D.D.C. Feb. 6, 2023) ........................................................ 22

*Neiberger v. Islamic Republic of Iran,*
    2022 WL 17370239 (D.D.C. Sept. 8, 2022) .................................................... 15

*Opati v. Republic of Sudan,*
    60 F. Supp. 3d 68 (D.D.C. 2014) ................................................................... 22

*Opati v. Republic of Sudan,*
    590 U.S. 418 (2020) ...................................................................................... 17

*Oveissi v. Islamic Republic of Iran,*
    768 F. Supp. 2d 16 (D.D.C. 2011) ................................................................. 25

*Oveissi v. Islamic Republic of Iran,*
    879 F. Supp. 2d 44 (D.D.C. 2012) ....................................................... 39, 41, 42

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017) ..................................................... 6, 7, 17, 19

*Owens v. Republic of Sudan,*
    174 F. Supp. 3d 242 (D.D.C. 2016) ........................................................... 17, 18

*Owens v. Republic of Sudan*,
    826 F. Supp. 2d 128 (D.D.C. 2011) ................................................................ 15

*Panahi v. Islamic Republic of Iran*,
    2020 WL 6591425 (D.D.C. Nov. 10, 2020) .......................................... *passim*

*Peterson v. Islamic Republic of Iran*,
    515 F. Supp. 2d 25 (D.D.C. 2007) .................................................................. 24

*Rimkus v. Islamic Republic of Iran*,
    750 F. Supp. 2d 163 (D.D.C. 2010) ............................................................. 8-9

*Roth v. Islamic Republic of Iran*,
    78 F. Supp. 3d 379 (D.D.C. 2015) .................................................................. 23

*Roth v. Islamic Republic of Iran*,
    651 F. Supp. 3d 65 (D.D.C. 2023) .................................................................... 9

*Salazar v. Islamic Republic of Iran*,
    370 F. Supp. 2d 105 (D.D.C. 2005) ................................................................ 22

*Selig v. Islamic Republic of Iran*,
    573 F. Supp. 3d 40 (D.D.C. 2021) ............................................... 24, 25, 29, 42

*Sheikh v. Republic of Sudan*,
    485 F. Supp. 3d 255 (D.D.C. 2020) .......................................................... 42, 44

*Singer v. Islamic Republic of Iran*,
    2024 WL 3026554 (D.D.C. June 17, 2024) ...................................................... 9

*Sotloff v. Syrian Arab Republic*,
    525 F. Supp. 3d 121 (D.D.C. 2021) ................................................................ 15

*Spencer v. Islamic Republic of Iran*,
    71 F. Supp. 3d 23 (D.D.C. 2014) ...................................................................... 9

*Taitt v. Islamic Republic of Iran*,
    664 F. Supp. 3d 63 (D.D.C. 2023) ............................................................ 24, 29

*Taylor v. Islamic Republic of Iran*,
    811 F. Supp. 2d 1 (D.D.C. 2011) ...................................................................... 8

*Taylor v. Islamic Republic of Iran*,
    2019 WL 8060796 (D.D.C. Sept. 11, 2019) ..................................................... 8

*Thuneibat v. Syrian Arab Republic*,
    167 F. Supp. 3d 22 (D.D.C. 2016) ............................................................. 6-7, 25

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................. *passim*

*Wamai v. Republic of Sudan*,
    60 F. Supp. 3d 84 (D.D.C. 2014) ..................................................................... 42

## STATUTES

18 U.S.C. § 2339A ........................................................................................... 13

28 U.S.C. § 1330(b) .................................................................................... 4, 11

28 U.S.C. § 1350 note ...................................................................................... 17

28 U.S.C. § 1605A ..................................................................................... 1, 3, 9

28 U.S.C. § 1605A(a) ................................................................................... 5, 20

28 U.S.C. § 1605A(a)(1) ............................................................................ *passim*

28 U.S.C. § 1605A(a)(2) ................................................................... 3, 4, 13, 16

28 U.S.C. § 1605A(a)(2)(A)(i) .......................................................................... 4

28 U.S.C. § 1605A(a)(2)(A)(ii) ......................................................................... 5

28 U.S.C. § 1605A(a)(2)(A)(iii) ........................................................................ 5

28 U.S.C. § 1605A(c) ................................................................................ *passim*

28 U.S.C. § 1605A(h)(3) ................................................................................. 13

28 U.S.C. § 1608(a) .................................................................................... 4, 12

28 U.S.C. § 1608(a)(1) ............................................................................... 12, 45

28 U.S.C. § 1608(a)(2) ............................................................................... 12, 45

28 U.S.C. § 1608(a)(3) ............................................................................... 12, 45

28 U.S.C. § 1608(a)(4) ....................................................................... 12, 43, 44, 45

28 U.S.C. § 1608(c)(1) ..................................................................................... 12

28 U.S.C. § 1608(e) ....................................................................... 3, 6, 43, 44

34 U.S.C. § 20144(j)(3) ................................................................................... 39

**RULES**

Fed. R. Evid. 201(b) ........................................................................................................ 8

Fed. R. Civ. P. 4 ............................................................................................................. 43

Fed. R. Civ. P. 54(b) ...................................................................................................... 43

**REGULATIONS**

Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran,
    49 Fed. Reg. 2836-02 (Jan. 23, 1984).............................................................. 16

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 46(2)(a)-(b); cmt. *l* ................................................. 21

This is a civil action against the Islamic Republic of Iran under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"). Plaintiffs are American service members and civilians—and their family members—who were killed or wounded while serving in Afghanistan between 2006 and 2022. Members of a Taliban-led terrorist Syndicate committed the attacks that killed and wounded Plaintiffs or their family members. The Islamic Republic of Iran, which has been designated as a State Sponsor of Terrorism since 1984, sponsored these terrorist attacks to pursue its foreign-policy objectives and eliminate the U.S. presence along its eastern border. Iran supported the Syndicate by, for example, providing them with sophisticated weapons and recruiting and paying terrorists to kill U.S. forces. Iran also trained terrorists—both within Afghanistan and at training camps in Iran—to attack Americans more effectively. The Syndicate used this support to attack Plaintiffs or their family members.

Iran's liability is clear. Judge John Bates recently heard substantially similar claims in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (D.D.C.). The evidence presented there, including during a live, three-day evidentiary hearing, was extensive. The key items Judge Bates considered, including hearing transcripts and expert reports, are attached here. *See* Exs. A-F.[1]

After reviewing this evidence, Judge Bates held that Iran provided material support for the Taliban-led Syndicate and found liability for various attacks, 27 of which are also at issue

---

[1] "Ex." refers to the Exhibits attached to the Declaration of James A. Ruck (Oct. 15, 2024) accompanying this Motion: Ex. A (Oct. 18 bellwether hearing transcript, *Cabrera* Dkt. 62-63); Ex. B (Oct. 19 bellwether hearing transcript, *Cabrera* Dkt. 65-66); Ex. C (Oct. 20 bellwether hearing transcript, *Cabrera* Dkt. 67); Ex. D (expert report of Mr. Roggio (Oct. 4, 2021), *Cabrera* Dkt. 59-1 ("Roggio Rep.")); Ex. E (expert report of Dr. Clarke (Sept. 19, 2021), *Cabrera* Dkt. 59-2 ("Clarke Rep.")); Ex. F (excerpted expert report of Lt. Col. Wood (Oct. 4, 2021), *Cabrera* Dkt. 59-3 ("Wood Bellwether Rep.")); Ex. G (expert report of Mr. Roggio (Oct. 15, 2024)); Ex. H (excerpted expert report of Lt. Col. Wood (Apr. 3, 2023), *Cabrera* Dkt. 231-12 ("Wood Rep.")); Ex. I (excerpted expert report of Dr. Gartenstein-Ross (Apr. 3, 2023) *Cabrera* Dkt. 231-11 ("Gartenstein-Ross Rep.")).

here.[2]  Plaintiffs now seek a default judgment against Iran establishing its liability for those 27 terrorist attacks already adjudicated in *Cabrera*.  Plaintiffs also seek damages for a subset of Plaintiffs associated with some of those attacks.  These 14 bellwether Plaintiffs are immediate family members of American service members and civilians wounded or killed in six different terrorist attacks in Afghanistan.  All have suffered great emotional distress because of their family members' attacks in Afghanistan.  Judicial notice of the facts and findings in *Cabrera* is sufficient to establish Iran's liability for these attacks under the FSIA's terrorism exception.  And Plaintiffs have provided declarations demonstrating this subset of Plaintiffs' entitlement to damages under the FSIA's private right of action.  *See* Damages Exs. 1-14.[3]

        This Motion proceeds in six parts.  Part I summarizes Plaintiffs' legal theory and obligations to obtain a default judgment against Iran through the terrorism exception to the FSIA. It describes what Plaintiffs must show to establish personal jurisdiction, subject-matter jurisdiction, and the elements of their cause of action.  And it provides the Court with an overview of the unique evidentiary standards that apply in FSIA default-judgment cases.  Part II provides an overview of *Cabrera* and asks the Court to take judicial notice of the evidence presented and findings made by Judge Bates in that case.  These facts are presented in the simultaneously filed Proposed Findings of Fact.  Relying on these facts, Parts III and IV explain how Plaintiffs have made the requisite legal showings necessary to prove Iran's liability.  Part III focuses on personal jurisdiction.  And Part IV focuses on subject-matter jurisdiction, dividing the

---

    [2] Judge Bates will consider seven other attacks at issue here in *Cabrera*.  Because Judge Bates has not yet issued a ruling on these seven attacks, they are not discussed in this Motion. Plaintiffs plan on returning to the Court with a similar request for relief as requested herein once Judge Bates does rule on these seven attacks.

    [3] "Damages Ex." refers to the Exhibits attached to the Motion to Seal filed under seal on October 15, 2024, Dkt. 33.

necessary elements into two categories: (1) general (non-attack-specific) elements that will be relevant to all attacks in this case, and (2) elements relating to the 27 attacks at issue in this Motion. Part V then lays out the damages claims of the subset of 14 Plaintiffs.[4] Finally, Part VI addresses miscellaneous items that Plaintiffs believe will help with the efficient resolution of this case.

## I.    BACKGROUND

Although foreign states are generally immune from federal-court jurisdiction, the FSIA creates certain exceptions. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). One of those exceptions is the terrorism exception, 28 U.S.C. § 1605A. This exception strips foreign sovereigns of immunity for claims of "personal injur[ies] or death" that were "caused by" an "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act," *id.* § 1605A(a)(1), if certain requirements are met, *id.* § 1605A(a)(2).

### A.  Legal Framework

Although Iran has defaulted, *see* Dkt. 28, Plaintiffs must establish their "right to relief by evidence satisfactory to the court" to obtain a default judgment. 28 U.S.C. § 1608(e); *see also Panahi v. Islamic Republic of Iran*, 2020 WL 6591425, at *3 (D.D.C. Nov. 10, 2020) (Jackson, J.). Plaintiffs must establish personal jurisdiction, subject-matter jurisdiction, a cause of action, and damages.

---

[4] Should the Court agree with Judge Bates's prior rulings and hold Iran liable for these attacks, Plaintiffs will file a proposed administrative plan and propose Special Masters to prepare Reports and Recommendations about eligibility and damages for the remaining Plaintiffs whose claims are implicated by this Motion. *See* Dkt. 31. The Court could also enter judgment on liability and refer all Plaintiffs claims to Special Masters in the first instance.

### 1. *Personal Jurisdiction*

"Personal jurisdiction over a foreign state . . . exist[s] as to every claim for relief over which the district courts have jurisdiction . . .  where service has been made under section 1608." 28 U.S.C. § 1330(b).  The requirements for establishing subject-matter jurisdiction are discussed below.  As for service, § 1608 lays out a hierarchy of service attempts, ultimately permitting service through the Department of State.  *See* 28 U.S.C. § 1608(a); *see also Panahi*, 2020 WL 6591425, at *4-6.

### 2. *Subject-Matter Jurisdiction*

The FSIA's terrorism exception requires Plaintiffs to show that they are seeking money damages for personal injuries or death "caused by an act of . . . extrajudicial killing . . . [or] hostage taking . . . or the provision of material support or resources for such an act," and that the support was provided by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1); *see also Panahi*, 2020 WL 6591425, at *4.  In other words, Plaintiffs must show:  (1) an official, employee, or agent of Iran—acting within the scope of his or her authority—provided material support for the attacks; (2) the attacks constituted "extrajudicial killings" or "hostage takings"; (3) they are seeking money damages for a personal injury or death; and (4) their injuries were "caused by" Iran's material support for the attacks.

Once Plaintiffs satisfy those threshold jurisdiction-stripping elements, Plaintiffs must also meet additional requirements under § 1605A(a)(2) for a court to hear their FSIA claims.  *See Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 154 (D.D.C. 2019) (Jackson, J.).  *First*, the foreign state must have been a designated state sponsor of terrorism at the time of the attack and at the time the claim was filed.  28 U.S.C. § 1605A(a)(2)(A)(i).  *Second*, the claimant or victim must have been a national of the United States, a member of the armed forces, or a U.S.

government employee or contractor at the time of the attack.  28 U.S.C. § 1605A(a)(2)(A)(ii);

*see also Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *34 (D.D.C. July 19, 2022)

("Bellwether Op.").  *Finally*, the foreign state must receive "a reasonable opportunity to

arbitrate" a plaintiff's claim *if* the act of terrorism "occurred in the foreign state against which the

claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).[5]

### 3.  *Federal Cause of Action*

Plaintiffs bring claims under 28 U.S.C. § 1605A(c), which establishes a private right of

action for "personal injury" and authorizes "solatium damages."  The elements are "essentially

the same" as the elements necessary to establish the waiver of sovereign immunity discussed

above.  *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  So "a

plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under

§ 1605A(a) has also established entitlement to relief as a matter of federal law."  *Force v. Islamic

Republic of Iran*, 464 F. Supp. 3d 323, 369 (D.D.C. 2020).  There is one other requirement:  the

federal cause of action requires that the plaintiff—rather than the plaintiff *or* the victim—be a

national of the United States, a member of the armed forces, or a government employee or

contractor.  28 U.S.C. § 1605A(c).

### 4.  *Damages*

As the *Cabrera* court explained, "[n]o amount of money will ever fully compensate the

plaintiffs for the losses they suffered because of the Syndicate attacks."  Bellwether Op. at *43.

Plaintiffs "will continue to suffer from the emotional and psychological scars of these attacks for

years to come."  *Id.*  But Congress has recognized that awarding monetary damages to terrorist

attack victims "at least partially redresses their injuries and can provide some measure of

---

[5] This requirement is inapplicable here because all the alleged acts of terrorism took place in Afghanistan—not Iran.  *See* Proposed Findings of Fact Part V.

justice," and it serves "national security interests by deterring those foreign nations that sponsor terrorism." *Id.*

"Damages under the FSIA's private right of action 'may include economic damages, solatium, pain and suffering, and punitive damages.'" *Id.* (quoting 28 U.S.C. § 1605A(c)); *see also Colvin*, 363 F. Supp. 3d at 161. Each of the Plaintiffs here is a family-member plaintiff entitled to solatium damages. And because "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks," *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (quoting *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 34 (D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ("*Owens I*")), prejudgment interest is appropriate, *see* Bellwether Op. at *55. Plaintiffs also seek "punitive damages" under the FSIA's private right of action. 28 U.S.C. § 1605A(c).

### B. Evidentiary Standards

Although Plaintiffs must establish their "right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), they do not have the same evidentiary obligations as in a typical civil case. The D.C. Circuit has recognized as much: "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (alterations adopted) (citations omitted). In cases like this, "courts should liberally construe the Rules of Evidence to ensure that state sponsors of terrorism cannot 'effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court.'" Bellwether Op. at *5 (quoting *Han Kim*, 774 F.3d at 1048).

The Court may thus accept "[u]ncontroverted factual allegations that are supported by admissible evidence . . . as true." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33

(D.D.C. 2016). Uncontested declarations are sufficient evidence. *See* Bellwether Op. at \*38

(citing *Han Kim*, 774 F.3d at 1050-51); *see also Colvin*, 363 F. Supp. 3d at 152. Plaintiffs may

also prove their claims "using evidence that might not be admissible in a trial," because the

Court is not required "to step into the shoes of the defaulting party and pursue every possible

evidentiary challenge." *Owens I*, 864 F.3d at 785.

Additionally, the Court may rely heavily on expert reports. As the D.C. Circuit has

recognized, "reliance upon secondary materials and the opinions of experts is often critical in

order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.* at 787.

"As long as the evidence itself is admissible, as expert testimony certainly may be, and the court

finds it satisfactory, its form or type is irrelevant." *Id.* at 788.

## II.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE FACTS AND FINDINGS IN *CABRERA*

The Court should take judicial notice of the facts considered and findings made by Judge

Bates in *Cabrera*, which are presented in Parts I-II and IV-V of the simultaneously filed

Proposed Findings of Fact.[6] The proposed findings of fact in Parts I, II, and IV are relevant to *all*

plaintiffs in this case and will assist any Special Masters appointed by the Court in assessing

those plaintiffs' claims.

### A.  Judicial Notice in FSIA Terrorism-Exception Cases

Courts may take judicial notice of "facts that are 'not subject to reasonable dispute' and

that are 'either (1) generally known within the territorial jurisdiction . . . or (2) capable of

---

[6] In *Cabrera*, Judge Bates concluded that Iran provided material support to the Taliban-led Syndicate from 2006 to 2019—the time period encompassing all of the attacks in that litigation. Bellwether Op. at \*1. Because there are terrorist attacks in this Action that occurred between 2020-2022, Plaintiffs provide a report from Mr. William Roggio—the same expert Judge Bates relied on, *id.*, at \*4—to support a finding that Iran continued to provide material support to the Taliban-led Syndicate at least through 2022. *See* Ex. G (expert report of Mr. Roggio (Oct. 15, 2024)). Part III of the Proposed Findings of Fact relies on Mr. Roggio's report.

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (quoting Fed. R. Evid. 201(b)). "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings." *Id.* The "validity of [these] judicial records is generally 'not subject to reasonable dispute'" and can be used to establish the evidence that was presented. *Id.*

Courts in this District regularly take judicial notice of factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants, . . . even when those proceedings have taken place in front of a different judge." *See Est. of Johnson v. Islamic Republic of Iran*, 2024 WL 3225954, at *2 (D.D.C. June 28, 2024) (citing *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018), and *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017)); *cf. Panahi*, 2020 WL 6591425, at *7 (relying on a finding in a prior case to show that Iran was responsible for a direct-victim's detention and torture). As relevant here, "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'" *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)), *vacated*, 2019 WL 8060796 (D.D.C. Sept. 11, 2019).

While evidence need not be "reproduced," "taking notice of another court's finding of fact does not necessarily denote adoption or finding of that fact." *Harrison*, 882 F. Supp. 2d at 31. Instead, "courts in subsequent related cases . . . rely upon the evidence presented in earlier litigation . . . to reach their own, independent findings of fact in the cases before them." *Rimkus*,

750 F. Supp. 2d at 172.  This approach is "efficient and sufficiently protective of the absent

defendant['s] interests." *Johnson*, 2024 WL 3225954, at *2 (quoting *Akins*, 332 F. Supp. 3d at

11).  Courts in this District thus routinely take judicial notice of evidence and findings from

previous cases establishing a defendant's liability for a particular terrorist attack.  *See*, *e.g.*,

*Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 25 (D.D.C. 2014) (1983 Marine barracks

bombing in Beirut); *Johnson*, 2024 WL 3225954, at *2 (Khobar Towers bombings in Saudi

Arabia); *Singer v. Islamic Republic of Iran*, 2024 WL 3026554, at *1 (D.D.C. June 17, 2024) (a

bus bombing in Jerusalem).  Indeed, another Court in this District has already taken judicial

notice of the evidence in *Cabrera* for Iran's material support for Taliban attacks in Afghanistan.

*See Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 73 (D.D.C. 2023).

### B.  *Cabrera* Overview

In *Cabrera*, Judge Bates adjudicated substantially similar claims to the ones at issue here.

Plaintiffs in that case were American service members and civilians, and their family members,

who served in Afghanistan between 2006 and 2019.  Bellwether Op. at *1.  As here, the *Cabrera*

plaintiffs alleged that a terrorist Syndicate comprising, among other groups, al-Qaeda, the

Taliban, and the Taliban's Haqqani Network perpetrated terrorist attacks against American

service members and civilians in Afghanistan.  *Id.*  The *Cabrera* plaintiffs alleged that Iran

provided material support for this Taliban-led Syndicate and sought compensatory damages from

Iran under the terrorism exception to the FSIA, 28 U.S.C. § 1605A.  *Id.*

After Iran was properly served and defaulted, Judge Bates held a three-day live

evidentiary hearing in October 2021.  *See* Exs. A-C.  Plaintiffs presented extensive evidence

about Iran's material support for the Taliban-led Syndicate, eleven "bellwether" attacks, and the

claims of twenty-three "bellwether plaintiffs," who were physically injured in the bellwether

attacks or were family members of direct victims of the bellwether attacks.  Bellwether Op. at

*1; *see id.* at *3.  At the evidentiary hearing, the *Cabrera* plaintiffs put on three expert witnesses and five fact witnesses.  *Id.* at *3.  The first expert witnesses was Mr. William F. Roggio, a Senior Fellow at the Foundation for Defense of Democracies whom the court qualified as an expert "in the field of Middle Eastern terrorism."  *Id.* at *3-4.  The second was Dr. Colin Clarke, a Director of Policy and Research at an intelligence consulting firm whom the court also qualified as an expert "in Middle Eastern terrorism."  *Id.*  And the third was Lt. Col. Steven Wood (Ret.), a Director of Corporate Development who had served in the U.S. Army for 22 years whom the court qualified as an expert in "attack attribution analysis."  *Id.* at *3-5.  The fact witnesses included Col. Thomas McGrath (Ret.), commander of the Afghan Regional Security Integration Command from May 2007 to August 2008; two service members injured in bellwether attacks; one civilian kidnapping victim; and the wife of a service member killed in a bellwether attack.  *Id.* at *3.  During the bellwether hearings, the *Cabrera* court admitted reports from each of the three experts and many other exhibits.  *Id.*; *see* Ex. D (Roggio Rep.); Ex. E (Clarke Rep.); Ex. F (Wood Bellwether Rep.).

Judge Bates made detailed findings of fact about the operations of the Taliban-led Syndicate in Afghanistan, Iran's material support for that Syndicate, and the Syndicate's responsibility for each of the bellwether attacks.  Bellwether Op. at *5.  These findings are described in the simultaneously filed Proposed Findings of Fact.

As for legal conclusions, Judge Bates found personal jurisdiction over Iran because plaintiffs "successfully served Iran through diplomatic processes" and "so long as the Court has subject-matter jurisdiction over plaintiffs' claims, it also has personal jurisdiction over Iran."  *Id.* at *33.  He then held that plaintiffs satisfied each of the elements of the FSIA terrorism exception for the court to have subject-matter jurisdiction.  *Id.* at *34-41.  And he held that the survivor

plaintiffs and the family-member plaintiffs satisfied the FSIA's private right of action, 28 U.S.C. § 1605A(c).  *Id.* at *42.

As to damages, Judge Bates held that the bellwether survivor plaintiffs were entitled to pain-and-suffering damages, and that the bellwether family-member plaintiffs were entitled to solatium damages.  *Id.* at *43.  After awarding damages to the plaintiffs associated with four of the eleven bellwether attacks, Judge Bates referred the claims of the other plaintiffs associated with the bellwether attacks to Special Masters to recommend damages in the first instance.  *Id.* at *57.  He later referred the claims of plaintiffs injured in other attacks to Special Masters to prepare reports and recommendations about liability and damages.

To date, Judge Bates has adjudicated the claims of nearly 1,000 plaintiffs associated with hundreds of attacks, relying on what will ultimately be 15 Reports and Recommendations from Special Masters.  *See* Bellwether Op.; *Cabrera v. Islamic Republic of Iran*, 2023 WL 3496303 (D.D.C. May 16, 2023) ("May 16, 2023 Op."); *Cabrera v. Islamic Republic of Iran*, 2024 WL 864092 (D.D.C. Feb. 29, 2024) ("Feb. 29, 2024 Op."); *Cabrera v. Islamic Republic of Iran*, 2024 WL 3225942 (D.D.C. June 28, 2024) ("June 28, 2024 Op.").  Judge Bates's findings and rulings have been based on a detailed analysis of a comprehensive evidentiary record. The Court should take notice of this evidence and make the same carefully considered findings here.  *See* Proposed Findings of Fact Parts I, III.

## III.    PERSONAL JURISDICTION

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  "In other words, 'under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction.'"  Bellwether Op. at *33 (quoting *GSS Grp.,*

*Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012)); *see also Colvin*¸363 F. Supp. 3d at 154-55.

Plaintiffs properly served Iran following the required hierarchy of 28 U.S.C. § 1608(a). Plaintiffs and Iran have no special arrangement for service of process, *see* 28 U.S.C. § 1608(a)(1), and service on Iran is not permitted by any applicable international convention, *see id.* § 1608(a)(2); *see also Panahi*, 2020 WL 6591425, at *5. So Plaintiffs initiated service by mail according to § 1608(a)(3). *See* Dkt. 12, 13. After the statutorily required 30 days passed without Iran responding, Plaintiffs initiated service under § 1608(a)(4). *See* Dkt. 18. The Embassy of Switzerland, at the behest of the U.S. State Department, completed § 1608(a)(4) service on June 11, 2024. *See* Dkt. 26. This means that Plaintiffs have successfully served Iran. *See* 28 U.S.C. § 1608(c)(1). Thus, so long as the Court has subject-matter jurisdiction over Iran—which it does, *see infra* Part IV—it also has personal jurisdiction.

## IV.     THE EVIDENCE IN CABRERA ESTABLISHES PLAINTIFFS' CLAIMS

Based on the facts established in *Cabrera* and in the simultaneously filed Proposed Statement of Facts, the Court should conclude that it has subject-matter jurisdiction. Many, but not all, elements are best discussed globally, rather than on an attack-by-attack or plaintiff-by-plaintiff basis. And these legal conclusions will be relevant to resolving liability for the other attacks at issue in this case. This Motion thus discusses the general elements of Plaintiffs' claims first, before discussing the remaining elements on an attack-by-attack basis.

### A.  Subject-Matter Jurisdiction (General Elements)

Four of the elements Plaintiffs need to establish for subject-matter jurisdiction are best analyzed globally, as the liability findings here will apply to all attacks in this case. Three of these are requirements from § 1605A(a)(1):  (1) that Iran provided material support for the attacks; (2) that Plaintiffs are seeking money damages for death or personal injury; (3) that Iran's

material support caused Plaintiffs' injuries.  And the fourth, from § 1605A(a)(2), is that Iran was

a designated state sponsor of terrorism.  Taking judicial notice of the facts and findings in

*Cabrera*, as discussed in the Proposed Findings of Fact, the Court should conclude that these

elements are met here.  *See* Bellwether Op. at *34-36.

### 1.  *Iran Provided Material Supports for the Attacks in This Action*

Iran—acting through the IRGC and Qods Force—provided material support for the

Taliban-led Syndicate's attacks.  As detailed in the Proposed Findings of Fact, it provided the

Taliban-led Syndicate with countless forms of support—be it weapons and explosives, training,

financial support, safe haven, or facilitating the Syndicate's drug-trafficking operations.  *See*

Proposed Findings of Fact Part I.B.  These are all forms of material support under the terrorism

exception, which adopts the definition of "material support or resources" in 18 U.S.C. § 2339A:

"any property, tangible or intangible, or service, including currency or monetary instruments or

financial securities, financial services, lodging, training, expert advice or assistance, safehouses,

false documentation or identification, communications equipment, facilities, weapons, lethal

substances, explosives, personnel . . . , and transportation, except medicine or religious

materials."  *See* 28 U.S.C. § 1605A(h)(3); *see also* Bellwether Op. at *35-36.

Iran provided this support through the IRGC and Qods Force, as many "government

documents that detail Iran's support for the Taliban" reveal.  Bellwether Op. at *36.  Iran's

"Supreme Leader intentionally directed the Qods Force's provision of material support to the

Syndicate, and the Qods Force did not act without his approval."  *Id.* (citing Ex. A at 82:5-17

(Roggio)).  "Every member of the Qods Force who provided material support to the Syndicate

was thus an 'official, employee, or agent' of Iran 'acting within the scope of his or her office,

employment, or agency.'"  *Id.* (quoting 28 U.S.C. § 1605A(a)(1)).

In short, as Judge Bates concluded, "[b]ased on the weight of evidence in this case, and Iran's clear practice of providing material support to similar terrorist groups, the Court concludes that Iran provided material support for the Syndicate's terrorist attacks." Bellwether Op. at *36. Plaintiffs will combine this evidence with a showing that the Taliban-led Syndicate committed each of the individual attacks, *see* Proposed Findings of Fact Part V, to establish material support for each attack.

### 2. *Plaintiffs Seek Money Damages for Death or Personal Injury*

Plaintiffs also must show that they are seeking money damages for personal injury or death. At least one individual died or was injured in an attack that involved an extrajudicial killing in each of the attacks at issue in this case. *See* Proposed Findings of Fact Part V. The direct-victim Plaintiffs are seeking monetary damages for their pain and suffering. Family-member Plaintiffs in this case are seeking solatium damages—monetary damages to compensate for "the mental anguish, bereavement, and grief" and "loss of . . . society or comfort" from a family member's injury or death. Bellwether Op. at *35 (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 78 (D.D.C. 2010)). And all Plaintiffs are seeking monetary punitive damages. *See* Compl. at 158 (Dkt. 1) (prayer for relief).

### 3. *Iran's Material Support Caused Plaintiffs' Injuries*

Iran's material support caused Plaintiffs' injuries. 28 U.S.C. § 1605A(a)(1). Plaintiffs need not show that Iran's material support was "directly for the specific act." Bellwether Op. at *39. Material support is fungible. So the terrorism exception "strips immunity from a foreign state that 'specifically instructs' a terrorist organization to carry out an attack and from a foreign state that 'only provides general support, but was not involved with the' specific act." *Id.* (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).

To establish causation under the FSIA, a plaintiff must show that: "(1) the defendant's actions were a substantial factor in the sequence of events that led to the plaintiff's injury; and (2) the plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* (internal quotation omitted).  Plaintiffs satisfy both requirements.

*First*, Iran's material support was a substantial factor in the Syndicate's attacks. Numerous courts in this district have "reached the same conclusion in many similar cases where a state sponsor of terrorism provides material support that enhances a terrorist group's ability to attack, even where that support is not directly traceable to a specific attack."  Bellwether Op. at *39-40 (citing *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011)); *see also Force*, 464 F. Supp. 3d at 334-35; *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139 (D.D.C. 2021); *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 103-04 (D.D.C. 2019); *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 120, 136 (D.D.C. 2018); *see also Est. of Parhamovich v. Syrian Arab Republic*, 2021 WL 6843587, at *8, *12 (D.D.C. June 23, 2021); *Neiberger v. Islamic Republic of Iran*, 2022 WL 17370239, at *8, *10 (D.D.C. Sept. 8, 2022). As Judge Bates held:  Iran's support for the Syndicate flowed to all members and "empowered the Syndicate to carry out attacks on U.S. forces and civilians more effectively."  Bellwether Op. at *40.

*Second*, as Judge Bates explained, "plaintiffs' injuries were not only foreseeable:  they were the *intended* result of Iran's support."  Bellwether Op. at *41 (citing Ex. A at 120:14-18 (Roggio)) (emphasis in original).  Iran wanted to kill and wound American troops to force the United States to leave Afghanistan.  *Id.* (citing Ex. A at 120:14-18 (Roggio)).  And it "intended for its material support for the Syndicate to enable lethal attacks on American and Coalition forces."  *Id.*  "By any measure, plaintiffs' injuries and deaths," so long as they are from a

15

Taliban-led Syndicate attack, "were a reasonably foreseeable consequence of Iran's provision of material support to the Syndicate." *Id.*

### 4. Iran Was a State Sponsor of Terrorism at All Relevant Times

*Finally*, Plaintiffs satisfy § 1605A(a)(2)'s requirement that the claims are against a state sponsor of terrorism. Iran was a designated state sponsor of terrorism at all relevant times. It was first designated in 1984 and has remained so ever since. *See* Bellwether Op. at *34 (quoting Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984)); *id.* at *9; U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism (last visited Aug. 5, 2024); *see also Panahi*, 2020 WL 6591425, at *4.

\*        \*        \*

In sum, the *Cabrera* court held that Iran—a designated state sponsor of terrorism— provided material support to the Taliban-led Syndicate's attacks, causing plaintiffs' injuries. Taking judicial notice of the facts and findings in *Cabrera*, this Court should hold the same.

### B. Subject-Matter Jurisdiction (Attack-Specific Elements)

That leaves three elements to prove subject-matter jurisdiction. *First*, to complete the showing that Iran provided material support for the attack, Plaintiffs must show that the Taliban-led Syndicate committed the attack. 28 U.S.C. § 1605A(a)(1). *Second*, Plaintiffs must show that the attack was an extrajudicial killing or hostage taking. *Id. Finally*, Plaintiffs must show that the claimant or victim was—at the time of the attack—a U.S. national, a member of the armed forces, or a U.S. government employee or contractor. 28 U.S.C. § 1605A(a)(2).[7]

---

[7] As discussed *supra* (at Part I.A.2) the other requirement of § 1608A(a)(2)—to offer to arbitrate—is inapplicable because the attacks all occurred in Afghanistan and not Iran.

Whether the Taliban-led Syndicate committed the attack and whether the claimant or victim was—at the time of the attack—a U.S. national, a member of the armed forces, or a U.S. government employee or contractor are factual findings. This Court should rely on the evidence Judge Bates considered to find each of these elements is met for the 27 attacks at issue in this Motion. *See* Proposed Findings of Fact Part V.

Whether a given attack is an extrajudicial killing requires additional legal analysis. But following Judge Bates's persuasive legal analysis, and based on his factual findings, this Court should also conclude that this element is met for each attack in this Motion.

An extrajudicial killing is a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note) ("Torture Victim Protection Act"); *see also Colvin*, 363 F. Supp. 3d at 158.

*First* it requires a killing. But those physically injured in an attack that killed others may bring claims because "the same *act* of killing one person can quite obviously injure another." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 266 (D.D.C. 2016) ("*Owens II*"), *aff'd*, *Owens I*, 864 F.3d 751, 788 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020) (emphasis in original); *see also* Bellwether Op. at *37 (finding extrajudicial killing where "plaintiffs were severely injured in attacks that killed others"). In all 27 attacks, Plaintiffs are family members of a direct victim who was killed or a direct victim who was wounded in an extrajudicial killing. *See* Proposed Findings of Fact Part V.

17

*Second*, the killing must be deliberated.  A deliberated attack is one "undertaken with careful consideration, not on a sudden impulse."  Bellwether Op. at *38 (quoting *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021)).  The evidence before Judge Bates shows that the Taliban-led Syndicate planned each of these attacks in advance.  *See* Proposed Findings of Fact Part V.  Some of these attacks involve tactics that require planning the particular attack, such as planting an IED along a known Coalition travel route.  *See*, *e.g.*, Proposed Findings of Fact Part V.E.  At other times, the Taliban-led Syndicate "may not have known in advance that it would have the opportunity to conduct a particular attack."  Bellwether Op. at *38.  Such attacks were still "deliberated" because the Taliban-led Syndicate "planned its tactics in advance should the opportunity to kill Americans arise."  *Id.*  In other words, these opportunistic attacks were "deliberated" because the terrorists were acting "in a cool state of blood, in furtherance of a fixed design . . . and not under the influence of a violent passion" when they launched the attack.  *Owens II*, 174 F. Supp. 3d at 263 (citation omitted).  For example, the November 27, 2010 RPG Attack in Wardak Province required obtaining the weapons in advance and training the terrorists to launch an attack when the opportunity arose.  *See* Proposed Findings of Fact Part V.J.

*Finally*, none of these attacks was "authorized by a previous judgment pronounced by a regularly constituted court" or "lawfully carried out under the authority of a foreign nation."  Torture Victim Protection Act § 3(a).  To establish an "extrajudicial killing, the [plaintiffs] need demonstrate only that the [defendant] killed the [victim] without due process."  *Han Kim*, 774 F.3d at 1050.  The Taliban-led Syndicate never afforded due process to the service members whom they killed.  And "[b]y 2006, the start of the relevant period for this case, the Islamic

Republic of Afghanistan was the rightful Afghan government.  The Taliban was neither a foreign

nation nor a military force."  Bellwether Op. at *38 (citation omitted).

*       *       *

Thus, like Judge Bates, the Court should hold Iran liable for each of the 27 attacks at

issue.  All that remains is for Plaintiffs to demonstrate their right to damages under the FSIA's

private right of action.

## V.    THE 14 BELLWETHER PLAINTIFFS HAVE ESTABLISHED THE PLAINTIFF-SPECIFIC ELEMENTS AND DAMAGES.

To help guide the Special Masters, this Motion asks the Court to award damages to a

subset of 14 bellwether plaintiffs associated with six of the terrorist attacks discussed in the

Proposed Findings of Fact.  Each Plaintiff suffered incalculable loss.  No amount of money will

ever fully compensate them.  But awarding damages to terrorist victims like Plaintiffs at least

partially redresses their injuries and serves national-security interests.  The Court should enter a

default judgment against Iran, find that Plaintiffs are entitled to damages, and award them the

full amounts to which they are entitled.  But, if the Court prefers, it can follow Judge Bates'

decision as to liability and refer these Plaintiffs' damages claims to Special Masters to

recommend damages awards in the first instance.

### A.  Federal Cause of Action

Plaintiffs bring claims under the private right of action in 28 U.S.C. § 1605A(c), which

provides that a "state sponsor of terrorism . . . shall be liable . . . for personal injury or death

caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the

United States may maintain jurisdiction under this section for money damages."[8]  The elements

---

[8] Before Congress created a private right of action, plaintiffs relying on the FSIA's
terrorism exception had to assert a claim under another source of law, such as state law.  *See Owens
I*, 864 F.3d at 764.  Under this "pass-through" approach, family-member plaintiffs generally sought

19

for establishing Iran's liability are "essentially the same" as the elements necessary to establish its waiver of sovereign immunity.  *Kilburn*, 699 F. Supp. 2d at 155.  "In other words, [§ 1605A(c)] creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity."  *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019).  Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law."  *Force*, 464 F. Supp. 3d at 369.  Because Iran lacks sovereign immunity, *see supra* Part IV, Plaintiffs have proved their claim.

Section 1605A(c), also requires that the plaintiff—rather than the plaintiff *or* the victim—be a national of the United States, a member of the armed forces, or a government employee or contractor.  *See* 28 U.S.C. § 1605A(c).  The 14 Plaintiffs addressed here meet that test.  Each submits evidence of their U.S. citizenship.  *See* Damages Exs. 1-14 (Dkt. 33).  The Court should thus conclude that these 14 Plaintiffs may bring claims under § 1605A(c).

## B.  Theories of Recovery

Damages under § 1605A(c) "include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Although "§ 1605A(c) provides a private right of action, it does not provide guidance on the substantive bases for liability to determine Plaintiffs' entitlement to damages."  *Est. of Fouty v. Syrian Arab Republic,* 2024 WL 3443591, at *22 (D.D.C. July 17, 2024)*.  Because § 1605A(c) "does not spell out the elements of these claims," the Court must "apply general principles of tort law," *see Est. of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 23 n.7 (D.D.C. 2011), such as those described in "well-

---

recovery for mental pain and suffering and the loss of a family member's society by bringing claims under a state's wrongful-death statute or for intentional infliction of emotional distress. And non-U.S. national plaintiffs still bring such claims.  Some FSIA cases thus discuss the elements of various state-law claims.  Such analysis is unnecessary here.  *See id.* at 764-65.

established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)," *see Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 353 (D.C. Cir. 2018).  Under those principles, each of the 14 Plaintiffs at issue—either family members (or the functional equivalent) of those wounded or killed by terrorist attacks—are entitled to damages for their emotional distress.[9]

The 14 bellwether plaintiffs here bring claims for solatium damages resulting from six terrorist attacks on their family members.  Solatium is "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Colvin*, 363 F. Supp. 3d at 161-62.  A claim for solatium under § 1605A(c) is generally "indistinguishable" from a claim for intentional infliction of emotional distress.  *Hirshfeld*, 330 F. Supp. 3d at 140.

### 1.  Family-Member Plaintiffs

The Restatement generally limits recovery to family-member plaintiffs who are present. *See* Restatement (Second) of Torts § 46(2)(a)-(b).  But one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010), because terrorism is sufficiently extreme and outrageous to show that it is intended to inflict severe emotional harm on even those who are not present at the site of the act, s*ee Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 129 (D.D.C. 2022). [10]  *See also Colvin*, 363 F. Supp. 3d at 157-58.  As

---

[9] Plaintiffs do not currently seek economic damages.

[10] Indeed, the Restatement itself "leaves open the possibility of situations" where "presence at the time may not be required," § 46 cmt. *l*.  FSIA terrorism-exception cases unanimously waive

such, "immediate family members—parents, siblings, spouses, and children—are entitled to solatium awards." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 79 (D.D.C. 2014), *appeal dismissed and remanded*, 2022 WL 1003610 (D.C.C. Apr. 1, 2022).

Ten of the bellwether Plaintiffs are the immediate family members of an individual killed in one of the attacks. D.C. and M.C. are the daughters of Specialist Kevin Cardoza. *See* C. Martinez on Behalf of D.C. Decl. ¶ 2; C. Martinez on Behalf of M.C. Decl. ¶ 2. Samantha Ulrich is the daughter of Civilian Government Contractor, Corey Dodge. *See* S. Ulrich Decl. ¶ 3. Hollie Towle and Tammy Bowden are Corey Dodge's sisters and Letha and Ronnie Dodge are his parents. *See* H. Towle Decl. ¶ 3; T. Bowden Decl. ¶ 3; L. Dodge Decl. ¶ 3; R. Dodge Decl. ¶ 2. Sandra Lee Hackenberg and Jennifer Mabus are the adoptive mother and sister, respectively, of Staff Sargeant ("SGT") Thomas Baysore Jr.[11] *See* S. Lee Hackenberg Decl. ¶ 3; J. Mabus Decl. ¶ 3. Monica Smith is the half-sister of Private ("PVT") First Class Devon Harris, who was killed in action. *See* M. Smith Decl. ¶ 3.[12]

Two of the bellwether plaintiffs—Deborah Trimble and Anthony Trimble—are the sister and brother of PVT First Class Kevin Trimble who was wounded in action. *See* D. Trimble Decl. ¶¶ 2-3; A. Trimble Decl. ¶¶ 2-3.

---

this presence requirement in allowing family members to recover. *See, e.g., Murphy*, 740 F. Supp. 2d at 75-76; *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005).

[11] Adoptive family members are treated the same as biological family members. *See Valore*, 700 F. Supp. 2d at 79.

[12] "[H]alf-siblings 'are presumed to recover' as full siblings would" and they are consistently found to be a member of the victim's family in these cases where "the evidence . . . supports application of that presumption" as the half-sibling "attests to [their] close relationship with [the victim]." *See Mustard v. Islamic Republic of Iran*, No. 21-cv-163, 2023 WL 1778193, at *11 (D.D.C. Feb. 6, 2023) (citation omitted); *see also, e.g., Fouty*, 2024 WL 3443591, at *26. Here, Ms. Smith's declaration supports application of that presumption. She was fifteen when PVT First Class Harris was born and grew up caring for him along with her other siblings, reading to them, playing with them and changing their diapers. M. Smith Decl. ¶ 5. They stayed close through adulthood, and he confided in her about his college decisions. *Id.* at ¶ 7.

Each of the family-member Plaintiffs has established they are an immediate family member by declaration.  *See*, *e.g.*, *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 401 (D.D.C. 2015) ("Each has established by uncontroverted affidavits that they are [decedent's] immediate family members.").

### 2.   *"Functional Equivalents" of Family Members*

The class of plaintiffs who can recover solatium damages also "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members," even though they are not legally or biologically related.  *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (citation omitted) (internal quotation marks omitted). The functional equivalent of an immediate family member is one who generally "lived in the victim's immediate household and ha[s] been in other important respects like a spouse, parent, sibling, or child to the victim."  *Est. of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 29 (D.D.C. 2009).  Courts in this District regularly find that stepparents and stepchildren are the "functional equivalent" of immediate family members when they treat their stepchild or parent as such.  *See*, *e.g.*, *Fritz*, 324 F. Supp. 3d at 63 (awarding solatium damages to the stepmother of a victim where the evidence demonstrated that she "treated [the victim] as, and considered [the victim] to be, one of her sons" and as to the stepmother of a second victim who "functioned as [that victim's] mother—fulfilling all aspects of such a relationship—from the time [the victim] was approximately four years old until his death").

Two bellwether plaintiffs, Nancy Ann Morgado and Connor Larson, are the functional equivalent of an immediate family member to the loved one they lost.  Nancy Ann Morgado is the stepmother of Second Lieutenant ("2LT") Travis Morgado, who was killed in action.  N. Morgado Decl. ¶¶ 3, 7.  Connor Larson is the stepson of Civilian Contractor Corey Dodge, who was killed in action.  C. Larson Decl. ¶¶ 2, 6.

### C. Damages Awards

To obtain damages for an FSIA claim, a plaintiff must prove that (1) "the consequences of the defendants' acts were reasonably certain to occur"; and (2) "the amount of damages by a reasonable estimate." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 63-64 (D.D.C. 2021). Iran's material support was reasonably certain to result in terrorist attacks killing, maiming, and kidnapping American citizens. *See* Bellwether Op. at *43; *Ewan*, 466 F. Supp. 3d at 246 (explaining that plaintiffs "have proven that the consequences of Iran's conduct were reasonably certain to—and indeed intended to—cause injury to members of the U.S. military"). The Court should therefore enter damages awards based on the estimates proposed below. Each proposed award follows the framework that this Court and many others in this District have long applied in calculating damages under the FSIA's terrorism exception. *See, e.g.*, *Ewan*, 466 F. Supp. 3d at 249 (applying these "frameworks").

#### 1. Solatium Damages

Solatium damages are "by their very nature unquantifiable," but courts have identified damages "baselines" for family member plaintiffs and their functional equivalents to "ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022). These baseline amounts are based on the relationship between the victim and the family member. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007). The family of a deceased victim typically receives damages of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling. *See, e.g.*, *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 92 (D.D.C. 2023). The family of an injured victim typically receives damages of $4 million for a spouse, $2.5 million for a child or parent, and $1.25 million for a sibling. *See, e.g.*, *id.* An upward adjustment may be appropriate "in cases 'with aggravating circumstances.'" *Id.* (citation omitted) (internal quotation marks omitted).

### a.  *Children*

Plaintiffs request solatium awards of $6.25 million each for D.C., M.C., and Connor Larson, and $5 million for Samantha Ulrich.

Plaintiffs seek an upward adjustment of 25%, to $6.25 million for Kevin Cardoza's daughters, D.C. and M.C., and for Corey Dodge's stepson Connor Larson because they were minors when their parents were killed and have suffered particularly devastating effects. "[C]ourts have recognized the particularly devastating effect that the loss of a parent can have on minors" and so often give them larger awards. *Selig v. Islamic Republic of Iran,* 573 F. Supp. 3d 40, 75 (D.D.C. 2021); *see also Holland v. Islamic Republic of Iran,* 496 F. Supp. 2d 1, 35 (D.D.C. 2005) (awarding two minor children $12 million each for state-law solatium claim who lost their "father at an[] extremely young age, a loss that was exceedingly detrimental to their upbringing and well-being," and when they experienced "behavioral problems caused—in part—by the lack of a father figure."); *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 29 (D.D.C. 2011) (awarding a 50% upward departure where the less than six-year-old plaintiff eventually turned to alcohol in an attempt to cope with the pain of his loss of his grandfather who was the equivalent of a father); *Thuneibat,* 167 F. Supp. 3d at 52-53 (D.D.C. 2016) (awarding a 25% upward adjustment to two minor brothers, aged 6 and 12, where one struggled in school and the other was prone to violence following their sister's death).[13]  This Court should follow suit.

### i.  **D.C. and M.C.**

D.C. and M.C. were only three and two years old, respectively, when their father died.  C. Martinez on Behalf of D.C. Decl. ¶ 3; C. Martinez on Behalf of M.C. Decl. ¶ 3.  Kevin Cardoza

---

[13] Alternatively, even if this Court does not award an adjustment for minors, it should upward adjust for Connor because of his self-medication with drugs, C. Larson Decl. ¶ 7.  *See Valore,* 700 F. Supp. 2d at 86; *Oveissi,* 768 F. Supp. 2d at 29.

died the day before D.C.'s fourth birthday. C. Martinez on Behalf of D.C. Decl. ¶ 5. D.C. was expecting a call from her father for her birthday, which never came. *Id.* She learned that her father died when she saw his photo on the news. *Id.* Her voice broke and she started to cry. *Id.* D.C. and M.C. had loving relationships with their father. C. Martinez on Behalf of M.C. Decl. ¶ 4; C. Martinez on Behalf of D.C. Decl. ¶ 4. When M.C. was born, Kevin was overwhelmed with love and joy. C. Martinez on Behalf of M.C. Decl. ¶ 4. Because Kevin and the girls' mother were teenagers when M.C. and D.C. were born, M.C. and D.C. grew up living with their mother and her parents.[14] C. Martinez on Behalf of M.C. Decl. ¶ 4; C. Martinez on Behalf of D.C. Decl. ¶ 4. Nevertheless, Kevin spent as much time with the girls as he could. C. Martinez on Behalf of M.C. Decl. ¶ 4; C. Martinez on Behalf of D.C. Decl. ¶ 4. D.C. still cherishes her memories of visiting the zoo with her father. C. Martinez on Behalf of D.C. Decl. ¶ 4.

D.C. has struggled with her father's death, becoming angry and rebellious as she has grown up. C. Martinez on Behalf of D.C. Decl. ¶ 7. She has had several emotional breakdowns, she frequently cries, and questions God about her father's death. *Id.* ¶ 10. D.C. uses romantic relationships to try and fill her father's place in her life. *Id.* ¶ 9. She has depression and anxiety and has visited multiple therapists and a veterans' counseling center to try to cope. *Id.* ¶ 7. D.C. is sadddened that she will never experience her father's love or guidance again. *Id.* ¶ 8. After losing her father, she worries about death, questioning her mortality. *Id.* ¶ 10.

---

[14] The *Cabrera* court deducted $1 million from the baseline awards for children of victims killed in action when they did not live with the victim before his death. Bellwether Op. at *50. However, several courts have awarded at least baseline awards to family members who did not live with the victim. *Lee v. Islamic Republic of Iran*, 2022 WL 20444119, at *10-11 (D.D.C. Apr. 11, 2022), *report and recommendation adopted*, 2023 WL 4891534 (D.D.C. June 29, 2023) (awarding a half-sister $2.5 million even though she did not live with her half-brother who was injured); *Hirshfeld*, 330 F. Supp. 3d at 122, 148 (siblings of victim awarded $2.5 million though they mostly only saw him on the weekend).

M.C. has also struggled to grapple with her father's death.  C. Martinez on Behalf of

M.C. Decl. ¶¶ 6-9.  She is devastated that she will never really know who her father was.  *Id.* ¶ 6.

She has become aggressive, angry and closed-off.  *Id.* ¶ 8.  At thirteen, M.C. also uses romantic

relationships to try and fill her father's place in her life.  *Id.* ¶ 6.  M.C. feels lost without her

father.  *Id.*  M.C. and D.C.'s mother believes neither of them will ever truly recover from the

death of their father.  C. Martinez on Behalf of M.C. Decl. ¶ 10; C. Martinez on Behalf of D.C.

Decl. ¶ 11.

      **ii.**    **Connor Larson**

Connor was only four years old when he met his stepfather, Corey Dodge.  C. Larson

Decl. ¶ 4.  Connor lived with his mother and Corey full-time starting in 2002, when his mother

and Corey married, until Corey's death in 2015.  *Id.*  Connor says that Corey was his "main

father figure growing up," as Connor's relationship with his biological father was "very shaky."

*Id.*  He viewed Corey as his "real father," even calling him "Dad," and Corey referred to Connor

as his son.  *Id.*  Until Corey began going overseas, they spent nearly every day together.  *Id.* ¶ 5.

Connor's earliest memory is learning from Corey how to ride a dirt bike.  *Id.* ¶ 5.  Corey attended

all of Connor's sporting events and was his biggest fan.  *Id.*  They had fun together too; they

went to see *Transformers* or *Fast and Furious* every time a new movie was released, they played

mini golf, they went out to eat, did target practice, went four-wheeling, and practiced sports

together.  *Id.*  The way that Connor and Corey treated each other as father and son demonstrates

that they are the "functional equivalent" of immediate family members.  *See Heiser*, 659 F.

Supp. 2d at 29; *Fritz*, 324 F. Supp. 3d at 63.

When Connor was 17 years old, he was leaving football practice one day when his

mother came to his school crying.  C. Larson Decl. ¶¶ 3, 6.  He immediately knew that his

stepfather had been killed in Afghanistan, and he broke down.  *Id.*

Connor has struggled to recover from his stepfather's death. *Id.* ¶ 7. In his senior year of high school, Connor left home and was homeless, spending most of his time smoking and drinking. *Id.* He was kicked off all of his sport teams because he stopped going to practices and games. *Id.* After barely managing to graduate high school, Connor couldn't hold a job. *Id.* He had planned to join the Marines and follow in his stepfather's footsteps, but after Corey was killed, he was unable to see this dream through. *Id.* Connor also started talking about wanting to die. *Id.* He self-medicated his pain with drugs. *Id.* Once, Connor's girlfriend told his mother that she was worried for his safety, so Connor's mother tried to send him to a hospital, but he refused to go. *Id.* Since then, Connor has attempted to turn his life around so he can give his young daughter a good life like his stepfather gave him, but it is difficult for him to raise his daughter knowing she will never meet her grandfather. *Id.* ¶ 8.

### iii.    Samantha Ulrich

Samantha Ulrich and her father, Corey Dodge, had a strong relationship. S. Ulrich Decl. ¶ 5. She remembers singing in the car together and her father acting goofy to try to make her and her family laugh. *Id.* Samantha and her father would talk about what was happening in her life and his. *Id.* Her mother and father separated when Samantha was around five years old, and her father had visitation rights every other weekend. *Id.* When she visited her father's house on those weekends, she would play basketball or football with him. *Id.* Her father valued including Samantha in activities with her stepmother and stepsiblings, such as bowling, going to baseball games, or going on road trips. *Id.*

Samantha was 20 years old when her cousin called to say that her father had been killed in Afghanistan. *Id.* ¶¶ 4, 7. Samantha dropped everything and fell to the kitchen floor, screaming and crying and rejecting what she had just heard. *Id.* ¶ 7. In the days after her father was killed, Samantha could not eat or sleep, and she could not get out of bed or leave her house.

*Id.*  A month after her father's death, she was prescribed sleep medication.  *Id.* ¶ 9.  Samantha dropped out of college because she could not handle the stress of school on top of the anguish she felt.  *Id.* ¶ 8.  She quit both her jobs.  *Id.*  Before the attack Samantha was a positive-thinking and happy young adult, but she is not anymore and often feels depressed.  *Id.* ¶¶ 8-9.

D.C., M.C., and Connor Larson have each suffered unique difficulties by losing their parents as minors, beyond the typical mental anguish of losing a parent in adulthood.  C. Martinez on Behalf of M.C. Decl. ¶¶ 6-9; C. Martinez on Behalf of D.C. Decl. ¶¶ 6-10; C. Larson Decl. ¶¶ 7-8.  They all lost "an important source of guidance, correction, and love at a time when [they] still desperately need[ed] it."  *Selig*, 573 F. Supp. 3d at 70-71 (D.D.C. 2021).  Plaintiffs thus request solatium awards of $6.25 million each for D.C., M.C., and Connor Larson.

Samantha Ulrich had a close relationship with her father and suffered immensely due to the terrorist attack that killed him.  S. Ulrich Decl. ¶¶ 5, 7-9.  Plaintiffs request a baseline solatium award of $5 million for Samantha Ulrich.

### b.    *Parents*

Plaintiffs request a solatium award of $5 million for Nancy Ann Morgado, Sandra Lee Hackenberg, and Letha and Ronnie Dodge, each of whom lost a child to a terrorist attack.  *See*, *e.g.*, *Taitt*, 664 F. Supp. 3d at 92 (awards of $5 million are consistent with solatium damages generally awarded to the parents of individuals killed in terrorist attacks); *Fuld v. Islamic Republic of Iran*, 2024 WL 1328790, at *18 (D.D.C. Mar. 28, 2024).[15]

---

[15] The *Cabrera* court has held that parents who are in their sixties or older should be subject to a downward departure from the presumed $5 million award.  Bellwether Op. at *51; May 16, 2023 Op. at *10; Feb. 29, 2024 Op. at *5.  However, other courts regularly award the guideline amount to older parents, acknowledging that their suffering is equal to other parents who lose children.  *See*, *e.g.*, *Fuld*, 2024 WL 1328790, at *18 (awarding $5 million each to Harvey Jonas Yonah Fuld and Mary Alice Fuld, whose son was killed when they were about 75 and 71, respectively); *Selig*, 573 F. Supp. 3d at 67 (awarding $5 million each to Anthony and Barbara

### i.    Nancy Ann Morgado

Nancy Ann Morgado is Travis Morgado's stepmother and the functional equivalent of Travis' biological mother.  N. Morgado Decl. ¶¶ 3, 5.   Nancy met Travis in 1999 when she started dating his father.  *Id.* ¶ 5.  Travis was 12 years old.  *Id.*  Nancy married Travis' father in 2001 when Travis was 14 years old.  *Id.*  Nancy had a strong relationship with Travis before he died.  *Id.*  Travis lived with Nancy and his father during summers, Christmas breaks, and spring breaks, and eventually moved in with them permanently after high school graduation.  *Id.*  Nancy considers Travis to be her son and considers her other children to be his siblings.  *Id.*  Nancy did not have any children before marrying Travis' father, but motherhood came easy with Travis as a son.  *Id.* ¶ 5.  Travis would talk to Nancy about everything—school, family, his hobbies, and his goal of becoming an engineer.  *Id.*  They enjoyed cooking dinner together, playing board games, and going on adventures.  *Id.* ¶ 6.  Whenever they spent time together after being apart, it was like no time had passed.  *Id.*  When he was not living with Nancy, he would call often to talk about what was happening in their lives.  *Id.* ¶ 5.  The way that Nancy and Travis treated each other as mother and son demonstrates that they are the "functional equivalent" of immediate family members.  *See Heiser*, 659 F. Supp. 2d at 29; *Fritz*, 324 F. Supp. 3d at 63.

Nancy experienced the anguish and grief that any parent would when she lost her son.  N. Morgado Decl. ¶¶ 7-14.  The day she learned of his death is ingrained in her memory.  *Id.* ¶ 7.  She looked out her door to see two soldiers in uniform and broke down crying.  *Id.*  They told her they could not reveal any information until Travis' father returned home but she knew Travis was gone.  *Id.*  She took several weeks off from work after Travis' death.  *Id.* ¶ 10.  She felt

---

Kantor, whose daughter was killed when she was 46-years-old, suggesting both of her parents were at least in their sixties).

depressed and in a fog.  *Id.* ¶ 11.  She could not sleep.  *Id.* ¶ 10.  She "lost interest in the activities she used to enjoy [and] felt angry at the world."  *Id.* ¶ 11.  Nancy is now always worried that something bad will happen to her family.  *Id.*  Nancy has self-medicated with alcohol and sleeping aides.  *Id.* ¶ 10.  Nancy, her husband, and her daughter all struggled with Travis' death and attended family therapy, but Nancy and her family are still in so much pain.  *Id.* ¶¶ 12-13.  Nancy believes that the despair that she experienced on the day of Travis' death will never subside.  *Id.*  ¶ 14.

### ii.    Sandra Lee Hackenberg

Sandra Lee Hackenberg adopted SGT Thomas "Tommy" Baysore, Jr., when he was three years old.  S. Hackenberg Decl. ¶ 3.  He was part of the family from the start.  *Id.* ¶ 5.  One of things she misses most about him is his hugs.  *Id.*  When he was little, he would give a big squeeze and as he got older, he would sometimes lift Sandra in the air.  *Id.*  When Tommy was young, he and Sandra would always tell each other how much they loved each other.  *Id.* ¶ 5.  Sandra and Tommy's father divorced when Tommy was sixteen, and Tommy primarily lived with his father because Sandra could not afford an apartment large enough for her and Tommy; but Sandra lived nearby so Tommy would visit often.  *Id.* ¶ 9.  She can still picture Tommy waiting at her doorstep.  *Id.*

When Sandra heard that Tommy had been killed, she insisted again and again that someone made a terrible mistake.  *Id.* ¶ 11.  When she saw an Army vehicle outside her home, she started crying hysterically.  *Id.*  She could not hear what the officers were telling her.  *Id.*  A few months later, she had a heart attack that she attributes to the stress and pain she was experiencing.  *Id.* ¶ 12.  Since then, Sandra has struggled to focus at work or complete basic household tasks.  *Id.* ¶¶14-15.  She was diagnosed with depression because of the attack and

31

takes antidepression medication every day.  *Id.* ¶ 12.  She does not believe she will ever fully recover from Tommy's death.  *Id.* ¶ 18.

### iii.    Letha and Ronnie Dodge

Letha and Ronnie Dodge are Corey James Dodge's parents.  L. Dodge Decl. ¶ 3; R. Dodge Decl. ¶ 2.  Letha and Ronnie each had a strong relationship with their son.  L. Dodge Decl. ¶ 5; R. Dodge Decl. ¶ 4.  Letha remembers Corey as a sweet child.  L. Dodge Decl. ¶ 5.  While Corey was young, Letha once tried to take a job down the street from their home, but she could not bear being away from her children.  *Id.*  Ronnie relishes memories of fishing with Corey, laughing when Corey thought he caught a huge fish, but it was really just a bundle of weeds.  R. Dodge Decl. ¶ 4.  When Corey got older, he stayed close to his parents, and turned to them for advice, especially his mother's.  L. Dodge Decl. ¶ 6; R. Dodge Decl. ¶ 4.  Corey told his father once that he did not know what to do with his life.  R. Dodge Decl. ¶ 4.  He followed Ronnie's advice to attend the police academy and work towards becoming a state trooper.  *Id.*

Letha was at a church picnic when she learned her son had been killed.  L. Dodge Decl. ¶ 7.  She fell to her knees and screamed.  *Id.*  Letha had begged her son not to go to Afghanistan.  *Id.*  Ronnie was at a veteran's car show when he heard.  R. Dodge Decl. ¶ 5.  He told his fellow veterans the news and struggled to drive home while his tears blurred his vision.  *Id.*  Letha and Ronnie have both struggled to recover from their son's death.  L. Dodge Decl. ¶¶ 9-10; R. Dodge Decl. ¶¶ 6-8.  Ronnie thinks about his son's death often.  R. Dodge Decl. ¶ 6.  He says that while his wife can burst into tears, he cries on the inside to avoid upsetting his family.  *Id.*  He regrets not being able to see his son continue to live his life.  *Id.* ¶ 7.  Letha finds that she is not interested in anything she used to enjoy and she does not often leave her house.  L. Dodge Decl. ¶ 9.  She saw a doctor about her grief but did not want to take medication.  *Id.*  She believes in

talking with God, *id.*, whom she believes will steer her straight, but she remains heartbroken. *Id.* ¶¶ 9-10.

These plaintiffs all had a close relationship with their child and suffered immensely due to the terrorist attack that killed their child. Awards of $5 million each for Nancy Ann Morgado, Sandra Lee Hackenberg, Letha Dodge, and Ronnie Dodge are appropriate in this case.

### c.    *Siblings*

Plaintiffs request solatium awards of $2.5 million each for Hollie Towle, Tammy Bowden, Jennifer Mabus, and Monica Smith, because each of them lost a sibling in a terrorist attack. *See*, *e.g.*, *Valore*, 700 F. Supp. 2d at 85. Plaintiffs also request solatium awards of $1.25 million each for Deborah Trimble and Anthony Trimble whose brother, PVT First Class Kevin Trimble, was wounded in a terrorist attack. *Id.*

### i.    Hollie Towle

Hollie Towle is Corey Dodge's sister. H. Towle Decl. ¶ 3. Hollie and Corey had a close relationship throughout Corey's life. *Id.* ¶ 5. Hollie remembers Corey fondly as a class clown and the baby of the family. *Id.* When she thinks of Corey, she remembers singing country music with him and their siblings in the backseat of their father's car. *Id.* She remembers Corey scaring her with turtles and garden snakes he found in their backyard. *Id.* As they grew older, Hollie and Corey stayed close. *Id.* ¶ 6. Hollie remembers Corey coming home from Afghanistan and making the whole family laugh. *Id.* She misses those days now. *Id.*

The day Hollie learned of the attack will be seared in her memory forever. *Id.* ¶ 7. When Hollie's daughter called her to say Corey had been killed, Hollie dropped the phone and ran down the hallway screaming. *Id.* It took ten days for the family to receive Corey's body and make funeral arrangements. *Id.* That time was very difficult for Hollie. *Id.* Hollie started having panic attacks after her brother's attack and had to take medication to be able to go to

work.  *Id.* ¶ 8.  Hollie continues to struggle with her grief, but she hides her pain and emotions because she feels that she needs to stay strong for her family, especially her parents, so she often cries and mourns alone.  *Id.* ¶ 9.  Hollie still talks to Corey and visits his grave often.  *Id.* ¶ 8. Though Hollie's pain has eased a bit, she believes it will always remain with her.  *Id.*

### ii.    **Tammy Bowden**

Tammy Bowden is Corey Doge's sister.  T. Bowden Decl. ¶ 3.  Tammy and Corey had a close relationship throughout Corey's life.  *Id.* ¶ 5.  Indeed, Tammy named her son after Corey. *Id.* ¶ 6.  When she told Corey that she was naming her son after him, he was honored.  *Id.*  Their family was extremely closeknit, and Tammy was always protective of Corey as her younger brother.  *Id.* ¶ 5.  All the kids would play outside all the time during their childhood.  *Id.*  If she ever saw someone picking on Corey, she would not hesitate to tell them to leave her baby brother alone.  *Id.*  She would take Corey to and from his friends' houses and karate classes.  *Id.*  Once they were older, she dropped Corey off at the airport when he started his service.  *Id.*  Tammy has fond memories of her brother, joking around while also being generous with his time and money, making sure his family was loved and cared for.  *Id.* ¶ 6.  She was proud when Corey became a father, and she saw him start to grow into a new role.  *Id.*

When Tammy's mother called her to tell her about Corey's death, Tammy immediately let out horrifying, ear-piercing screams.  *Id.* ¶ 7.  She sat on her deck exactly where she was when she received the call, unable to move.  *Id.*  She could not work for two years after her brother's death.  *Id.* ¶ 8.  She could not bear to get out of bed and get herself ready for the day. *Id.*  This meant all the financial responsibilities fell on her husband, which made things difficult for her family.  *Id.*  She had trouble sleeping and started having panic attacks.  *Id.*  She still does not sleep well because she is haunted by her brother's passing.  *Id.* ¶ 9.  She was prescribed medications to help with the panic attacks and depression that set in after the attack.  *Id.*  Tammy

has also had a front row seat to her parents' grief and watching them deal with this ongoing pain and how it ages them, is painful for her and complicates her own grieving process. *Id.* ¶ 8. She still feels as if she learned about her brother's attack just yesterday. *Id.* ¶ 9.

### iii.    Jennifer Mabus

Jennifer Mabus is SGT Thomas "Tommy" Baysore, Jr.'s adoptive sister. J. Mabus Decl. ¶ 3. Her parents adopted Tommy when he was just three years old because he had experienced severe abuse at the hands of his biological parents. *Id.* ¶ 5. Jennifer was thirteen. *Id.* Jennifer loved her brother from the first day she met him. *Id.* He felt like a brother to her even before his official adoption. *Id.* ¶ 6. He was a huge part of her life. *Id.* When they were young, Jennifer and her other siblings took Tommy everywhere they went. *Id.* Jennifer taught Tommy how to ride a bike and would go to his soccer games. *Id.* The whole family loved spending time together. *Id.* ¶ 5. They even took a family cross-country road trip from San Diego to Connecticut. *Id.* ¶ 6. When Tommy was seventeen, he spent about a year living with Jennifer, her husband, and their children and they became even closer during this time. *Id.* ¶ 8.

When Jennifer's sister called to tell her that Tommy had been killed, she was shocked. *Id.* ¶ 9. She could hardly understand what her sister was saying. *Id.* Jennifer was tasked with telling her older sister and parents about Tommy's death. *Id.* ¶¶ 9-10. She says telling her father that her brother had died was the hardest thing she has ever done. *Id*. ¶ 10. At the time, Jennifer had not yet told anyone that she was pregnant with her fifth child and there were complications with the pregnancy. *Id.* ¶ 9. It was so difficult for her to have this exciting news mixed with the tragic death of her brother. *Id.* Now when she sleeps, she has nightmares about how Tommy died. *Id.* ¶ 12. When she is awake, she wonders what would have become of her beloved brother's life. *Id.* Since Tommy died, she has not seen Tommy's son and she is devastated by that estrangement. *Id.* ¶ 13.

35

### iv.    Monica Smith

Monica Smith is PVT First Class Devon Harris's half-sister.  M. Smith Decl. ¶ 3.  She was fifteen when Devon was born so she often acted as the caretaker for Devon and their other siblings.  *Id.* ¶ 5.  She read to them, played with them, and changed their diapers.  *Id.*  Monica and Devon became closer as they grew older.  *Id.* ¶ 7.  It became easier for them to relate to one another and Devon began to see Monica as a sister more than a babysitter.  *Id.*  Monica often invited Devon to visit her at home and at her job.  *Id.*  During those visits, he met Monica's children and now ex-husband and confided in Monica about his experience in college and his decision to join the service.  M. Smith Decl. ¶¶ 7-8.

When Monica learned that her brother had been killed, she was in a state of quiet shock until, suddenly, all her emotions took over.  *Id.* ¶ 9.  For days after learning of his death she was unable to eat.  *Id.*  She could not sleep until after Devon's funeral.  *Id.*  Arranging the funeral was emotionally draining.  *Id.* ¶ 10.  For a year after Devon's death, Monica's boss would often send her home from school, where she worked as a counselor, because she was unable to stop crying and focus.  *Id.* ¶ 11.  Monica relies on her family and friends to avoid feeling hopeless and believes Devon would not want her to feel that way. *Id.* ¶ 12.  Still, she struggles to do her job, counseling children on their futures when her brother never had one.  *Id.*  She feels like a piece of herself is gone forever.  *Id.*

### v.    Deborah Trimble

Deborah Trimble is PVT First Class Kevin Trimble's sister.  D. Trimble Decl. ¶ 2. She had a loving relationship with Kevin growing up.  *Id.* ¶ 4.  Deborah remembers fondly taking care of her little brother when they were growing up.  *Id.*  She tutored him, taught him to drive, cook, and clean.  *Id.*  She treasures her memories of hiking and building campgrounds and log cabins with her brother.  *Id.*

When Kevin was injured in an IED blast attack, Deborah was 28 years old.  *Id.* ¶ 3.  She learned the details of his injuries by piecing together information from different phone calls from the Army.  *Id.* ¶ 5.  Initially, Deborah learned that Kevin suffered severe trauma and had a broken neck.  *Id.*  She had to be the one to call her parents and sister and tell them the news.  *Id.*  It was painful for her.  *Id.*  In the early days of Kevin's recovery, Deborah would visit Kevin in the hospital every day, and it was horrible for her to watch her brother in so much pain.  *Id.* ¶ 6.

According to Deborah, as a young, strong independent man, Kevin struggled to admit that he needed his family, which put a strain on their relationship.  *Id.* ¶ 9.  He was angry and that anger turned to despondence.  *Id.*  He considered and attempted suicide multiple times.  *Id.*  Deborah painfully recalls Kevin calling her and telling her that he wanted to take his life.  *Id.*  At the time, no family member lived near Kevin, and he did not have friends nearby, so Deborah had no one to call to go check on him.  *Id.*  She would have to stay on the phone with him, talking him through his horrible thoughts, hoping he would not take any action.  *Id.*  Seeing her once goal-oriented brother struggle this way made Deborah feel hopeless.  *Id.*

Caring for Kevin took a toll on the family.  *Id.* ¶ 7.  Deborah had to be Kevin's primary caretaker.  *Id.*  Deborah felt she had to step into the maternal role for her family.  *Id.*  Because of all the time she had to spend traveling between school and caring for Kevin, she had to drop out of school. *Id.* ¶ 8.  She missed about a year of school and had to go part-time for a semester while caring for her brother.  *Id.*  Deborah experienced insomnia, overwhelming anxiety, depression, and helplessness, sought counseling, and was prescribed an antidepressant because of the attack.  *Id.* ¶ 10.

### vi.    Anthony Trimble

Anthony Trimble is PVT First Class Kevin Trimble's brother.  A. Trimble Decl. ¶ 2. While growing up, they loved to bike around their neighborhood and feed the geese in a nearby

pond. *Id.* ¶ 4. They would often climb the biggest tree in their backyard and, looking over their

neighborhood, talk about their dreams and secrets. *Id.*

When Kevin was injured in an IED blast attack, Anthony was just 20 years old. *Id.* ¶ 3.

Anthony learned of his injuries piecemeal. *Id.* ¶ 5. Anthony first learned that Kevin lost a foot,

the next day he learned that Kevin had lost a hand. *Id.* Each time the Army called, the news was

worse. *Id.* Anthony had little hope that Kevin would survive. *Id.* Anthony was shocked and

devastated by the details, but nothing could prepare him for seeing Kevin in the ICU he was

covered in bandages, hoses, and cables and he had ghostly white skin. *Id.* There were several

panicked rushes into surgeries and every time Kevin regained consciousness, a crushing wave of

pain would overwhelm him. *Id.* ¶ 6. The sight of his little brother desperately reaching for the

Dilaudid drip to stop the pain is seared into Anthony's brain. *Id.*

Anthony says that Kevin pushed away the people who cared about him most. *Id.* ¶ 7.

Anthony remembers Kevin using alcohol and drugs to deal with the pain and shock of this

dramatic life-changing event. *Id.* ¶ 8. He would call Anthony late at night telling Anthony he

was sitting outside a bar with a weapon wondering whether he could go on with his life this way.

*Id.* It was painful and scary for Anthony to know his brother needed help and because he was

not a therapist, could only hope he was saying the right thing to support his brother in those

moments. *Id.*

Anthony left his job and college for months to stay with Kevin at the hospital, which

negatively impacted his education and career. *Id.* Anthony lost over half of his college

scholarship because he had to take a leave of absence to be with Kevin after the attack. *Id.* He

was also absent from critical training in the Marine Corps Reserve which limited his

opportunities for promotion. *Id.*

Anthony says that the attack deeply affected his family.  *Id.* ¶ 10.  Anthony deeply regrets that he did not seek professional help in the months following the attack when he felt a deep sense of helplessness and despair.  *Id.* ¶ 9.  He since has, but he still feels a permanent sense of unease and anxiety that anything could happen to him or his loved ones at any moment.  *Id.* ¶ 10. He feels guilty that he can walk and run while his brother is in so much pain and has to live with a disability.  *Id.* ¶ 9.

Hollie Towle, Tammy Bowden, Jennifer Mabus, Monica Smith, Deborah Trimble, and Anthony Trimble all had a close relationship with their sibling and suffered immensely due to the terrorist attacks.  Awards of $2,500,000 each for Hollie Towle, Tammy Bowden, Jennifer Mabus, and Monica Smith, and $1,250,000 each for Deborah Trimble and Anthony Trimble, are appropriate in this case.

### 2.  *Prejudgment Interest*

Courts have "discretion, subject to equitable considerations," to award prejudgment interest on compensatory damages, and the Court should do so here.[16]  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 58 (D.D.C. 2012) ("*Oveissi II*").  As courts in other § 1605A(c) cases have explained, "an award of prejudgment interest here is appropriate" because "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks."  *Ewan*, 466 F. Supp. 3d at 250 (quoting *Khaliq v. Republic of Sudan*,

---

[16] Should Plaintiffs succeed in their claims, Plaintiffs anticipate recovering a portion of any final compensatory damages award from the United States Victims of State Sponsored Terrorism Fund.  But the Fund does not allow the recovery of prejudgment interest or punitive damages.  *See* 34 U.S.C. § 20144(j)(3) ("The term 'compensatory damages' does not include pre-judgment or post-judgment interest or punitive damages.").  Because the Fund offers Plaintiffs the only realistic near-term prospect for collecting on any judgment against Iran, they do not expect to collect prejudgment interest or punitive damages.  Thus, from Plaintiffs' perspective, the compensatory-damages figures are by far the most important part of any award, and the theoretical availability of prejudgment interest or punitive damages should not dissuade the Court from awarding Plaintiffs the full amount of compensatory damages to which they are entitled.

33 F. Supp. 3d 29, 34 (D.D.C. 2014). Because "solatium is a payment that treats the loss of a close family member as a harm that arises at the moment of the tort," Plaintiffs should receive prejudgment interest to account for the delay as part of full compensation. *Fritz*, 324 F. Supp. 3d at 64. Prejudgment interest also prevents defendants from "profit[ing] from the use of the money" since the attack. *Est. of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013). The Court should thus award prejudgment interest on all awards here.

The D.C. Circuit has approved calculating prejudgment interest using the prime rate, reasoning that it is "*more* appropriate" than the Treasury Bill rate because it is "a market-based estimate" of what the victim would have had to pay to borrow the money. *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450-51 (D.C. Cir. 1996) (emphasis in original). Using "the prime rate for each year between the [attack] and the entry of judgment" results in a more precise award than alternative calculation methods. *Id.* The *Cabrera* court previously calculated the appropriate multiplier for compensatory damages awards in FSIA cases using the Federal Reserve's data for the average annual prime rate each year, which is available on the Federal Reserve's website. Bellwether Op. at *55. Using this data and the process, Plaintiffs have calculated the below multipliers to determine the full compensatory damages awards for the 14 bellwether plaintiffs with damages claims currently before the Court.[17]

---

[17] *See* Declaration of Andrew R. Dunlap (Oct. 15, 2024) (describing calculation method and attaching spreadsheet supporting calculations), accompanying this Motion.

### 3. *Punitive Damages*

The Court should also award Plaintiffs punitive damages against Iran, as authorized by § 1605A(c),[18] "to punish and deter Iran from its increasing support of terrorism." *Valore*, 700 F. Supp. 2d at 90.

Courts calculate the appropriate punitive damages award based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Oveissi II*, 879 F. Supp. 2d at 56 (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)). All four factors support awarding punitive damages here. *First*, Iran provided material support to the Syndicate's terrorist campaign, which included many heinous terrorist attacks on American service members and civilians serving their country in Afghanistan, and Iran has a "demonstrated policy" of funding these terrorist campaigns. *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C. 2003). *Second*, Iran intentionally caused Plaintiffs' severe physical and psychological trauma—Iran's goal in supporting the members of the Taliban-led Syndicate was to cause terrorist attacks that maim and kill Americans. *See supra* Part IV. Other courts in this District have recognized that "Iran's intention, in supporting terrorist groups such as the one involved here, is to create maximum harm through terrorist acts." *Acosta*, 574 F. Supp. 2d at 31. *Third*, given Iran's repeated support for anti-American terrorist groups, "only a large punitive damage award will serve as an effective deterrent against future terrorist acts." *Id.* *Fourth*, as numerous courts in this District

---

[18] Much of Iran's support for the Taliban occurred after § 1605A was enacted in 2008, but "punitive damages are . . . available regardless of the year Iran provided support to the Syndicate." Bellwether Op. at *56 n.47.

have found, "Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism." *Oveissi II*, 879 F. Supp. 2d at 56.

      Courts in this District have calculated punitive damages awards using different methods. At first, courts tended to calculate punitive damages as a multiplier of "Iran's annual expenditures on terrorist activities." *Valore*, 700 F. Supp. 2d at 88; *see also Doe*, 943 F. Supp. 2d at 190. But courts struggled with how to award punitive damages in subsequent cases involving the same conduct and different plaintiffs. *See Doe*, 943 F. Supp. 2d at 190. More recently, courts in this District have awarded "punitive damages in an amount equal to the total compensatory damages awarded in [each] case." *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 273 (D.D.C. 2020). "An amount of punitive damages equal to compensatory damages . . . is commensurate with the character of Defendants' acts and the nature and extent of the harm caused." *Selig*, 573 F. Supp. 3d at 77; *see also Fritz*, 324 F. Supp. 3d at 65 (applying a "multiplier of two" to the compensatory damages). The multiplier approach "has the virtue of straightforwardly scaling as additional sets of plaintiffs come forward—punitive damages will continue to grow as the full scope of the harm done by Iran's material support [for the Syndicate] becomes evident." *Sheikh*, 485 F. Supp. 3d at 273. Punitive damages based on compensatory damages are calculated "by reference to the entire compensatory award," including prejudgment interest. *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 98 (D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens I*, 864 F.3d 751; *see also Ewan*, 466 F. Supp. 3d at 252 n.4.

      Plaintiffs thus request that the Court award punitive damages in an amount equal to the total compensatory damages award under § 1605A(c) as outlined in Part V.C.1 above, thereby deterring Iran's further support of terrorist organizations like the Taliban-led Syndicate.

| Plaintiff | Solatium Damages | Solatium Damages with Pre-Judgment Interest | Punitive Damages | Total Damages (Solatium with Pre-Judgment Interest + Punitive) |
|---|---|---|---|---|
| Plaintiff D.C. | $6,250,000 | $10,212,937.46 | $10,212,937.46 | $20,425,874.92 |
| Plaintiff M.C. | $6,250,000 | $10,212,937.46 | $10,212,937.46 | $20,425,874.92 |
| Connor Larson | $6,250,000 | $9,488,078.95 | $9,488,078.95 | $18,976,157.90 |
| Samantha Ulrich | $5,000,000 | $7,590,463.16 | $7,590,463.16 | $15,180,926.32 |
| Sandra Lee Hackenberg | $5,000,000 | $8,067,804.66 | $8,067,804.66 | $16,135,609.32 |
| Nancy Ann Morgado | $5,000,000 | $8,421,719.56 | $8,421,719.56 | $16,843,439.12 |
| Letha Dodge | $5,000,000 | $7,590,463.16 | $7,590,463.16 | $15,180,926.32 |
| Ronnie Dodge | $5,000,000 | $7,590,463.16 | $7,590,463.16 | $15,180,926.32 |
| Hollie Towle | $2,500,000 | $3,795,231.58 | $3,795,231.58 | $7,590,463.16 |
| Tammy Bowden | $2,500,000 | $3,795,231.58 | $3,795,231.58 | $7,590,463.16 |
| Jennifer Mabus | $2,500,000 | $4,033,902.33 | $4,033,902.33 | $8,067,804.66 |
| Monica Smith | $2,500,000 | $4,415,885.09 | $4,415,885.09 | $8,831,770.18 |
| Deborah Trimble | $1,250,000 | $2,151,723.10 | $2,151,723.10 | $4,303,446.00 |
| Anthony Trimble | $1,250,000 | $2,151,723.10 | $2,151,723.10 | $4,303,446.20 |
| **Total** | $56,250,000 | $92,693,142.22 | $92,693,142.22 | $185,386,284.84 |

## VI.    MISCELLANEOUS ITEMS

Should the Court enter any default judgment in favor of Plaintiffs, Plaintiffs suggest that the Court take three actions:  (1) enter partial final judgment according to Federal Rule of Civil Procedure Rule 54(b); (2) designate any orders resolving claims as being the final "default judgment" to be served on Iran in accordance with 28 U.S.C. § 1608(e); and (3) order service through the U.S. Department of State in accordance with 28 U.S.C. § 1608(a)(4).  Each of these requests follows actions taken by Judge Bates in *Cabrera*.  *See*, *e.g.*, *Cabrera* Dkt. 264 at 20-21.

*First*, Plaintiffs request that the Court issue rolling final judgments under Federal Rule of Civil Procedure 54(b).  Rule 54(b) provides that, "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all . . . parties only if the court expressly determines that there is no just reason for delay."  Fed. R. Civ. P. 54(b).  There is

no just reason for delay here.  Because Iran is an absent defendant, it will not be prejudiced by "staggered appeals or the like."  *Sheikh*, 485 F. Supp. 3d at 274.  Each Plaintiff's claim stands or falls on its own.  And by issuing rolling final judgments, the Court would help ensure that Plaintiffs whose claims the Court has considered are able to apply to the U.S. Victims of State Sponsored Fund as quickly as possible, increasing their chance of receiving payment if a payment cycle is announced.

*Second*, Plaintiffs request that the Court designate any order resolving the claims of any Plaintiff as the final "default judgment" to be served on Iran under 28 U.S.C. § 1608(e). Designating the order as the final default judgment for service under § 1608(e) would eliminate the need for the Clerk to enter individual judgment forms for each Plaintiff, thereby reducing the burden on the Clerk, streamlining the number of entries on the docket, and allowing Plaintiffs to initiate service earlier.

*Third*, Plaintiffs request that the Court order service of each forthcoming default judgment through the U.S. Department of State under 28 U.S.C. § 1608(a)(4).  Section 1608(e) requires service of a default judgment "in the manner prescribed for service in this section." Service of a complaint and summons on a foreign sovereign generally requires moving sequentially through the three service methods before pursuing service through the State Department under 28 U.S.C. § 1608(a)(4).  *See*, *e.g.*, *Panahi*, 2020 WL 6591425, at *5. However, the Attorney Manual for Service of Process on a Foreign Defendant for this District indicates that the Court "should state specifically which rule to follow" in serving a default judgment.[19]  Similarly, the State Department explains:

---

[19] *See* D.D.C., Att'y Manual for Service of Process on a Foreign Def. (Pursuant to Fed. R. Civ. P. 4 and the FSIA) at 18 (Rev. Dec. 2021), https://www.dcd.uscourts.gov/sites/dcd/files/AttyManualForeignMlg2021.pdf (last visited Oct. 15, 2024).

> As a practical matter, if service has been attempted in accordance with the hierarchical methods set forth in Section 1608(a)(1)-(3) in the initial phase of the action (i.e. service of process) without success, necessitating service through diplomatic channels, under Section 1608(a)(4), when service of a default judgment on the foreign state becomes necessary, the Department of State will accept a request for service through diplomatic channels without plaintiffs repeating efforts at service under Section 1608(a)(1)-1608(a)(3).[20]

Plaintiffs have attempted to serve their complaint under § 1608(a)(3); that attempt failed. *See* Dkt. 18-1 at 1.  Requiring Plaintiffs to continue sending future judgments to Iran by mail would be futile.  It also is unnecessary under the statute, which allows for diplomatic service once it is clear that "service cannot be made within 30 days" by mail.  28 U.S.C. § 1608(a)(4).  An order allowing immediate diplomatic service would also comply with the Attorney Manual in this District and would track the State Department's existing guidance.  And it would serve the interests of justice by reducing the time required to serve Iran by 30 days—thereby allowing meritorious claims to enter the Fund more quickly.  Accordingly, Plaintiffs request that the Court issue an order allowing Plaintiffs to proceed directly to diplomatic service for any future final judgment the Court issues on the Tranche 1 Plaintiffs.

Plaintiffs have proposed language implementing each of these three items in the contemporaneously filed Proposed Order.  The proposed language follows that used by Judge Bates in *Cabrera*.  *See*, *e.g.*, *Cabrera* Dkt. 264 at 20-21.

## VII.    CONCLUSION

The Court should find Iran liable for each of the 27 attacks discussed above and enter damages awards for each of the 14 bellwether plaintiffs who have presented evidence of eligibility and damages to the Court in the amounts requested above.

---

[20] U.S. Dep't of State—Bureau of Consular Affairs, *Foreign Sovereign Immunities Act*, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Service-of-Process/Foreign-Sovereign-Immunities-Act.html (last visited Oct. 15, 2024).

Dated:  October 15, 2024

Respectfully submitted,

*/s/ Grace W. Knofczynski*
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 1500407)
James A. Ruck (D.C. Bar No. 1739309)
Chase H. Robinett (D.C. Bar No. 90008072)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
jruck@kellogghansen.com
crobinett@kellogghansen.com

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

Andrew R. Dunlap (*pro hac vice*)
Will Rathgeber (*pro hac vice*)
Esther D. Ness (*pro hac vice*)
Selendy Gay PLLC
1290 Avenue of the Americas
New York, N.Y. 10104
Tel:  (212) 390-9363
adunlap@selendygay.com
wrathgeber@selendygay.com
eness@selendygay.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of October, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Grace W. Knofczynski*
Grace W. Knofczynski
