**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
AMANDA ADAMKAVICIUS, *et al.*,   )
                                )
            Plaintiffs,          )
                                )
        v.                       )        Civil Action No. 23-3571 (ABJ)
                                )
ISLAMIC REPUBLIC OF IRAN,        )
                                )
            Defendant.           )
_____ )


## <u>MEMORANDUM OPINION</u>

BACKGROUND ......................................................................................................... 4

THE APPLICABLE LEGAL STANDARDS .......................................................... 5

   I.   Personal Jurisdiction. ................................................................................ 6

   II.   Subject Matter Jurisdiction. ..................................................................... 7

   III.   Judicial Notice. ........................................................................................ 8

FINDINGS OF FACT ............................................................................................. 11

   I.   The Taliban-Led Syndicate. .................................................................. 11

     A.   The Taliban .......................................................................... 12

     B.   The Haqqani Network ......................................................... 14

     C.   The Kabul Attack Network .................................................. 15

     D.   Al-Qaeda .............................................................................. 15

   II.   Iran's Support for the Taliban-Led Syndicate. .................................... 16

III.    The Taliban-led Syndicate's Areas of Operational Dominance. .................................. 18

    A.    Southern Afghanistan ........................................................................................... 19

    B.    Loya Paktia ........................................................................................................... 19

    C.    Kabul Province ...................................................................................................... 20

    D.    Eastern Afghanistan/"N2KL" ............................................................................... 20

    E.    North Central Afghanistan .................................................................................... 21

    F.    Western Afghanistan ............................................................................................. 21

    G.    Southeastern Afghanistan ..................................................................................... 21

IV.    The Attacks in This Case. .............................................................................................. 22

    A.    May 4, 2013 IED Attack in Kandahar Province. .................................................. 22

    B.    August 22, 2015 Suicide Bombing Attack in Kabul............................................. 23

    C.    September 26, 2013 Insider Attack in Paktia Province. ........................................ 24

    D.    November 27, 2010 RPG Attack in Wardak Province. ......................................... 25

    E.    September 18, 2011 IED Attack in Panjwai District. ............................................ 27

    F.    May 23, 2012 IED Attack in Kandahar Province. ................................................ 27

    G.    August 6, 2011 Anti-Aircraft Attack in Tangi Valley, Kandahar Province. ......... 28

    H.    October 29, 2011 Suicide Bombing in Kabul City, Kabul Province. .................... 30

    I.    May 30, 2007 Anti-Aircraft Attack in Upper Sangin Valley, Helmand Province........ 31

    J.    July 23, 2007 IED Attack in Sarobi District, Paktika Province.................................... 32

    K.    August 1, 2008 IED Attack in Kunar Province. ................................................... 33

L.    March 30, 2010 IED Attack, Kandahar Province. ........................................................ 34

M.    June 7, 2010 IED Attack in Dangam, Kunar Province. ............................................ 35

N.    June 25, 2010 Complex Attack in Kunar Province ................................................... 36

O.    October 4, 2010 IED Attack in Kandahar Province. ................................................. 37

P.    February 17, 2011 IED Attack in Helman Province. ................................................ 38

Q.    February 28, 2011 IED Attack in Wardak Province. ................................................ 39

R.    April 27, 2011 Insider Attack in Kabul Province. .................................................... 40

S.    September 25, 2011 IED Attack in Mehtar Lam, Laghman Province. ....................... 42

T.    August 16, 2012 Attack on Helicopter in Shah Wali Kot, Kandahar Province. ........... 43

U.    September 14–15, 2012 Complex Attack in Helmand Province. ............................... 44

V.    July 23, 2013 Suicide Attack in Wardak Province. .................................................. 45

W.    August 12, 2013 IED Attack in Logar Province. ...................................................... 47

X.    October 5, 2013 IED Attack in Kandahar Province. ................................................. 48

Y.    February 10, 2014 Suicide Attack in Kabul ............................................................. 49

Z.    February 15, 2014 Complex Attack in Helmand Province. ....................................... 50

AA.    November 12, 2016 Suicide Attack in Bagram, Parwan Province. .......................... 52

ANALYSIS ............................................................................................................................... 53

I.    Personal Jurisdiction. ................................................................................................... 53

A.    Service Under § 1608(a)(3). ................................................................................... 54

B.    Service Under § 1608(a)(4) ..................................................................................... 55

II.    Subject Matter Jurisdiction. ........................................................................... 57

III.    Plaintiffs Have Properly Alleged Causes of Action. .................................................. 60

IV.    Damages.................................................................................................. 61

    A.    Solatium ............................................................................................ 61

    B.    Pre-Judgment Interest ............................................................................ 65

    C.    Punitive Damages ................................................................................. 67

CONCLUSION.................................................................................................. 69

## BACKGROUND

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, "establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . [but] that grant of immunity is subject to a number of exceptions." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  One of these exceptions, known as the "state-sponsored terrorism exception," denies the protection of sovereign immunity to countries that provide material support to terrorist organizations. *See* 28 U.S.C. § 1605A. Plaintiffs have brought this case under that exception. *See* Compl. ¶¶ 946–53.  They have sued the Islamic Republic of Iran seeking compensatory and punitive damages for injuries and losses they sustained as a result of 27 terrorist actions in Afghanistan, and they allege that Iran provided material support and resources to the terrorist organizations that perpetrated the attacks. *See generally* Compl.

Because Iran did not respond, plaintiffs have filed a motion for default judgment. *See* Mot. for Default J. [Dkt. #34] ("Pls.' Mot."); Mem. in Supp. of Mot. for Default J. [Dkt. # 34-1] ("Pls.' Mem.").  They rely heavily on the decision issued by another court in this district in *Cabrera v.*

*Islamic Republic of Iran*, No. 19-cv-3835, 2022 WL 2817730 (D.D.C. July 19, 2022), which arose out of a series of terrorist incidents in Afghanistan.  *Id.* at *1.  In that case, the court held that Iran provided material support for a Taliban-led syndicate, *id.* at *57, and it found Iran liable under the FSIA for numerous attacks, *id.*, 27 of which are the focus of this litigation.  Pls.' Mot. at 1.

Plaintiffs seek judgment in their favor for injuries suffered as a result of this group of attacks, as well as an award of damages for 14 "bellwether" plaintiffs impacted by a subset of six of the attacks.  Pls.' Mem. at 1–2.

## THE APPLICABLE LEGAL STANDARDS

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).  And under Federal Rule 55(b)(2), the Court may consider entering default judgment when a party applies for that relief.  See Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor the resolution of genuine disputes on their merits," and, therefore, "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 832, 836 (D.C. Cir. 1980), quoting *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (internal quotation omitted).

When a default judgment is sought under the FSIA, a claimant must establish their claim or right to relief "by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  As the D.C. Circuit has explained, "the statute has always authorized the courts to enter default judgments against defendants who refuse to appear.  With these provisions, Congress aimed to prevent state sponsors of terrorism – entities particularly unlikely to submit to this country's laws – from escaping liability

for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), citing 28 U.S.C. § 1608(e).  But "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  Before the Court can enter default judgment, it must assure itself that plaintiffs have established that the Court has subject matter jurisdiction to hear the case and that it may exercise personal jurisdiction over the defendants.  *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014).

## I.    Personal Jurisdiction.

28 U.S.C. § 1330(b) states that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b); *see also Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) ("[T]o sue a foreign state . . ., a plaintiff must effect service in compliance with the Foreign Sovereign Immunities Act.").  Section 1608 provides "four methods of service in descending order of preference," *id.*, and the D.C. Circuit requires "strict adherence to the terms of [the Act]."  *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).  Under the FSIA:

> (a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:
>
>> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>>
>> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>>
>> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

> (4) if service cannot be made within 30 days under paragraph (3),
> by sending two copies of the summons and complaint and a notice
> of suit, together with a translation of each into the official language
> of the foreign state, by any form of mail requiring a signed receipt,
> to be addressed and dispatched by the clerk of the court to the
> Secretary of State in Washington, District of Columbia, to the
> attention of the Director of Special Consular Services – and the
> Secretary shall transmit one copy of the papers through diplomatic
> channels to the foreign state and shall send to the clerk of the court
> a certified copy of the diplomatic note indicating when the papers
> were transmitted.

28 U.S.C. § 1608(a).  To comply with section 1608, "a plaintiff must attempt service by the first

method (or determine that it is unavailable) before proceeding to the second method, and so on."

*Angellino v. Royal Family Al-Saud,* 688 F.3d 771, 773 (D.C. Cir. 2012), quoting *Ben–Rafael v.*

*Islamic Republic of Iran,* 540 F.Supp.2d 39, 52 (D.D.C. 2008) (internal quotation omitted).

## II.    Subject Matter Jurisdiction.

28 U.S.C. § 1330 provides that a district court has "original jurisdiction without regard to

amount in controversy of any nonjury civil action against a foreign state" as to any claim for relief

with respect to which the state is not entitled to immunity under the Foreign Sovereign Immunities

Act or pursuant to an international agreement.  28 U.S.C. § 1330(a).  The FSIA generally shields

foreign governments against civil suits, but it contains an exception to that immunity for acts of

terrorism.  That exception states:

> A foreign state shall not be immune from the jurisdiction of courts of the
> United States . . . in which money damages are sought against a foreign state
> for personal injury or death that was caused by an act of torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the provision of
> material support or resources for such an act if such act or provision of
> material support or resources is engaged in by an official, employee, or
> agent of such foreign state while acting within the scope of his or her office,
> employment, or agency.

28 U.S.C. § 1605A(a)(1).

If the claim involves one of the specified acts, to hear the case, the Court must also find that at the time of the act, "the foreign state was designated as a state sponsor of terrorism," and that the claimant or victim was – at the time of the attack – a U.S. national, a member of the armed forces, or a U.S. government employee or contractor. 28 U.S.C. § 1605A(a)(2).[1]  "Iran has been designated a state sponsor of terrorism since 1984," *Mohammadi*, 782 F.3d at 14, so plaintiffs meet the first criterion, and each plaintiff is a citizen of the United States, so they also satisfied the second.  It is necessary to delve into the facts underlying each death at issue in this case to determine whether Iran or its proxies were involved, and whether Iran provided the necessary material resources or support.

## III.    Judicial Notice.

Plaintiffs submit that this Court can and should take judicial notice of the facts established and findings made in *Cabrera* when determining whether they have properly pled all elements of a claim under § 1605A.  Pls.' Mot. at 1–2.

Courts in this district regularly take judicial notice of factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants, . . . even when those proceedings have taken place in front of a different judge."  *See Estate of Johnson v. Islamic Republic of Iran*, 2024 WL 3225954, at *2 (D.D.C. June 28, 2024), citing *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018), and *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d

---

1    The exception also requires a court to find that, "if 'the act occurred in the foreign state against which the claim has been brought,' the claimant gave the foreign state a 'reasonable opportunity' to arbitrate prior to filing a lawsuit."  *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1058 (D.C. Cir. 2024), citing 28 U.S.C. § 1605A(a)(2)(A)(iii).  Because the attack at issue in this case took place in Afghanistan, not Iran, this requirement does not apply.  *See Thole v. Islamic Republic of Iran*, No. CV 23-793, 2024 WL 2208208, at *10, n.7 (D.D.C. May 16, 2024) (finding "reasonable opportunity to arbitrate" requirement inapplicable where attack took place in Saudia Arabia, but FSIA claim was brought against Iran).

186, 191 (D.D.C. 2017).  As those courts have observed, "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'"  *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012), quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011), *vacated*, 2019 WL 8060796 (D.D.C. Sept. 11, 2019).  Applying that reasoning, courts routinely take judicial notice of evidence and findings of fact from previous cases establishing a defendant's liability for a particular terrorist attack.  *See, e.g.*, *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 25 (D.D.C. 2014); *Johnson*, 2024 WL 3225954, at *2; *Singer v. Islamic Republic of Iran*, 2024 WL 3026554, at *1 (D.D.C. June 17, 2024).  The Court finds those decisions to be instructive, and it will follow that approach here.

The *Cabrera* plaintiffs were American service members and civilians, who served in Afghanistan between 2006 and 2019, as well as a subset of their family members.  *Cabrera*, 2022 WL 2817730, at *1.  Like the plaintiffs here, they alleged that a terrorist syndicate comprised of, among other groups, al-Qaeda, the Taliban, and the Taliban's Haqqani Network perpetrated terrorist attacks against American service members and civilians in Afghanistan.  *Id.*  The *Cabrera* plaintiffs alleged that Iran provided material support for what they referred to as this "Taliban-led Syndicate," *id*. at *25, and they sought compensatory damages from Iran under the terrorism exception to the FSIA, 28 U.S.C. § 1605A.  *Id.* at *1.

After Iran was properly served and it defaulted, the court held a three-day evidentiary hearing in October 2021.  *Cabrera*, 2022 WL 2817730, at *1.  The *Cabrera* plaintiffs introduced extensive evidence about Iran's material support for the Taliban-led Syndicate, they detailed eleven "bellwether" attacks, and they presented claims on behalf of twenty-three "bellwether

plaintiffs," who were physically injured in the bellwether attacks or were family members of direct victims of the bellwether attacks. *Id.* at *1, *3.

The court heard from three expert witnesses and five fact witnesses. *Cabrera*, 2022 WL 2817730, at *3. The first expert witness was William F. Roggio, a senior fellow at the Foundation for Defense of Democracies, whom the court qualified as an expert "in the field of Middle Eastern terrorism." *Id.* at *3–4. The second was Dr. Colin Clarke, Ph.D., the Director of Policy and Research at an intelligence consulting firm, whom the court also qualified as an expert "in Middle Eastern terrorism." *Id.* And the third was Lt. Col. Steven Wood (Ret.), the Director of Corporate Development for Data Machines Corporation, an artificial intelligence company, who had served in the U.S. Army for 22 years. He was qualified as an expert in "attack attribution analysis." *Id.* at *3–5.

The fact witnesses included Col. Thomas McGrath (Ret.), commander of the Afghan Regional Security Integration Command from May 2007 to August 2008; two service members injured in attacks; one civilian kidnapping victim; and the wife of a service member killed in an attack. *Cabrera*, 2022 WL 2817730, at *3. During the bellwether hearings, the *Cabrera* court also admitted reports from each of the three experts and many other exhibits. *Id.*; *see also* Expert Report of William F. Roggio, Ex. D to Mot. [Dkt. # 34-7] ("Roggio Rep."); Expert Witness Report of Dr. Colin Clarke, Ex. E to Mot. [Dkt. # 34-8] ("Clarke Rep."); Excerpts from Expert Report of Steven A. Wood, Ex. F to Mot. [Dkt. # 34-9] ("Wood Bellwether Rep.").

Based on that record, the court made detailed findings of fact about the operations of the Taliban-led Syndicate in Afghanistan, Iran's material support for the Syndicate, and the Syndicate's responsibility for each of the bellwether attacks. *Cabrera*, 2022 WL 2817730, at *5. It found that it could exercise personal jurisdiction over Iran because plaintiffs "successfully served

Iran through diplomatic process[es]." *Id.* at *33.  It also held that plaintiffs had satisfied each of the elements of the FSIA terrorism exception that would give the court subject-matter jurisdiction over the case. *Id.* at *34–41. And it held that the survivor plaintiffs and the family-member plaintiffs satisfied the requirements to have a private right of action under 28 U.S.C. § 1605A(c). *Id*. at *41–42.

The Court has reviewed the record in *Cabrera,* and the detailed findings of fact made with great care by the court, and it finds that the court's conclusions are well-supported by the evidence presented in that case, including the testimony and written submissions received from both fact and expert witnesses and exhibits.  The Court will therefore take judicial notice of the evidence adduced and factual findings made in *Cabrera* when it makes the determinations necessary to adjudicate plaintiffs' motion for default judgment.

### FINDINGS OF FACT

### I.    The Taliban-Led Syndicate.

From at least 2006 to 2019, multiple terrorist groups operated in Afghanistan.  *Cabrera*, 2022 WL 2817730, at *6, citing Roggio Rep. ¶ 27–28, 31, 33.  Most prominent was the Taliban. *Id.*, citing Hr'g Tr., *Cabrera*, Civ. Action No. 19-3835 (D.D.C. Oct. 18, 2021) (ECF No. 62–63), Ex. A to Mot. [Dkt. # 34-4] ("Oct. 18 Tr.") at 25:24–26:21.  Many of these terrorist groups combined in what is referred to as a terrorist "syndicate" – "a group of terrorists or terrorist organizations combined to promote a common interest."  *Id.*, citing Clarke Rep. at 12.  At that time, the U.S. government saw these groups not as separate entities that occasionally cooperated, but rather as part of a single "syndicate of terrorism." *Id.,* citing *Afghanistan: Assessing the Road Ahead: Hearing Before the S. Comm. on Foreign Rels*., 111th Cong. 24 (2009) (statement of Sec. Hillary Clinton, U.S. Dep't of State).  The members of this Taliban-led Syndicate "shared close

strategic, tactical, and operational coordination, which enabled each group to make its operations more lethal for American forces." *Id.*, citing Oct. 18 Tr. at 25:24–26:21. They also "shared a common goal: re-establishing" their terrorist state "by driving the United States and its allies out of Afghanistan by driving up the cost for U.S. presence by killing and wounding American troops." *Id.*, citing Oct. 18 Tr. at 26:11–21; Roggio Rep. ¶ 23 (internal quotation marks omitted) (alterations adopted).

There were four "major players" in the Taliban-led Syndicate: the Taliban, the Taliban's Haqqani Network, the Kabul Attack Network, and al-Qaeda. *Id.*

A.       **The Taliban**

The Taliban emerged in 1994, following the Soviet Union's occupation of Afghanistan. *Cabrera*, 2022 WL 2817730, at *6, citing Oct. 18 Tr. 137:25–138:13; Roggio Rep. ¶¶ 36–37. While the group originally consisted of students who had studied at religious schools in Pakistan, "Mullah Mohammad Omar organized [them] into a Sunni jihadist fighting force and mobilized them to overthrow the Afghan government and impose Sharia law." *Id.*, citing Oct. 18 Tr. at 29:23–30:15; Roggio Rep. ¶ 37. Expanding from its base in Kandahar Province, in southeastern Afghanistan, the Taliban began to seize territory. *Id.*, citing Oct. 18 Tr. at 30:16–17; Roggio Rep. ¶ 39. It took over the capital, Kabul, in 1996. *Id.* That same year, it provided safe haven to Osama bin Laden and the rest of al-Qaeda in exchange for financial support. *Id.*, citing Oct. 18 Tr. at 139:21–140:3. By September 2001, the Taliban had de facto control of Afghanistan. *Id.*, citing Roggio Rep. ¶¶ 39, 41.

Following the September 11, 2001 attacks on the United States, "the Taliban refused to surrender bin Laden." *Cabrera*, 2022 WL 2817730, at *6, citing Roggio Rep. ¶ 42; Oct. 18 Tr. at 49:23–50:18. This led to the U.S. invasion a month later. *Id.*, citing Roggio Rep. ¶ 42; Oct. 18

Tr. at 140:15–18.  The Taliban were effectively defeated by December, with its leadership and soldiers fleeing to other countries, including Iran and Pakistan.  *Id.*, citing Oct. 18 Tr. at 140:16–23; Roggio Rep. ¶ 42).  The United Nations then authorized the formation of the International Security Assistance Force ("Coalition") to maintain security and help the Afghan government rebuild.  *Id.*, citing Roggio Rep. ¶ 43.

Afghanistan ratified a new constitution and formed the Islamic Republic of Afghanistan in January 2004.  *Cabrera*, 2022 WL 2817730, at *6*, citing Roggio Rep. ¶ 43.  "[F]rom 2006 to 2019 (the time period relevant to the attacks at issue in [*Cabrera*]), the lawful government of Afghanistan was the Islamic Republic of Afghanistan."  *Id.*, citing Roggio Rep. ¶ 41; Oct. 18 Tr. at 31:10–12.

But as the Republic emerged, "the Taliban – with the help of Iran, Al Qaeda, Pakistan, and other jihadist allies – plotted its comeback."  *Cabrera*, 2022 WL 2817730, at *7, citing Roggio Rep. ¶ 44.  The "Taliban began to launch offensives against NATO, U.S., and Afghan forces," with attacks gradually increasing throughout the country.  *Id.*, citing Roggio Rep. ¶ 44.  The United States responded in 2009 with a "surge," deploying 30,000 more troops to Afghanistan.  *Id.*, citing Roggio Rep. ¶ 45.  The effort was only temporarily effective.  *Id.*, citing Roggio Rep. ¶¶ 45–46.  The Taliban regained its foothold as soon as the United States began to withdraw troops in 2011.  *Id.*, citing Roggio Rep. ¶¶ 45–46.

The Taliban has a pyramid-like power structure.  *See Cabrera*, 2022 WL 2817730, at *7.  At the top sits the emir, "who also functions as a faith leader."  *Id.*, citing Oct. 18 Tr. at 32:15–20, 141:4–7, 144:23–145:1.  "Under the emir is a leadership council called the Rahbari Shura, also known as the Quetta Shura."  *Id.*, citing Oct. 18 Tr. at 32:22–33:4, 141:7–15.  The Rahbari Shura provides guidance to other, lower-level regional shuras and Taliban groups throughout the country,

based on guidance from the emir. *Id.*, citing Oct. 18 Tr. at 32:22–33:4, 142:6–12; Roggio Rep. ¶¶ 51–57. It also collected and disseminated funds and resources to these regional shuras. *Id.*, citing Oct. 18 Tr. at 145:7–12. "The Rahbari Shura exerts a significant or high level of control over the Taliban; when it issues key directives on how to fight, on how to implement Sharia law or what to do with the courts, these directives are followed." *Id.*, quoting Oct. 18 Tr. at 33:7–16 (internal quotation marks omitted) (alteration adopted).

### B.       The Haqqani Network

"The Haqqani Network, led by Jalaluddin and Siraj Haqqani, is a terrorist faction of the Taliban, which planned and executed terrorist attacks throughout Afghanistan, most prominently in the eastern and southeastern regions of the country, in Paktia, Paktika, and Khost Provinces." *Cabrera*, 2022 WL 2817730, at *8, citing Oct. 18 Tr. at 37:9–38:15, 46:25–47:6, 138:24–139:7, 191:22–192:15; Roggio Rep. ¶ 59. Although the U.S. government has assigned the Haqqani Network and Taliban different terrorist designations, "there is no difference between the Haqqani Network and the Taliban. They are one and the same." *Id.,* citing Oct 18 Tr. at 39:8–9. Indeed, "the two groups reject any distinction between themselves." *Id.*, citing Oct. 18 Tr. at 39:8–18; Roggio Rep. ¶¶ 60, 73–74. And they share leadership – for example, Jalaluddin and Siraj Haqqani, *id.,* citing Oct. 18 Tr. at 37:16–20, 38:10–15, have been the leaders of Taliban regional shuras. *Id.* at *7, citing Oct. 18 Tr. at 141:20–23. "The Taliban and the rest of the Syndicate benefitted from the Haqqani Network's expertise in conducting acts of terrorism, some of which, like the use of suicide tactics, the Haqqani Network gleaned from al-Qaeda." *Id.* at *8, citing Oct. 18 Tr. at 44:9–46:4; Roggio Rep. ¶¶ 78–80.

14

### C.    The Kabul Attack Network

"The Kabul Attack Network, another subset of the Taliban and the greater Syndicate, focused on conducting effective attacks in and around Kabul," the capital, "to achieve the Syndicate's goal of expelling American and Coalition forces and weakening the lawful Afghan government." *Cabrera*, 2022 WL 2817730, at *8, citing Oct. 18 Tr. at 59:8–60:7, 149:6–12; Roggio Rep. ¶¶ 117–18. The Haqqani Network in particular played a key role in the group. *Id.*, citing Oct. 18 Tr. at 149:15–19; Roggio Rep. ¶ 120. "In creating the Kabul Attack Network, the Syndicate pooled its resources, gathering and sharing personnel, equipment, and safe houses to carry out high-profile attacks in Kabul that would make the news and cause discomfort in the United States with targets including hotels, schools, mosques, restaurants, military headquarters and convoys, and Afghan government buildings." *Id.*, quoting Oct. 18 Tr. at 59:23–60:7 (internal quotation marks omitted) (alteration adopted).

### D.    Al-Qaeda

"Al-Qaeda is a Sunni jihadist organization that seeks to establish a global caliphate." *Cabrera*, 2022 WL 2817730, at *8, citing Oct. 18 Tr. at 48:21–24. It was founded by Osama bin Laden and Abdullah Azzam near the end of the Soviet occupation of Afghanistan, seeking to harness the network of mujahedeen fighters into a unified force. *Id.*, citing Oct. 18 Tr. at 48:24–49:8. "After the events of September 11, 2001, the Taliban strengthened its ties to al-Qaeda by refusing to hand over bin Laden and other senior al-Qaeda leaders to the U.S. government. In return for safe haven and support inside Afghanistan, al-Qaeda assisted the Taliban in recapturing Afghanistan." *Id.*, citing Roggio Rep. ¶¶ 93–95; Clarke Rep. at 37–39; Oct. 18 Tr. at 49:25–50:18.

The Taliban shared personnel with al-Qaeda. *Cabrera*, 2022 WL 2817730, at *8, citing Oct. 18 Tr. at 51:1–6. These "dual-hatted terrorists" fought for both the Taliban and al-Qaeda.

*Id.*, citing Roggio Rep. ¶ 104 (citation omitted); Oct. 18 Tr. at 51:19–52:13.   One prominent example is the leader of the Taliban's Haqqani Network, "Sirajuddin Haqqani, who has described the Taliban's cooperation with al-Qaeda as 'at the highest limits.'"  *Id.*, quoting Roggio Rep. ¶ 104 (citation omitted); Oct. 18 Tr. at 51:19–52:13.

Al-Qaeda also joined the Taliban "in planning and authorizing terrorist attacks."  *Cabrera*, 2022 WL 2817730, at *9.  It helped develop tactics, provided ideological and technical expertise, and paid the families of Taliban suicide bombers. *Id.*, citing Roggio Rep. ¶ 108; Oct. 18 Tr. at 56:14–25.  It trained Taliban terrorists at camps within and outside Afghanistan.  *Id.*, citing Roggio Rep. ¶¶ 112–13.  "And a component of al-Qaeda fought alongside the Taliban and later reorganized and embedded itself within the Taliban's structure, fielding small units and embedding military trainers who instructed Taliban fighters on waging a successful insurgency."  *Id.*, citing Roggio Rep. ¶ 108.

## II.     Iran's Support for the Taliban-Led Syndicate.

Iran – "a major state sponsor of global terrorism, and particularly of terrorism against the United States," *Cabrera*, 2022 WL 2817730, at *9, citing Oct. 18 Tr. at 61:7–12; Roggio Rep. ¶ 123 – has provided significant support for the Taliban-led Syndicate. *Id.* Iran's terrorist activities are facilitated through its agents, partners, proxies, and affiliates, including Hezbollah, the Islamic Revolutionary Guard Corps ("IRGC"), and Iran's Qods Force.  *See id.*, citing Oct. 18 Tr. at 63:9–64:14; Roggio Rep. ¶¶ 139, 141–42.  The IRGC is "the primary driver of Iran's terror activities," *id.*, quoting Roggio Rep. ¶ 126, and the Qods Force is "Iran's primary mechanism for cultivating and supporting terrorists abroad."  *Id.*, quoting Roggio Rep. ¶ 130.

Iran provided material support to the Taliban-led Syndicate in five primary ways.  *See id.* at *11.

First, Iran "provided a range of weapons to the Syndicate including small arms (*e.g.*, AK-47s and other assault rifles), anti-tank missiles, rocket-propelled grenades, surface-to-air missiles, improvised explosive devices ('IEDs'), explosively formed penetrators ('EFPs'), rockets, mortars, indirect fire weapons, recoilless rifles, PKM machine guns, ammunition, and components for suicide attacks (*e.g.*, triggers and detonators)." *Cabrera*, 2022 WL 2817730, at *11, citing Roggio Rep. ¶¶ 182–84; Oct. 18 Tr. at 83:15–84:1, 165:1–7; *Cabrera* Pls.' Ex. 198 at 68.  Iran has provided weapons to the Taliban since at least 2006, *id.*, citing *Cabrera* Pls.' Ex. 7 at 192 (State Department's 2009 Country Reports on Terrorism), and it provided them throughout Afghanistan. *Id.*, citing Oct. 18 Tr. at 87:13–17.

Second, Iran "provided a variety of training to Taliban fighters, including on small unit and infantry tactics, techniques for executing complex attacks (for example, initiating an attack with a suicide bomb), and intelligence gathering and planning." *Cabrera, 2022 WL 2817730,* at *11, citing Oct. 18 Tr. at 94:18–95:4, 163:15–165:7.  The Qods Force sent trainers into Afghanistan. *Id.*, citing Oct. 18 Tr. at 95:23–96:6; Roggio Rep. ¶¶ 211–13; *Cabrera* Pls.' Ex. 9 at 192 (State Department's 2009 Country Reports on Terrorism describing Qods Force training in Afghanistan). And Iran brought Taliban members into Iran for longer term training on more advanced tactics. *Id.*, citing Oct. 18 Tr. at 97:5–25.  For example, "from 2005 or 2006 until the fall of the Afghan government in 2021, Iran operated training camps near its border with Afghanistan, with sites in Tehran, Mashhad, Zahedan, and the province of Kerman." *Id.*, citing Oct. 18 Tr. at 96:15–24; Roggio Rep. ¶ 218, Fig. 11.  These terrorists then returned to Afghanistan and trained other Syndicate members – magnifying the effects of Iran's support. *Id.*, citing Oct. 18 Tr. at 98:9–19.

Third, Iran provided financial support, including giving "cash to key Taliban leaders so they could buy weapons and other materials to disseminate throughout the regions where they

operated." *Cabrera*, 2022 WL 2817730, at *12, citing Oct. 18 Tr. at 98:20–99:3; Roggio Rep. ¶

223.  Iran also "issued bounties on U.S. and Afghan forces," paying "sums of money for killing

U.S. troops or damaging U.S. equipment." *Id.*, citing Roggio Rep. ¶ 224.  This financial support

both incentivized attacks on Americans and funded the Syndicate's future attacks. *Id.*, citing Oct.

18 Tr. at 99:3–17.

Fourth, Iran "provided a safe haven within its borders for Taliban fighters" beginning with

the American invasion of Afghanistan. *Cabrera*, 2022 WL 2817730, at *12, citing Oct. 18 Tr. at

104:3–105:13; Roggio Rep. ¶ 202.  In 2007, the Taliban opened a regional office in Mashhad, Iran

– where the IRGC was active. *Id.*, citing Oct. 18 Tr. at 105:14–106:3.  Iran's safe havens "were

critical to the Taliban's insurgency, especially because they allowed Taliban fighters to organize,

plan, and fundraise free from threat of attack and without American interference." *Id.*, citing Oct.

18 Tr. at 104:14–21.

Fifth, Iran facilitated "highly lucrative" drug-trafficking operations that earned hundreds

of millions for the Taliban. *Cabrera*, 2022 WL 2817730, at *12, citing Oct. 18 Tr. at 152:18–23.

Iran's actions to assist the Taliban included "permitting drugs to pass through the Iranian/Afghan

border, issuing special license plates to Taliban vehicles[,] . . . declining to search those vehicles

at border entry points," *id.*, citing Oct. 18 Tr. at 153:18–25, 156:1–159:7; Clarke Rep. at 77–82,

and "provid[ing] weapons to drug traffickers as they returned to Afghanistan," *id.*, citing Oct. 18

Tr. at 153:18–25.

## III.  The Taliban-led Syndicate's Areas of Operational Dominance.

Geography and time period are fundamental pieces of information that enable experts to

attribute an attack to a particular terrorist group. *See Cabrera*, 2022 WL 2817730, at *13 (noting

that it is often possible to attribute an attack to a particular terrorist group based solely on the

geography and time period). The Taliban-led Syndicate had operational dominance in seven different regions of Afghanistan during the relevant period. *Id.* at *13–15.

### A.    Southern Afghanistan.

Southern Afghanistan comprises Kandahar and Helmand Provinces. *Cabrera*, 2022 WL 2817730, at *13. "The Taliban 'very likely' carried out all the attacks" in *Cabrera* in that region. *Id.*, citing Oct. 18 Tr. at 168:22–169:25, 178:2–16, 183:8–184:7, 186:10–187:11; Hr'g Tr., *Cabrera*, Civ. Action No. 19-3835 (D.D.C. Oct. 19, 2021) (ECF No. 65–66), Ex. B to Mot. [Dkt. # 34-5] ("Oct. 19 Tr.") at 421:7–22; Clarke Rep. at 44. "Those two provinces are traditional areas of Taliban control – indeed, the Taliban originated in Kandahar Province – and the Taliban was the most prominent insurgent group in the region from 2006 to 2019, with several different strongholds . . . from which the group launched attacks." *Id.*, citing Oct. 18 Tr. at 169:4–8, 189:3–18; Clarke Rep. at 45. Similarly, "[t]he Taliban was also the main group in Helmand Province, where it controlled large swaths of territory." *Id.*, citing Oct. 18 Tr. at 187:2–188:2; Oct. 19 Tr. at 375:21–376:3, 421:7–22; Clarke Rep. at 46–48). "And although other insurgent groups were present in the area at the same time, 'they came nowhere close to rivaling the Taliban's grip' on the region." *Id.*, citing and quoting Clarke Rep. at 48.

### B.    Loya Paktia

Loya Paktia is made of Khost, Paktia, and Paktika Provinces in southeastern Afghanistan. *Cabrera*, 2022 WL 2817730, at *13. The Taliban-led Syndicate's Haqqani Network "very likely" carried out all the attacks in *Cabrera* in that region. *Id.*, citing Oct. 18 Tr. at 170:16–20. "Locals of the region are members of the same tribe as Haqqani Network leaders, and they generally support the Network and the Taliban more broadly." *Id.*, citing Oct. 19 Tr. at 488:14–17. The attacks in the region were overseen by the Taliban's Miranshah Shura, which was led by Jalaluddin

and Sirajuddin Haqqani, senior Taliban-led Syndicate Haqqani Network leaders.  *Id.*, citing Oct. 18 Tr. at 148:13–18; Clarke Rep. at 27; Wood Bellwether Rep. ¶¶ 82–84.  "[N]o other group had a meaningful presence in the region."  *Id.*, citing Clarke Rep.  at 48–49.

### C.    Kabul Province

"Members of the aptly named Kabul Attack Network, working jointly with the Taliban (including the Haqqani Network), al-Qaeda, and other Syndicate members, 'very likely' carried out all the attacks" in *Cabrera* in Kabul Province.  *Cabrera*, 2022 WL 2817730, at *14, citing Oct. 18 Tr. at 171:9–17.  "The Kabul Attack Network likely faced no challenges to its operational dominance (at least until ISIS-Khorasan's first attack in Kabul in 2016), and it claimed responsibility for numerous attacks prior to the formation of ISIS-Khorasan."  *Id.*, citing Clarke Rep.  at 63–65.

### D.    Eastern Afghanistan/"N2KL"

Eastern Afghanistan includes Nangarhar, Nuristan, Kunar, and Laghman Provinces – collectively known as "N2KL."  *Cabrera*, 2022 WL 2817730, at *14.  "[T]he Taliban, with participation from al-Qaeda, 'likely' carried out all the attacks" in *Cabrera* in this area.  *Id.*, citing Oct. 18 Tr. at 171:18–24.  "The Taliban (with al-Qaeda, which had a strong presence in the region because of its safe haven just across the border in Pakistan) was the dominant terrorist group in the region during the relevant time period[.]"  *Id.*, citing Oct. 18 Tr. at 172:7–16.  "Based on contemporary reporting and the Taliban's own claims of responsibility for numerous attacks, it is likely that the Taliban was the dominant terrorist organization in Kunar Province from 2007 to 2012; in Laghman Province from at least 2009 to 2011; in Nangarhar Province from at least 2008 to 2015; and in Nuristan Province after 2005."  *Id.*, citing Clarke Rep. at 59–63.

### E.   North Central Afghanistan

North Central Afghanistan comprises portions of Parwan Province and Kapisa, Baghlan, and Kunduz Provinces. *Cabrera*, 2022 WL 2817730, at *14. The Taliban "likely" carried out all the attacks in *Cabrera* in this region. *Id.*, citing Oct. 18 Tr. at 172:17–20. "The Taliban maintained operational dominance in Baghlan Province from 2008 to 2011; in Kapisa Province from 2007 to 2009 (even claiming responsibility for a joint attack on Coalition forces in July 2008); and in Kunduz Province from at least 2009 to 2010 (partially evidenced by its seizure of Kunduz City in 2015, suggesting that the group was already deeply entrenched in the area)." *Id.*, citing Clarke Rep. at 66, 68–70. In Parwan Province, "the Taliban was dominant from at least 2008 to 2016: multiple sources show that the Taliban was stronger than other insurgent groups, and the Taliban claimed responsibility for at least two attacks (including one on Bagram Airfield)." *Id.*, citing Clarke Rep. at 70–71.

### F.   Western Afghanistan

Western Afghanistan includes Nimruz, Farah, Herat, Baghdis, Ghor, and Faryab Provinces. *Cabrera*, 2022 WL 2817730, at *15, citing Oct. 18 Tr. at 173:22–174:1. "The Taliban 'very likely' carried out all the attacks" in *Cabrera* in this region. *Id.* "[T]here was no other known insurgent presence in any of those provinces other than Herat" at times relevant to *Cabrera*. *Id.*, citing Clarke Rep. at 72–74. The Taliban very likely had dominance in Baghdis from 2010 to 2011; Farah in "at least" 2011; Faryab from 2010 to 2012, and Herat "through at least 2009." *Id.*, citing Clarke Rep. at 71–74.

### G.   Southeastern Afghanistan

Southeastern Afghanistan comprises Ghazni, Logar, Uruzgan, Wardak, and Zabul Provinces. *Cabrera*, 2022 WL 2817730, at *15, citing Oct. 18 Tr. at 170:1–7. "[T]he Taliban and the Haqqani Network 'very likely' maintained operational dominance" in this area and carried out

21

the attacks at issue in *Cabrera*. *Id.*, citing Oct. 18 Tr. at 170:1–7. In particular, the Taliban-led Syndicate's Haqqani Network very likely maintained operational dominance in Ghazni Province between 2007 and 2012. *Id.*, citing Clarke Rep. at 52. And the Taliban very likely dominated Logar Province from 2008 to 2013; Uruzgan Province from 2007 to 2012 and again in 2019; Wardak Province from 2009 to 2013; and Zabul Province from 2008 to 2012. *Id.*, citing Clarke Rep. at 53–58; Oct. 18 Tr. at 190:4–191:13; Wood Bellwether Rep. ¶¶ 234–36.

## IV. The Attacks in This Case.

### A. May 4, 2013 IED Attack in Kandahar Province.[2]

U.S. Army Specialist Kevin Cardoza was part of a patrol sent to clear an accident on Highway 1 in Maiwand District, Kandahar Province on May 4, 2013. Expert Witness Report of Dr. Daveed Gartenstein-Ross, Ph.D. Ex. I to Mot. [Dkt. # 34-12] ("Gartenstein-Ross Rep.") at 154. On the patrol's return trip, its "vehicle was struck by a command wire IED with 500 pounds of explosive material." *Id.* The explosion killed all six occupants of the vehicle, including SPC Cardoza. *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Maiwand District, Kandahar Province, which he found indicated the Taliban very likely committed the attack. Gartenstein-Ross Rep. at 155–56. The attackers also used an IED, a common Taliban tactic, technique and procedure. *See id.* at 156. Gartenstein-Ross also noted the references to the "enemy" in the subsequent U.S. government investigation of the incident, a term which was

---

2    The *Cabrera* court held Iran liable for the attack following the report and recommendation of a special master. *See Cabrera v. Islamic Republic of Iran*, 2024 WL 3225942, at *5 (D.D.C. June 28, 2024) ("June 28, 2024 Op.") (Item 138).

commonly used to refer to the Taliban. *Id.* Based on these factors, Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack. *Id.* at 155.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack," in addition to "train[ing] an individual to identify the target and initiate the device." Gartenstein-Ross Rep. at 155. He thus concluded that "the Taliban very likely planned this IED attack in advance in order to kill others – particularly Coalition forces." *Id.* at 156.

### B.        August 22, 2015 Suicide Bombing Attack in Kabul.[3]

On the evening of August 22, 2015, U.S. government contractor Corey Dodge was a passenger in an armored pickup truck traveling down a crowded residential street. Expert Report of Steven A. Wood. Ex. H to Mot. [Dkt. # 34-11] ("Wood Rep.") ¶ 748. When the vehicle was near the Sarak Clinic in Kabul City, a suicide vehicle-borne IED detonated and struck the pickup truck. *Id.* The blast was "significant." *Id.* Mr. Dodge and two other U.S. DynCorp contractors were killed. *Id.* Nine Afghan nationals also died in the blast, and 66 Afghan nationals were injured. *Id.*

In his expert report, retired Lt. Col. Steven A. Wood noted that the attack took place in Kabul Province, which he found was enough to determine that the Taliban-led Syndicate very likely committed the attack. Wood Rep. ¶ 750. Mr. Dodge was also killed by a suicide vehicle-borne IED, a common Kabul Attack Network tactic, technique, and procedure. *See id.* ¶ 759(c). LTC Wood also stated that although the Taliban-led Syndicate's spokesman denied responsibility

---

3        The *Cabrera* court held Iran liable for the attack following the report and recommendation of a special master. *See* June 28, 2024 Op., at *5 (Item 147).

for the attack, his "expert assessment is that the Taliban-led Syndicate falsely denied being involved in the attack due to perceived frustration with the large number of civilian casualties the attack caused." *Id.* ¶ 757. Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate's Kabul Attack Network was responsible for this attack. *Id.* ¶ 749.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate's Kabul Attack Network had to acquire the car and explosives for this attack," in addition to determining when and where to conduct it and train the suicide vehicle-borne team. Wood Rep. ¶ 756. He therefore concluded that "the Taliban-led Syndicate's Kabul Attack Network likely planned this [suicide vehicle-borne IED] attack in advance with the intent to kill others: in particular, Americans and Coalition forces." *Id.* ¶ 759(d).

**C.        September 26, 2013 Insider Attack in Paktia Province.[4]**

On September 26, 2013, Staff Seargeant Thomas Baysore, Jr. was stationed at Combat Outpost Wilderness. Wood Rep. ¶ 495. That day, an Afghan National Army soldier named Ataul Rahman was walking around with his rifle. *Id.* ¶ 497. Personnel saw this and asked him where he was going. *Id.* He responded that he was going to see someone and walked up to a portable latrine, which SSG Baysore had just entered, and fired at least four rounds. *Id.* SSG Baysore was struck twice, once in the back and once in the neck, and subsequently died from his wounds. *Id.* Rahman continued firing at U.S. soldiers, and the U.S. soldiers fired back. *Id.* ¶ 498. They eventually shot and killed him. *Id.*

---

[4]    The *Cabrera* court held Iran liable for the attack following the report and recommendation of a special master. *See* June 28, 2024 Op., at *3 (Item 36).

In his expert report, LTC Wood noted that the attack took place in Paktia Province, which he found was enough to determine that the Taliban-led Syndicate's Haqqani Network likely committed the attack. Wood Rep. ¶ 500. SSG Baysore was also killed in an insider attack, a common Haqqani Network tactic, technique, and procedure. *See id.* ¶ 501. Wood also stated that the U.S. Army's investigation associated Rahman with "an insurgent organization" and noted that "local Taliban networks" may have supported this attack. *Id.* ¶ 507. The word "insurgent" was commonly used to refer to members of the Taliban-led Syndicate. *See id.* Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate's Haqqani Network was responsible for this attack. *Id.* ¶ 508.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate's Haqqani Network likely had to identify a potential Afghan soldier target, then recruit and radicalize this Afghan soldier," in addition to training or advising the Afghan soldier about what type of Coalition targets to attack. Wood Rep. ¶ 506. He therefore concluded that "the Taliban-led Syndicate's Haqqani Network likely planned this insider attack in advance with the intent to kill others: in particular, Coalition forces." *Id.* ¶ 509(e).

**D.      November 27, 2010 RPG Attack in Wardak Province.[5]**

On November 27, 2010, Private Second Class Devon Harris's unit was clearing a route that led towards Command Outpost Tangi in Sayadabad District, Wardak Province. Gartenstein-Ross Rep. at 488–89. During the route clearance mission, an IED struck the convoy's lead vehicle,

---

5      The *Cabrera* court held Iran liable for the attack following the report and recommendation of a special master. *See Cabrera v. Islamic Republic of Iran*, 2024 WL 864092, at *3 (D.D.C. Feb. 29, 2024) ("Feb. 29, 2024 Op.") (Item 22).

prompting PV2 Harris's vehicle to move to the front of the convoy. *Id.* at 489. The convoy continued towards Outpost Tangi until terrorists struck PV2 Harris's vehicle with a rocket-propelled grenade ("RPG"), which penetrated the vehicle's windshield. *Id.* PV2 Harris died as a result of injuries sustained in the RPG attack. *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place near Sayadabad District in Wardak Province, which he found indicated the Taliban very likely committed the attack. Gartenstein-Ross Rep. at 490. The attackers also attacked PV2 Harris using an RPG, a common Taliban tactic, technique, and procedure. *See id.* Dr. Gartenstein-Ross also noted that the U.S. Army's investigation shared information about the "enemy" operating within the area. *Id.* As noted before, the government's use of the word "enemy" in this context is commonly used to refer to the Taliban. *Id.* Based on these factors, Dr. Gartenstein-Ross found it "likely" that the Taliban committed this complex attack. *Id.* at 491.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had not only acquired the RPG munitions in advance of the attack, but also trained its insurgents to deploy RPGs against U.S. and Coalition forces." Gartenstein-Ross Rep. at 489. The Taliban also had to train its terrorists to be ready to kill Coalition forces when sudden opportunities arose. *Id.* He thus concluded that "the Taliban likely planned this RPG attack in advance to kill others – particularly Coalition forces." *Id.*

E.       **September 18, 2011 IED Attack in Panjwai District.**[6]

On September 18, 2011, U.S. Army Private First Class Kevin Trimble arrived to secure the location of a suspected IED in Panjwai District, Kandahar Province.  Gartenstein-Ross Rep. at 182–83.  While he was waiting for the arrival of an Explosive Ordnance Disposal team, PFC Trimble was standing near a wall across a ditch from the suspected IED.  *Id.* at 183.  An IED in the wall then exploded, severely wounding PFC Trimble and killing a fellow service member. *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Panjwai District, Kandahar Province, which he found was enough to determine that the Taliban likely committed the attack. Gartenstein-Ross Report at 183.  The attackers also used an IED, a common Taliban tactic, technique, and procedure.  *See id.* at 184.  Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack.  *Id.* at 183.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack."  Gartenstein-Ross Report at 183.  He therefore concluded that "the Taliban very likely planned this IED attack in advance in order to kill others—particularly Coalition forces."  *Id.*

F.       **May 23, 2012 IED Attack in Kandahar Province.**[7]

On May 23, 2012, U.S. Army Second Lieutenant Travis Morgado was conducting a mission to clear "suspected insurgent location[s]" in Zhari District, Kandahar Province on May

---

6       The *Cabrera* court Iran liable for the attack following the report and recommendation of a special master.  June 28, 2024 Op., at *4 (Item 126).
7       The *Cabrera* court Iran liable for the attack following the report and recommendation of a special master.  June 28, 2024 Op., at *4 (Item 114).

23, 2012.  Gartenstein-Ross Rep. at 221–22.  In one building, the soldiers discovered a cache of pressure-plate IEDs and various precursor materials in one of the buildings and communicated that to 2LT Morgado, who was located in a different building.  *Id.* at 222.  As 2LT Morgado and his squad exited the building, a pressure-plate IED exploded.  *Id.*  2LT Morgado was severely wounded in the blast and died before he could be evacuated.  *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Zhari District, Kandahar Province, which he found was enough to determine that the Taliban likely committed the attack.  Gartenstein-Ross Rep. at 223.  The attackers also used a pressure-plate IED to kill 2LT Morgado, a common Taliban tactic, technique, and procedure.  *See id.* at 223–24.  Dr. Gartenstein-Ross also noted that the U.S. Army's investigation repeatedly discusses "insurgents" and the "enemy," both of which were commonly used to refer to the Taliban.  *Id.* at 224. Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack.  *Id.* at 222.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack."  Gartenstein-Ross Rep. at 222.  He therefore concluded that "the Taliban very likely planned this IED attack in advance in order to kill others, particularly Coalition forces."  *Id.*

### G.    August 6, 2011 Anti-Aircraft Attack in Tangi Valley, Kandahar Province.[8]

On August 5, 2011, an American unit was on its way to interdict a senior Taliban commander in Tangi Valley.  *Cabrera*, 2022 WL 2817730, at *20, citing Oct. 19 Tr. at 428:2–18;

---

[8]    The *Cabrera* court held Iran liable for this attack, which killed 38 Coalition service members.  *See Cabrera*, at *20, *33–41.

Wood Bellwether Rep. ¶ 186.  The ground assault team did not find the target at the compound. *Id.*, citing Oct. 19 Tr. at 431:6–13; Wood Bellwether Rep. ¶ 191; *Cabrera* Pls.' Ex. 60 at 15–16, 37–38.  But helicopters did identify individuals moving away from the compound, and intelligence suggested that one of them was the Taliban leader. *Id.*, citing Oct. 19 Tr. at 431:6–13; Wood Bellwether Rep. ¶ 191; *Cabrera* Pls.' Ex. 60 at 15–16, 37–38.  A helicopter containing an immediate-reaction force, using the call-sign Extortion 17, was nearing the suspected location of the target "when the Taliban fired two [rocket-propelled grenades] from the roof of a two-story building." *Id.*, citing Wood Bellwether Rep. ¶¶ 193–94; Oct. 19 Tr. at 431:21–25.  "One RPG struck the helicopter: it crashed, killing everyone on board." *Id.*, citing Wood Bellwether Rep. ¶ 194; Oct. 19 Tr. at 432:1–11; *Cabrera* Pls.' Ex. 60 at 38–39.  "The RPG was an OG-7 antipersonnel round," *id.*, citing *Cabrera* Pls.' Ex. 60 at 1121, 1125, and "Iran produced OG-7 RPGs and regularly provided them to the Taliban." *Id.*, citing Wood Bellwether Rep. ¶ 203; Oct. 19 Tr. at 436:11–22.

The attack took place in Wardak Province, which the court concluded was "strategic terrain" for the Taliban.  *See Cabrera*, at *20.  The attackers also downed the helicopter using an RPG, a common Taliban tactic, technique, and procedure.  *Id.*, citing Wood Bellwether Rep. ¶¶ 75, 193–94, 199–200, Fig. 27; Oct. 19 Tr. at 431:21–25, 435:13–24 *Cabrera* Pls.' Ex. 60 at 38–39, 1098).  Based on these facts, the court found that the Taliban was responsible.  *See Id*.

As for an extrajudicial killing, the court stated:

> It appears the Taliban . . . planned this attack in advance. They were aware that U.S. troops often moved through the Valley using helicopters, and they often climbed to elevated positions (like the roof of a building) in order to get a clearer shot at airborne targets.

*Id.*, citing Oct. 19 Tr. at 435:4–5, 435:6–16.  Thus, the *Cabrera* court held that this attack was an extrajudicial killing under the FSIA.  *Id.* at *37–38.

H.        **October 29, 2011 Suicide Bombing in Kabul City, Kabul Province.**[9]

On October 29, 2011, an armored bus was moving between U.S. bases in Kabul. *Cabrera*, 2022 WL 2817730, at *21, citing Oct. 19 Tr. at 441:14–23; Wood Bellwether Rep. ¶¶ 211–12, Fig. 30; *Cabrera* Pls.' Ex. 52 at 7, 57, 83. "A car loaded with explosives made contact with the bus, detonating the explosives and destroying the bus." *Id.*, citing Oct 19. Tr at 442:25–443:3; Wood Bellwether Rep. ¶¶ 211–212, Figs. 29, 31; *Cabrera* Pls.' Ex. 52 at 7; *Cabrera* Pls.' Ex. 190 at 3, 6, 12 (story board summary of the attack from the investigating unit).

The attack took place in Kabul Province, which the court concluded was enough to determine that the Taliban-led Syndicate's Kabul Attack Network "very likely" committed the attack. *See Cabrera*, 2022 WL 2817730, at *14. The attacker also conducted a vehicle-borne suicide attack, "a common [tactic, technique, and procedure] of the Kabul Attack Network." *Id.* at *21. Furthermore, the Taliban publicly claimed responsibility for this attack, identifying the name of the suicide bomber when doing so. *Id.*, citing Oct. 19 Tr. at 449:19–450:3, 450:25– 451:11; Wood Bellwether Rep. ¶ 224; *Cabrera* Pls.' Ex. 52 at 29, 404–05. And a declassified military storyboard prepared after the attack described it as a "planned Taliban operation." *Id.*, citing *Cabrera* Pls.' Ex. 190 at 1. *Cabrera* therefore concluded that the Taliban-led Syndicate's Kabul Attack Network was responsible for this attack. *See id.*

The court further found that this was an extrajudicial killing under the FSIA based on the following facts:

---

9        The *Cabrera* court held Iran liable for this attack, which killed three U.S. service members, including SGT James Darrough. Bellwether Op. at *21, 33–41.

> The [Haqqani] Network planned this attack in advance, likely based on
> direction and guidance from the Haqqani-led Miranshah Shura; the
> Syndicate trained the suicide bomber, gathered materials for the VBIED in
> Miranshah, Pakistan, and imported them into Afghanistan along historical
> Haqqani Network smuggling routes. The group then assembled the weapon
> in staging areas outside Kabul before bringing it into the city for an attack.
> Once in Kabul, the Network identified potential targets and surveilled their
> routes before conducting the attack.

*Id.* at *21, citing Oct. 19 Tr. at 446:5–447:24; Wood Bellwether Rep. ¶¶ 215–218, Fig. 32; *Cabrera*

Pls.' Ex. 190 at 3.  He therefore concluded that this attack was an extrajudicial killing under the

FSIA. *Id.* at *37–38

### I.    May 30, 2007 Anti-Aircraft Attack in Upper Sangin Valley, Helmand Province.[10]

On May 30, 2007, a CH-47D helicopter named "Flipper 75" and another CH-47D

helicopter were returning from a mission and en route back to Kandahar Airfield.  Gartenstein-

Ross Rep. at 350.  However, Flipper 75 was shot down in the North Sangin Valley by a rocket,

possibly an RPG.  *Id.* at 351.  U.S. forces secured the crash site, killing about 70 to 90 enemy

combatants in the process.  *Id.*  All of the occupants of the helicopter were killed in the attack.  *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Helmand

Province, which he found was enough to determine that the Taliban "very likely" committed the

attack.  *See* Gartenstein-Ross Rep. at 351–52.  The attackers also downed Flipper 75 using a rocket

or similar weapon, and possibly an RPG, a common Taliban tactic, technique, and procedure.  *See*

*id.* at 352.  Dr. Gartenstein-Ross noted that the U.S. Army's investigation attributed the attack to

"enemy fire," which is commonly used to refer to the Taliban.  *Id.*  Based on these factors, Dr.

Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack.  *Id* at 351.

---

10    The *Cabrera* court held Iran liable for this attack following the report and recommendation
of a special master.  *See* June 28, 2024 Op. at *3, 6 (Item 149).

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to acquire the weapons and conduct training in the use of anti-aircraft tactics prior to the attack." Gartenstein-Ross Rep. at 351. He therefore concluded that "the Taliban very likely planned this ambush in advance in order to kill others – particularly Coalition forces." *Id.* at 353.

**J.     July 23, 2007 IED Attack in Sarobi District, Paktika Province.**[11]

On July 23, 2007, Sargeant Travon Johnson was conducting a patrol in a nine-vehicle convoy. Wood Rep. ¶ 523. As the patrol made its way along a wadi, the armored high mobility multipurpose wheeled vehicle containing SGT Johnson struck an IED. *Id.* ¶ 524. The blast threw the vehicle onto its side, and a secondary explosion prevented other U.S. soldiers from helping the passengers out of the vehicle. *Id.* SGT Johnson died from massive blunt force trauma from the blast. *Id.* The IED was later assessed to be a command wire IED, created using homemade explosives. *Id.*

In his expert report, LTC Wood noted that the attack took place in Paktika Province, which he found was enough to determine that the Taliban-led Syndicate's Haqqani Network "very likely" committed the attack. *See* Wood Rep. ¶¶ 526, 531(a). SGT Johnson was also killed by a command wire IED, a common Haqqani Network tactic, technique, and procedure. *See id* ¶¶ 527, 531(b). Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate's Haqqani Network was responsible for this attack. *Id.* ¶ 525.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate's Haqqani Network

---

11     The *Cabrera* court held Iran liable for this attack, killed PV1 Jair Garcia. *See* June 28, 2024 Op. at *5 (Item 2).

had to acquire the weapons for this CWIED attack – the IED and homemade explosives," in addition to determining when and where to place it, and training the triggerman on how to operate it. Wood Rep. ¶ 529. He therefore concluded that "the Taliban-led Syndicate's Haqqani Network likely planned this CWIED attack in advance with the intent to kill others: in particular, Coalition forces." *Id.* ¶ 531(c).

K.        **August 1, 2008 IED Attack in Kunar Province.[12]**

On August 1, 2008, U.S. Army Private Second Class Jair Garcia was part of a route-clearance package for a logistics resupply escort mission. Wood Rep. ¶ 109. After clearing a route, the RCP proceeded to a new road to clear. *Id.* ¶ 110. During this movement, the vehicle containing PV2 Garcia and three other soldiers struck a command wire IED. *Id.* The explosion killed PV2 Garcia, throwing him from the vehicle. *Id.* Three other U.S. soldiers and one interpreter were also killed. *Id.*

In his expert report, LTC Wood noted that the attack took place in Kunar Province, which he found was enough to determine that the Taliban likely committed the attack. *See* Wood Rep. ¶ 112. The attackers also used a command wire IED to kill PV2 Garcia, a common Taliban tactic, technique, and procedure. *See id.* ¶ 111. LTC Wood also noted that the Taliban claimed responsibility for this attack, which is a reliable indication of Taliban responsibility. *Id.* ¶ 117. Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate was responsible for this attack. *Id.* ¶ 111.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate needed to construct

_____

12    The *Cabrera* court held Iran liable for this attack, killed PV2 Jair Garcia. *See* June 28, 2024 Op. at *5 (Item 185).

or in some manner acquire an IED to utilize in this attack," in addition to identifying a location to emplace the IED. Wood Rep. ¶ 116. Furthermore, since the Taliban-led Syndicate used a command wire IED in this attack, they needed to train a trigger person on how to initiate the device and evade detection post-detonation. *Id.* He therefore concluded that "the Taliban-led Syndicate likely planned this [command wire] IED attack in advance with the intent to kill others: in particular, Coalition forces." *Id.* ¶ 119(c).

### L.  March 30, 2010 IED Attack, Kandahar Province.[13]

On March 30, 2010, U.S. Army Staff Seargeant Scott Brunkhorst was on a mission to "conduct key leader engagements" and "find improvised explosive devices" in Arghandab District, Kandahar Province. Gartenstein-Ross Rep. at 99. SSG Brunkhorst was patrolling an area containing a suspected IED when there was a large explosion. *Id.* The blast from the IED killed him. *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Arghandab District, Kandahar Province, which he found was enough to determine that the Taliban likely committed the attack. *See* Gartenstein-Ross Rep. at 100–01. The attackers also utilized an IED, a common Taliban tactic, technique, and procedure. *See id.* at 101. Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack. *Id.*

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack," in addition to choosing this specific location to deploy it.

---

13    The *Cabrera* court held Iran liable for this attack, killed PV2 Jair Garcia. *See* June 28, 2024 Op. at *5 (Item 126).

Gartenstein-Ross Rep. at 100.    He therefore concluded that "the Taliban very likely planned this IED attack in advance in order to kill others – particularly Coalition forces."    *Id.*

## M.        June 7, 2010 IED Attack in Dangam, Kunar Province.[14]

On June 7, 2010, U.S. Army Specialist Blaine Redding was on a mission to help establish a watch position in Bar Kunar District, Kunar Province.  Gartenstein-Ross Rep. at 395–96.  He was travelling in a convoy of vehicles supporting the mission when a command wire IED detonated in his vicinity, killing him.  *Id.* at 396.

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Kunar Province, which is enough to determine that the Taliban likely committed the attack.  *See* Gartenstein-Ross Rep. at 396–97.  The attackers also used a command wire IED, a common Taliban tactic, technique, and procedure.  *See id.* at 397.  He also noted that the U.S. Army's investigation attributed the attack to "the enemy" and "insurgents," which were commonly used to refer to the Taliban.  *Id.*   Based on these factors, Dr. Gartenstein-Ross found it "likely" that the Taliban was responsible for this attack.  *Id.* at 397–98.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack," and train someone to initiate the command wire IED and escape. Gartenstein-Ross Rep. at 396.  He therefore concluded that "the Taliban likely planned this [command wire] IED attack in advance in order to kill others – particularly Coalition forces." *Id.* at 398.

_____

14      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 97).

N.        **June 25, 2010 Complex Attack in Kunar Province.[15]**

On June 25, 2010, U.S. Army Specialist Jared Plunk was a driver in a convoy moving through Pech District, Kunar Province.  Gartenstein-Ross Rep. at 401.  When the convoy approached an Afghan National Police checkpoint, several rocket-propelled grenades struck the truck behind SPC Plunk's, and small arms fire erupted from three sides.  *Id.*  An RPG then struck SPC Plunk's vehicle.  *Id.*  Another soldier in the vehicle pulled the emergency brake before noticing that SPC Plunk was slumped over in his seat, with shrapnel embedded in the back of his head.  *Id.*  SPC Plunk died immediately.  *Id.* at 402.

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Kunar Province, which he found was enough to determine that the Taliban likely committed the attack.  *See* Gartenstein-Ross Rep. at 402–03.  The attackers also conducted a complex attack utilizing RPGs and small arms fire to ambush the convoy, a common Taliban tactic, technique, and procedure.  *See id.* at 403. Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack.  *Id.* at 403.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that the "coordinated ambush of the convoy" from three directions took "a degree of training."  Gartenstein-Ross Rep. at 402.  He therefore concluded that "the Taliban very likely planned this complex attack ambush in advance to kill as many of U.S. and Coalition forces as possible."  *Id.*

---

15    The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 98).

O.      **October 4, 2010 IED Attack in Kandahar Province.**[16]

On October 4, 2010, U.S. Army Sergeant Karl Campbell was on a foot patrol from COP Fitzpatrick in Arghandab District, Kandahar Province.  Gartenstein-Ross Rep. at 124.  He stepped on an IED, "which detonated and killed him instantly." *Id.* at 125.  "A secondary, unexploded IED was later found nearby." *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Arghandab District, Kandahar Province, which he found indicated the Taliban very likely committed the attack. *See* Gartenstein-Ross Rep. at 125–26.  The attackers also used an IED, a common Taliban tactic, technique, and procedure. *See id.* at 126.  Dr. Gartenstein-Ross also noted that the U.S. Army's investigation described "the enemy" firing on COP Fitzpatrick and "enemy" activity in the nearby village, and that this use of "enemy" commonly referred to the Taliban. *Id.*  Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack. *Id.* at 126.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack," in addition to choosing this specific location to deploy it. Gartenstein-Ross Rep. at 125.  He therefore concluded that "the Taliban very likely planned this IED attack in advance in order to kill others – particularly Coalition forces." *Id.*

---

16      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master. *See* June 28, 2024 Op. at *4 (Item 132).

P.        **February 17, 2011 IED Attack in Helman Province.**[17]

On February 17, 2011, U.S. Marine Corps Sergeant Matthew DeYoung was completing "area security" at an observation post in Sangin District, Helmand Province. Gartenstein-Ross Rep. at 365. An IED detonated in SGT DeYoung's vicinity, which amputated both of his legs above the knee, caused injuries to his pelvic and perineal areas, and fractured his mandible. *Id.* Although he received medical treatment, SGT DeYoung died from the multiple injuries he sustained in the IED blast. *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Sangin District, Helmand Province, which he found indicated the Taliban very likely committed the attack. *See* Gartenstein-Ross Rep. at 366. The terrorists also utilized an IED in this attack, a common Taliban tactic, technique, and procedure. *See id.* at 366–67. Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack. *Id.* at 367.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then place this IED in advance of the attack." Gartenstein-Ross Rep. at 366. The Taliban would have also typically conducted reconnaissance of Coalition forces' movements so that the Taliban could "place the IED in a location with high amounts of Coalition force traffic, enhancing the IED's effectiveness." *Id.* He therefore concluded that "the Taliban very likely planned this IED attack in advance in order to kill others – particularly Coalition forces." *Id.*

---

17      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master. *See* June 28, 2024 Op. at *4 (Item 80).

Q.        **February 28, 2011 IED Attack in Wardak Province.**[18]

On February 28, 2011, Staff Sergeant Chauncy Mays's unit noticed two "insurgents" assessed to be attempting to place an IED.  Gartenstein-Ross Rep. at 491.  Although the unit tried to engage them, the two insurgents fled.  *Id.*  An EOD team set out to disarm the IEDs, and SSG Mays helped with this effort.  *Id.*  SSG Mays soon found a second IED, which detonated before it could be disarmed. *Id.* at 491–92.  This explosion instantly killed SSG Mays and wounded a fellow service member.  *Id.* at 492.

In his expert report, Dr. Gartenstein-Ross noted that the attack took place near Sayadabad District in Wardak Province, which he found was enough to enable him to determine that the Taliban likely committed the attack.  *See* Gartenstein-Ross Rep. at 492–93.  The terrorists also attacked SSG Mays using an IED, a common Taliban tactic, technique, and procedure.  *See id.* at 493.  Dr. Gartenstein-Ross also noted that the U.S. Army's investigation shared information about the "enemy" and "insurgents" operating within the area.  *Id.*  The use of the word "enemy" and "insurgent" in this context is commonly used to refer to the Taliban.  *Id.*  Based on these factors, Dr. Gartenstein-Ross found it "likely" that the Taliban committed this complex attack.  *Id.* at 494.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had not only acquired the IED in advance of the attack, but also trained its insurgents to deploy IEDs against U.S. and Coalition forces."  Gartenstein-Ross Rep. at 492.  The Taliban also had to train its terrorists to be ready to kill Coalition forces when sudden opportunities arose.  *Id.*  He therefore concluded that "the

---

18        The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* Feb. 29, 2024 Op. at *3 (Item 23).

Taliban likely planned this IED attack in advance to kill others – particularly Coalition forces."
*Id*.

### R.        April 27, 2011 Insider Attack in Kabul Province.[19]

On the morning of April 27, 2011, Colonel Ahmed Gul of the Afghanistan National Air Force entered the Air Command and Control Center room at the Kabul International Airport. Gartenstein-Ross Rep. at 535.  Major Jeffrey Ausborn, Major David Brodeur, Lieutenant Colonel Frank Bryant Jr., and Master Sergeant Tara Brown of the U.S. Air Force were in the room when Gul entered, took out his pistol, and opened fire.  *Id.*  According to the U.S. Air Force's investigation, Gul first shot Major Ausborn and Lieutenant Colonel Bryant.  *Id.*  Their wounds were fatal, and both fell unconscious in the middle of the room.  *Id.*  Gul then shot Major Brodeur in the neck and lower-jaw area.  *Id.*  Major Brodeur was still mobile but became disoriented.  *Id.* All the while, Gul kept firing.  *Id.*  He later shot Major Brodeur once again, paralyzing him.  *Id.* Gul continued shooting, hitting multiple individuals, including Master Sergeant Brown and Major Ambard.  *Id.*  Master Sergeant Brown was the only individual shot who did not die in the room; she was transported to a hospital emergency room where she succumbed to her wounds.  *Id.* at 535–36.

---

19      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 142).  Although the expert report submitted in *Cabrera* does not mention Major Ambard, the underlying evidence submitted for the details about this terrorist attack included an Air Force investigative report, which mentioned Master Sergeant Brown, Major Ausborn, Major Brodeur, Lieutenant Colonel Bryant, and Major Ambard as victims in this attack.  *See also* Raymond Hoy, *Academy Hero Remembered by Friends, Colleagues*, U.S. Air Force Academy (April 29, 2011), https://www.usafa.af.mil/US-Air-Force-Academy-News/News-View/Article/428743/academy-hero-remembered-by-friends-colleagues/ (listing Ambard as victim in the attack).

Upon exiting the room, Gul got into a shootout with other U.S. soldiers. Gartenstein-Ross Rep. at 536. Eventually, he was found dead with multiple gunshot wounds, but there is some uncertainty around how he died. *Id.* "Ultimately, the United States Central Command investigation . . . concluded that Gul was shot and killed by the Afghan Quick Reaction Force." *Id.*

The attack took place in Kabul Province, which gave the expert reason to determine that the Taliban or the Kabul Attack Network likely committed the attack. *See* Gartenstein-Ross Rep. at 537–39. Major Ambard was also killed in an insider attack, a common Taliban tactic, technique, and procedure. *See id.* at 539. Dr. Gartenstein-Ross also noted that intelligence reports in the days leading up to the attack indicated the threats of an attack against the airport from the Taliban, including a potential suicide-vest attack from "an Afghan Air Force Colonel." *Id.* And he noted that Gul had past connections to the Taliban. *Id.* at 540–41. Finally, the Taliban released a credible claim of responsibility for this attack, which is generally a reliable indicator of the Taliban's responsibility. *Id.* at 545. While alternative theories have been floated for the attack, including that the attacker was part of a criminal group, Dr. Gartenstein-Ross ultimately rejected these theories based on the evidence available. *See id.* at 543–45. Based on these factors, Dr. Gartenstein-Ross found it "more likely than not" that the Taliban or the Taliban-led Syndicate's Kabul Attack Network was responsible for this attack. *Id.* at 545.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the organization more likely than not inspired the shooter based on shared beliefs of viewing Coalition forces as the enemy and thus deserving of death." Gartenstein-Ross Rep. at 537. He therefore concluded that the Taliban or Kabul Attack Network, which is merely a "subset of the Taliban and the greater Syndicate," *Cabrera*, 2022 WL

2817730, at *8, "deliberately planned insider attacks to be carried out not only to kill others –

particularly Coalition forces – but also to inspire more attacks to kill U.S. soldiers in the future."

Gartenstein-Ross Rep. at 545.

**S.        September 25, 2011 IED Attack in Mehtar Lam, Laghman Province.[20]**

On September 25, 2011, U.S. Army Specialist Francisco Briseño-Alvarez Jr. was returning

from a combat logistics patrol in Mehtar Lam District, Laghman Province.  Gartenstein-Ross Rep.

at 419.  He was serving as the gunner in the rear vehicle of a convoy when his vehicle was struck

by a command wire IED, which killed him.  *Id.* at 419–20.

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Laghman

Province, which he found was enough to determine that the Taliban likely committed the attack.

*See* Gartenstein-Ross Rep. at 420–21.  The terrorists also utilized a command wire IED in this

attack, a common Taliban tactic, technique, and procedure.  *See id.* at 421. He also noted that the

U.S. Army's investigation attributed the attack to the "enemy," which is commonly used to refer

to the Taliban.  *Id.* Based on these factors, Dr. Gartenstein-Ross found it "likely" that the Taliban

was responsible for this attack.  *Id.* at 421–22.

As to whether the evidence supports a finding that the attack was undertaken for purposes

of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) and then

place this IED in advance of the attack," in addition to training the triggerman on how to target the

convoy and escape successfully.  Gartenstein-Ross Rep. at 420.  He therefore concluded "that the

Taliban likely planned this IED attack in advance in order to kill others – particularly Coalition

forces." *Id.*

---

20      The *Cabrera* court held Iran liable for this attack following the report and recommendation
of a special master.  *See* June 28, 2024 Op. at *4 (Item 102).

**T.**    **August 16, 2012 Attack on Helicopter in Shah Wali Kot, Kandahar Province.[21]**

On August 16, 2012, U.S. Army Specialist Richard Essex and U.S. Navy Seal David Warsen were riding in a UH-60L helicopter.  Gartenstein-Ross Rep. at 164.  The crew of the aircraft was supporting a clearance mission to prevent "insurgent egress."  *Id.*  With no eyewitnesses around, the aircraft crashed, killing all onboard.  *Id.*  The U.S. Army found that there was "a preponderance of evidence" indicating that the aircraft was shot down.  *Id.*

U.S. Navy SEALs moved to secure the crash site.  Gartenstein-Ross Rep. at 164.  As they did so, they were targeted with enemy fire.  *Id.*  The SEALs also found a cache near the crash site; it contained a camera, laptop, and memory cards, among other items.  *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Kandahar Province, which he found was enough to determine that the Taliban-led Syndicate "very likely" committed the attack.  *See* Gartenstein-Ross Rep. at 165.  The attackers also killed SO2 Warsen in an anti-aircraft attack, a common Syndicate tactic, technique, and procedure.  *See id.*  Dr. Gartenstein-Ross considered the findings contained in the U.S. Army's investigation, which concluded that the helicopter likely was shot down by "insurgents associated with the Lashkar-e-Tayyiba (LeT) cell known to operate" in the area.  *Id.* at 165–66.  Relying on the investigation's "numerous statements" indicating "the area was one of high Taliban activity," and his "knowledge of the connection between LeT and the Taliban," Dr. Gartenstein-Ross concluded "that the

---

21    The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 177).  Although the expert report submitted in Cabrera does not mention SO2 Warsen, the underlying evidence submitted for the details about this terrorist attack was an AR 15-6, which mentioned both SGT Essex and SO2 Warsen as victims in this attack.  *See also Michigan Navy SEAL Killed In Afghanistan Helicopter Crash*, CBS News Detroit (Aug. 17, 2012), https://www.cbsnews.com/detroit/news/family-mich-navy-seal-killed-in-afghanistan-helicopter-crash/ (listing Warsen as victim of attack).

[i]nvestigation was referring to LeT terrorists supporting the local Taliban insurgent network as part of the Taliban-led Syndicate." *Id.* at 166.  Based on these factors, Dr. Gartenstein-Ross found it likely that the Taliban-led Syndicate was responsible for this attack.  *Id.* at 168.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate had to acquire the weapons and train terrorists in their use and in tactics prior to the attack."  Gartenstein-Ross Rep. at 164.  He thus concluded that "the Taliban-led Syndicate likely planned this anti-aircraft attack in advance to kill others – particularly Coalition forces."  *Id.*

### U.    September 14–15, 2012 Complex Attack in Helmand Province.[22]

On September 14, 2012, U.S. Marine Corps Sergeant Bradley Atwell was stationed at the BLS Complex.  Gartenstein-Ross Rep. at 293–94.  At about 10:00 that night, 15 Taliban insurgents disguised in authentic U.S. Army combat uniforms and armed with assault rifles, suicide vests, and RPGs infiltrated the complex under the cover of darkness.  *Id.* at 294.  Once inside, they split into three groups and began assaulting different parts of the base.  *Id.*  The Marines nearest the attack mounted a defense.  *Id.*  SGT Atwell was among them and died while fighting to expel the attackers from the base.  *Id.*  By the morning of September 15, one terrorist was wounded and 14 were killed.  The attack also wounded nine other U.S. personnel, eight U.K. personnel, and one civilian contractor.  *Id.*  The attackers also destroyed and damaged many aircraft, as well as fuel bladders and hangars.  *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Helmand Province, which he found was enough to determine that the Taliban "very likely" committed the

---

22    The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 178).

attack.  *See* Gartenstein-Ross Rep. at 295–96.  The complex attack that killed SGT Atwell was also common Taliban tactic, technique, and procedure.  *See id.* at 296.  Dr. Gartenstein-Ross also noted that both the U.S. government's report and the U.K. government's report on this attack explicitly named the Taliban as the culprit.  *Id.* at 297–98.  And he noted that the sole surviving member of the group that stormed the complex acknowledged his membership in the Taliban, which matched with a Taliban spokesman's claim of responsibility.  *Id.* at 298–301.  Such claims of responsibility are generally reliable indicators of Taliban responsibility for an attack.  *See id.* Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack.  *Id.* at 301–02.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "[t]his attack demonstrated significant coordination, training, and advance planning."  Gartenstein-Ross Rep. at 295.  He therefore concluded that "the Taliban very likely planned this complex attack in advance in order to kill others – particularly Coalition forces."  *Id.*

### V.      July 23, 2013 Suicide Attack in Wardak Province.[23]

On July 23, 2013 Specialist Nickolas Welch was serving on a dismounted patrol in Wardak Province.  Gartenstein-Ross Rep. at 494.  After completing its initial mission of clearing some compounds, his unit began to head back to Combat Outpost Soltan Kheyl.  *Id.* at 495.  Shortly after the unit began to move, members of the unit noticed there was an individual on a donkey waiting for the patrol group to pass.  *Id.*  The unit passed this individual, but reports indicate that, eventually, the person on the donkey entered the formation and detonated an explosive device that

---

23      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* Feb. 29, 2024 Op. at *4 (Item 33).

was attached to both him and the donkey. *Id.* This led to an explosion in the center of the formation, which wounded SPC Welch and instantly killed another U.S. soldier. *Id.* SPC Welch later died of his wounds from the suicide attack. *Id.*

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Wardak Province, which is enough to determine that the Taliban very likely committed the attack. *See* Gartenstein-Ross Rep. at 495–96. The terrorists also utilized a suicide attack, a common Taliban tactic, technique, and procedure. *See id.* at 496. Dr. Gartenstein-Ross noted that several open-source reports suggested that the Taliban used animal-borne IEDs in regions where the Taliban maintained a presence. *Id.* at 496–97. He added that the U.S. Army's investigation stated that the unit's mission was to clear and search compounds . . . "in order to disrupt and prevent the enemy" – the word used when discussing the Taliban – from establishing a presence "around the local populace." *Id.* at 497. Finally, the Taliban claimed responsibility for this attack, and Dr. Gartenstein-Ross found that to be credible. *Id.* at 497–98. Based on these factors, Dr. Gartenstein-Ross found it "likely" that the Taliban was responsible for this attack. *Id.* at 499.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire) this IED and recruit, indoctrinate, and train the suicide bomber in advance of the attack." Gartenstein-Ross Rep. at 495. The Taliban would have also generally instructed the suicide bomber on how to target the U.S. forces. *Id.* He therefore concluded that "the Taliban likely planned this suicide bombing attack in advance in order to kill others – particularly Coalition forces." *Id.*

W.        **August 12, 2013 IED Attack in Logar Province.**[24]

On August 12, 2013 Specialist James Wickliff Chacin was conducting a dismounted, counter-indirect-fire patrol.  Wood Rep. ¶ 987.  The patrol was hoping to disrupt insurgent activity at a historic launching point for indirect-fire rounds used to target Forward Operating Base Shank.  *Id.*  The patrol was also looking for an IED that had been reported in the area.  *Id.*  While the soldiers were searching for the IED, it detonated, blowing SPC Wickliff Chacin and two other U.S. soldiers into a nearby water canal.  *Id.*  The platoon immediately treated the casualties, and SPC Wickliff Chacin was medically evacuated to FOB Shank, before making his way to Germany and ultimately the ICU at Brooke Army Medical Center in San Antonio, Texas.  *Id.* ¶ 988.  He passed away from his wounds on September 20, 2013.  *Id.*  LTC Wood assesses that this was likely a command wire IED attack.  *Id.* ¶ 995.

In his expert report, LTC Wood noted that the attack took place in Logar Province, which is an area in which the Taliban "very likely" had dominance at the time of this attack.  Wood Rep. ¶ 992*.*  SPC Wickliff Chacin was also killed by an IED, a common Taliban-led Syndicate tactic, technique, and procedure.  *See id.* ¶¶ 996, 1001(b).  LTC Wood also noted that the U.S. Army's investigation regularly referred to "insurgents" and the "enemy," which are commonly used to refer to the Taliban-led Syndicate.  *Id.* ¶ 999.  Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate was responsible for this attack.  *Id.* ¶ 1000.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate needed to construct or in some manner acquire an IED to utilize in this attack," in addition to determining when and

---

24      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 44).

where to place it.  Wood Rep. ¶ 998.  In addition, since this was likely a command wire IED attack, the Taliban-led Syndicate needed to train the likely triggerman on how to detonate the device and to escape detection post-detonation.  *Id.*  LTC Wood concluded that "the Taliban-led Syndicate likely planned this [command wire IED] attack in advance with the intent to kill others: in particular, Coalition forces." *Id.* ¶ 1001(d).

X.      **October 5, 2013 IED Attack in Kandahar Province.**[25]

On October 5, 2013, U.S. Army Specialist Cody Patterson was on a mission targeting a "compound of interest" that reportedly contained a variety of weapons.  Gartenstein-Ross Rep. at 73.  A portion of the unit was pursuing an individual fleeing the compound when two individuals detonated suicide vests in short succession.  *Id.*  As other members of the unit moved to provide aid, they triggered a series of pressure-plate IED explosions.  *Id.*  SPC Patterson triggered a pressure-plate IED at 8:02 pm, which killed him and one another service member.  *Id.*  Three minutes later, another U.S. soldier triggered two pressure-plate IEDs, which "were likely connected by detonation cord." *Id.*  That soldier died in the resulting explosion. *Id.*  All told, there were 12 IED explosions and four deaths.  *Id.* at 73 n.418, 74.

In his expert report, Dr. Gartenstein-Ross noted that the attack took place in Kandahar Province, which he found was enough to determine that the Taliban likely committed the attack. *See* Gartenstein-Ross Rep. at 74-75.  The attackers also used multiple IEDs, which was a common Taliban tactic, technique, and procedure.  *See id.* at 75.  He noted that while the report of the U.S. Army's investigation was heavily redacted, it mentioned "a Taliban attack planner." *Id.*  The report also concluded that SPC Patterson was killed by the blast from an "enemy emplaced" IED.

---

25      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 139).

*Id.* As Dr. Gartenstein-Ross explained, this use of "enemy" commonly referred to the Taliban. *Id.* Dr. Gartenstein-Ross also considered the Taliban's "credible claim of responsibility for this attack" as further supporting his attribution. *Id.* at 75–76. Based on these factors, Dr. Gartenstein-Ross found it "very likely" that the Taliban was responsible for this attack. *Id.* at 76.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to build (or acquire)" these IEDs and choose to place them "in locations of strategic or operational importance to the group," such as this "IED production facility." Gartenstein-Ross Rep. at 74. For those reasons, concluded that "the Taliban very likely planned this IED attack in advance in order to kill others – particularly Coalition forces." *Id.*

**Y.    February 10, 2014 Suicide Attack in Kabul.[26]**

On February 10, 2014, Michael Hughes of DynCorp International, a government contractor, was riding in an SUV convoy leaving Pul-i-Charkhi prison. Wood Rep. ¶ 705. As the convoy drove down the road from the prison, a suicide bomber in a Toyota Corolla crashed into the SUV occupied by Mr. Hughes, causing a "huge fireball." *Id.* The blast was so violent that the Corolla's engine block flew more than 100 yards away. *Id.* The blast killed Hughes and another U.S. contractor, and it wounded two other U.S. contractors and seven Afghan nationals. *Id.*

The attack took place in Kabul Province, indicating to the expert that the Taliban-led Syndicate's Kabul Attack Network likely committed the attack. *See* Wood Rep. ¶ 707. Mr. Hughes was also killed by a suicide vehicle-borne IED, a common Kabul Attack Network tactic, technique, and procedure. *See id.* ¶¶ 708, 715(b). He noted that the U.S. government attributed

---

26    The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master. *See* June 28, 2024 Op. at *4 (Item 144).

the suicide vehicle-borne IED attack to "[Hezb-e-Islami Gulbuddin]", "an active participant in the Kabul Attack Network, a collection of insurgent groups that was a part of the Taliban-led Syndicate." *Id.* ¶ 712. And he noted that HIG itself claimed responsibility for the attack. *Id.* ¶ 713. LTC Wood added that "based on [his] experience and expert opinion . . . [Hezb-e-Islami Gulbuddin] would not have been able to conduct the attack without the help of other members of the Taliban-led Syndicate's Kabul Attack Network," as "[s]uicide bombing attacks were not a normal attack methodology for [Hezb-e-Islami Gulbuddin], with only three suicide bombing attacks attributed to them during the entire Afghan conflict." *Id.* Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate's Kabul Attack Network was responsible for this attack. *Id.* ¶ 714.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban-led Syndicate's Kabul Attack Network had to acquire the car and explosives for this attack," in addition to determining when and where to conduct it and train the suicide vehicle-borne IED team. Wood Rep. ¶ 711. He thus concluded that "the Taliban-led Syndicate's Kabul Attack Network likely planned this [suicide vehicle-borne IED] attack in advance with the intent to kill others: in particular, Americans and Coalition forces." *Id.* ¶¶ 711, 715(d).

## Z.    February 15, 2014 Complex Attack in Helmand Province.[27]

On February 15, 2014, Master Sergeant Aaron Torian was operating in Helmand Province as a Marine Special Operations Team Leader. Wood Rep. ¶¶ 1111–12. While on a partnered mission with Afghan National Army Special Forces and other Afghan forces, a friendly vehicle

---

27    The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master. *See* June 28, 2024 Op. at *4 (Item 180).

rolled onto its side.  *Id.* ¶ 1112.  During recovery operations, MSgt Torian identified a pressure-plate IED and called for an explosives ordinance disposal team to render the device safe.  *Id.*  He then walked forward along the line of stopped vehicles to warn the Afghan allies about the IED.  *Id.*  As he was walking forward, MSgt Torian activated another pressure-plate IED.  *Id.*  After the explosion, small arms fire broke out.  *Id.* ¶ 1113.  Soldiers moved MSgt Torian to the front of the vehicle to treat him, and he was later evacuated by helicopter.  *Id.*  MSgt Torian died of his wounds that evening.  *Id.*

In his expert report, LTC Wood noted that the attack took place in Helmand Province, which is an area in which the Taliban "very likely" had dominance at the time of this attack.  *See* Wood Rep. ¶ 1116.  MSgt Torian was also killed by an IED-initiated complex attack, a common Taliban tactic, technique, and procedure.  *See id.* ¶¶ 1121, 1126(b).  He also noted that the U.S. Army's investigation attributed the attack to the "enemy" and "insurgents," terms which are commonly used to refer to the Taliban.  *Id.* ¶ 1124.  Based on these factors, LTC Wood concluded with high confidence that the Taliban was responsible for this attack.  *Id.* ¶ 1114.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that "the Taliban had to acquire the weapons for this complex attack – the IED, small arms, and ammunition," in addition to determining when and where to launch the attack.  *Id.* ¶ 1123.  He thus concluded that "the Taliban likely planned this IED-initiated complex attack in advance with the intent to kill others: in particular, Coalition forces."  *Id.* ¶¶ 1123, 1126(d).

**AA.        November 12, 2016 Suicide Attack in Bagram, Parwan Province.**[28]

On November 12, 2016, hundreds of personnel were gathered in the early morning at the "Disney Clamshell" at Bagram Airfield for a five-kilometer run.  Wood Rep. ¶ 889.  At around 5:30 AM local time, a locally employed Afghan national named Ahmad Nayeb Abdul Zuhoor was standing on a sidewalk near Disney Road.  *Id.*  A group of U.S. soldiers who had just learned they would be unable to conduct physical training as planned walked by, and Nayeb jumped out at the soldiers and detonated a suicide vest IED containing potassium chlorate, ball bearings, and bolts. *Id.*  The detonation killed Private First Class Tyler Iubelt, Staff Sergeant John Perry, Retired Colonel Jarrold Reeves Jr., Sergeant First Class Allan Eric Brown, and a civilian, Peter Provost, among others.  *Id.*  Seventeen others were wounded.  *Id.*

In his expert report, LTC Wood noted that the attack took place in Parwan Province, which he found was enough to determine that the Taliban-led Syndicate likely committed the attack.  *See* Wood Rep. ¶ 891.  Moreover, the suicide attack was a common Syndicate tactic, technique, and procedure.  *See Cabrera*, 2022 WL 2817730, at *17.  He also noted that the Taliban claimed responsibility for the attack, which is usually a reliable indicator of its involvement.  Wood Rep. ¶ 901.  Based on these factors, LTC Wood concluded with high confidence that the Taliban-led Syndicate was responsible for this attack.  *Id.* ¶ 890.

As to whether the evidence supports a finding that the attack was undertaken for purposes of an extrajudicial killing, the expert opined that the Taliban-led Syndicate had to create the suicide vest IED, in addition to planning the location and time of the attack and training Nayeb on how to deploy it.  Wood Rep. ¶ 899.  LTC Wood also points to evidence showing that Nayeb smuggled

---

28      The *Cabrera* court held Iran liable for this attack following the report and recommendation of a special master.  *See* June 28, 2024 Op. at *4 (Item 200).

small amounts of explosives onto the base over several weeks, and that he likely assembled the suicide vest IED at his workstation. *Id.* ¶ 897. LTC Wood thus concluded that "the Taliban-led Syndicate likely planned this [suicide vest IED] attack in advance with the intent to kill others: in particular, Coalition forces." *Id.* ¶¶ 899, 903(d).

## ANALYSIS

Plaintiffs contend that Iran is liable for the attacks because it is a state sponsor of terrorism that provided material support for the Taliban-led Syndicate's attacks. After briefly addressing personal jurisdiction, the Court will turn to whether it possesses subject-matter jurisdiction, a question which, in this context, collapses with the ultimate question of whether Iran is liable for the attacks. *See, e.g.*, *Est. of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 19 (D.D.C. 2011) ("[L]iability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met." (citation omitted)). Finally, the Court will determine whether plaintiffs have established a cause of action for their claims.

## I.    Personal Jurisdiction.

Once more, under the FSIA:

> (a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:
>
>> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>>
>> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>>
>> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).  To comply with section 1608, "a plaintiff must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012), quoting *Ben–Rafael v. Islamic Republic of Iran,* 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (internal quotation omitted).

Here, service under sections 1608(a)(1) and (a)(2) was not possible. Plaintiffs had no special arrangement with Iran, so they were not required to comply with section 1608(a)(1), and because Iran has failed to join any relevant international conventions, section 1608(a)(2) was also not an option.  *See Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 175 (D.D.C. 2020) ("Because Iran does not have a special arrangement for service with the [claimants], nor is it party to an international convention on service, the [claimants] did not need to attempt service in accordance with §[§] 1608(a)(1) or (a)(2)."); *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 88 (D.D.C. 2018); *Ben-Rafael* 540 F. Supp. 2d at 52. Thus, the most preferable service option available to plaintiffs was section 1608(a)(3).

## A.    Service Under § 1608(a)(3).

Section 1608(a)(3) has five elements, all of which have been satisfied through plaintiffs' efforts.  A plaintiff must (1) send "a copy of the summons and complaint and a notice of suit," (2) "together with a translation of each into the official language of the foreign state," (3) "by any

form of mail requiring a signed receipt," (4) "to be addressed and dispatched by the clerk of the court" (5) "to the head of the ministry of foreign affairs of the foreign state concerned" (here, Mohammad Javad Zarif). 28 U.S.C. § 1608(a)(3).

Plaintiffs filed their complaint in this Court on November 30, 2023. *See* Compl. It consists of private rights of action under the FSIA against Iran pursuant to 28 U.S.C. § 1605A(c). *See* Compl. ¶¶ 175–945. On January 8, 2024, plaintiffs filed an affidavit seeking to effect service by requesting the Clerk of the Court's assistance in mailing the notice of suit, summons, complaint, and related documents to the Islamic Republic of Iran in Tehran, Iran, along with copies of those pleadings in Farsi, the official language of the foreign state, pursuant to 28 U.S.C. § 1608(a)(3). Aff. Requesting Foreign Mailing [Dkt. # 12]. On January 12, 2024, the Clerk of the Court docketed a notice that it had dispatched a copy of the summons, complaint, notice of suit, and related documents. Certificate of Clerk [Dkt. # 15].

## B.        Service Under § 1608(a)(4)

"[I]f service cannot be made within 30 days under paragraph (3)," a plaintiff must effectuate service under section 1608(a)(4). 28 U.S.C. § 1608(a)(4). That section has seven elements that must be satisfied. A plaintiff must (1) send "two copies of the summons and complaint and a notice of suit," (2) "together with a translation of each into the official language of the foreign state," (3) "by any form of mail requiring a signed receipt," (4) "to be addressed and dispatched by the clerk of the court" (5) "to the Secretary of State in Washington, District of Columbia," (6) "and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state" (7) "and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

On February 12, 2024, plaintiffs requested that the Clerk mail a copy of the summons and complaint to Iran pursuant to the provisions of 28 U.S.C. § 1608(a)(4). Aff. Requesting Foreign Mailing [Dkt. # 18]. On February 13, 2024, the Clerk sent via FedEx "[t]wo copies of the summons, complaint[,] and notice of suit, together with a translation of each into [Farsi]" to the Director of Overseas Citizens Services at the U.S. Department of State. Certificate of Clerk [Dkt. # 24]. These steps satisfied elements one through five. See 28 U.S.C. § 1608(a)(4).

On July 19, 2024, a return of service affidavit was filed in this action. *See* Return of Service/Affidavit [Dkt. # 26] ("Embassy Service Docs."). The documents filed reveal that the U.S. Embassy in Bern, Switzerland sent a Diplomatic Note to the Swiss Ministry of Foreign Affairs requesting judicial assistance from the Embassy of Switzerland in Tehran to effect service of the summons. Embassy Service Docs. at 9–11. The Clerk of the Court received a letter from Jared N. Hess, an Attorney Adviser at the United States Department of State, Overseas Citizens Services Office of Legal Affairs, stating:

> Because the United States does not maintain diplomatic relations with the Government of Iran, the Department of State is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. These documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1051-IE dated June 9, 2024 and delivered on June 11, 2024.

Embassy Service Docs. at 1. The submission included a copy of the authenticated certificate of service. *Id*.

Plaintiffs also attached additional documents showing proof of service by the Swiss Federal Department of Foreign Affairs on the Islamic Republic of Iran. *See* Embassy Service Docs. at 8. The Swiss Federal Department stated in a letter that it transmitted the documents to the Iranian

Ministry of Foreign affairs on June 11, 2024, and "[t]he reception of the mentioned documents was refused the same day by the Iranian Ministry of Foreign Affairs." *Id.*

Since the record reflects that the documents were in fact delivered, it is of no moment that Iran refused to accept them, *see Levinson*, 443 F. Supp. 3d at 175; *Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael*, 540 F. Supp. 2d at 52–53. Thus, the record shows that as of June 11, 2024, plaintiffs had fully complied with the requirements of 28 U.S.C. § 1608(a)(4) and properly served Iran under the FSIA. This means that the Court may exercise personal jurisdiction over the defendant.

## II.    Subject Matter Jurisdiction.

As stated earlier, 28 U.S.C. § 1330 provides that a district court has "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" as to any claim for relief with respect to which the state is not entitled to immunity under the Foreign Sovereign Immunities Act or pursuant to an international agreement.  28 U.S.C. § 1330(a).  The FSIA generally shields foreign governments against civil suits, but it contains an exception to that immunity for acts of terrorism.  It says:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

"Extrajudicial killing" is not defined in the FSIA but, per the statute, it has the same meaning as in Section 3 of the Torture Victim Protection Act ("TVPA") of 1991.  *See* 28 U.S.C. § 1605A(h)(7).  The TVPA defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial

guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C. § 1350 note.

"[T]his definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not

authorized by a previous judgment pronounced by a regularly constituted court."  *Owens v.*

*Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017).  Each of the attacks in this case detailed

above resulting in a death bears the signs of deliberation, and there is no indication that any was

authorized by a Court.

In addition, plaintiffs have alleged and shown that senior officials in Iran, the Islamic

Revolutionary Guard Corps, and Iran's Qods Force supported the groups that comprise the

Taliban-led Syndicate behind these attacks, including the Taliban, the Haqqani Network, the Kabul

Attack Network, and al-Qaeda.  *See* Compl. § III; *supra* Findings of Fact § II.  Iran provided the

groups with training, weapons, soldiers, safe haven and smooth passage, and more.  *See supra*

Findings of Fact § II.  Plaintiffs have therefore provided ample evidence "satisfactory to the court,"

28 U.S.C. § 1608(e), that Iran materially supported the terrorist groups and that this support came

from an "agent of such foreign state while acting within the scope of his or her office, employment,

or agency," *id.* § 1605A(a)(1).

Further, the FSIA waives sovereign immunity for injuries caused by "material support …

*for*" an extrajudicial killing if an official of the foreign state acting within the scope of his office

provided that support.  28 U.S.C. § 1605A(a)(1) (emphasis added).  "The word 'for' matters."

*Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 32 (D.D.C. 2022).  A foreign state's

support with the object or purpose of an extrajudicial killing constitutes support "for such an act"

under the statute.  *Id.*; *accord Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360–61

(D.D.C. 2020).  This interpretation faithfully considers Congress's inclusion of "for" in the statute

and abides by the D.C. Circuit's guidance to "interpret [the FSIA's] ambiguities flexibly and capaciously." *Id.*, quoting *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013).

Plaintiffs have sufficiently alleged and shown that Iran's proxies launched the attacks in which their family members were either killed or injured with the intent to kill and with material support – including training, soldiers, and weapons – from Iran. *See supra* Findings of Fact §§ II, IV.  None of the attacks injuring plaintiffs were sanctioned by applicable law. *See* 28 U.S.C. 1350 note.  Therefore, Iran gave "material support … for" the extrajudicial killings underlying the claims in this case.

Finally, plaintiffs must show that the attacks were "caused by" Iran's material support to terrorist groups. *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 31–32 (D.D.C. 2022). Claims brought under the FSIA do not require "but-for" causation. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009).  In interpreting a provision under the FSIA, the D.C. Circuit found the causation element "to require only a showing of proximate cause." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004), quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536–38 (1995) (internal quotation marks omitted).  "Proximate cause exists so long as there is some 'reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009), quoting *Kilburn*, 376 F.3d at 1128–29.

Courts in this District have routinely held a state sponsor of terrorism liable when it provides material support that enhances a terrorist group's ability to attack, even where that support is not directly traceable to a specific attack. *See, e.g.*, *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011); *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139 (D.D.C.

2021). The same conclusion is justified in this case. Plaintiffs have adequately alleged with supporting expert testimony that Iran provided the Taliban-led Syndicate with weapons, explosives, training, financial support, safe haven, and assistance with the Syndicate's drug trafficking operations, *see generally supra* Findings of Fact § II*,* and that this material support substantially contributed to the Syndicate's ability to commit each of the attacks at issue in the instant motion. *Id.*

Because plaintiffs have adequately demonstrated that the terrorism exception to the FSIA applies, defendant is not entitled to sovereign immunity, and this Court has subject matter jurisdiction over the case.

## III.    Plaintiffs Have Properly Alleged Causes of Action.

Plaintiffs bring claims under the private right of action in 28 U.S.C. § 1605A(c), which provides that a "state sponsor of terrorism . . . shall be liable . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages."  The elements for establishing Iran's liability are "essentially the same" as the elements necessary to establish its waiver of sovereign immunity. *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  "In other words, [§ 1605A(c)] creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019).  Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Force*, 464 F. Supp. 3d at 369.

Section 1605A(c) also requires that the plaintiff – as opposed to the victim – be a national of the United States, a member of the armed forces, or a government employee or contractor. *See*

28 U.S.C. § 1605A(c).  All fourteen bellwether plaintiffs have submitted declarations attesting to their U.S. citizenship.  *See* [Dkt. # 33].  The Court therefore concludes that they may bring their claims under 28 U.S.C. § 1605A(c).

## IV.    Damages.

"Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'"  *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018), quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). The Court has already concluded that Iran's material support was directed at the killing or maiming of American citizens, *see generally supra* Findings of Fact § II, and this conduct was reasonably certain to cause injury to plaintiff.  The only question remaining is the type of and amount in damages to be awarded.  *See* 28 U.S.C. § 1605A(c) (damages under the FSIA's private right of action "may include economic damages, solatium, pain and suffering, and punitive damages").

### A.    Solatium

The fourteen bellwether plaintiffs in this action are family members of an individual injured in an attack, and they have brought claims for solatium damages.  Solatium is "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  It also includes mental suffering as a result of injury to a loved one.  *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010).

Solatium damages "are by their very nature unquantifiable." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015). As a result, courts generally calculate solatium damages by looking to prior decisions for guidance. *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). "Judges in this District have established two primary frameworks, sometimes called the '*Peterson II*' or '*Heiser*' frameworks, for evaluating solatium damages for terrorist victims and their family members." *Sheikh v. Republic of Sudan,* 485 F. Supp. 3d 255, 270 (D.D.C. 2020). For family members of deceased victims, both frameworks provide a baseline of $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings; those numbers are halved for the family members of surviving victims ($4 million for spouses, $2.5 million for parents and children, and $1.25 million for siblings). *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) ("*Peterson II*"). An upward adjustment may be appropriate in cases "with aggravating circumstances." *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 92 (D.D.C. 2023). (citation omitted) (internal quotation marks omitted).

The class of plaintiffs who can recover solatium damages may also "include members of the victim's household who are viewed as the functional equivalents of immediate family members," even though they are not legally or biologically related. *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (citation omitted) (internal quotation marks omitted). The functional equivalent of an immediate family member is one who generally "lived in the victim's immediate household and ha[s] been in other important respects like a spouse, parent, sibling, or child to the victim." *Est. of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 29 (D.D.C. 2009). Courts in this District regularly find that stepparents and stepchildren are the "functional equivalent" of immediate family members when they treat their stepchild or parent as such. *See*, *e.g.*, *Fritz*, 324 F. Supp. 3d at 63 (awarding solatium damages to the stepmother of a

victim where the evidence demonstrated that she "treated [the victim] as, and considered [the victim] to be, one of her sons" and to the stepmother of a second victim who "functioned as [that victim's] mother – fulfilling all aspects of such a relationship – from the time [the victim] was approximately four years old until his death").

Courts may "presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish" and may accept "testimony proving a close emotional relationship" between siblings as sufficient for entitlement to solatium damages. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015). In addition to this presumption, plaintiffs may present evidence of their mental pain and suffering as a result of the deaths or injuries of their immediate family members. The Court has reviewed sealed declarations from the following individuals attesting to the personal impact of the attacks:

- Plaintiff D.C. is a U.S. citizen and the biological minor daughter of U.S. Army Specialist Kevin Cardoza. Decl. of C. Martinez on Behalf of D.C. (Sealed) [Dkt. # 35] at 2 ¶ 1–2. She was three years old at the time of the attack that resulted in Cardoza's death. *Id.* ¶ 3.

- Plaintiff M.C. is a U.S. citizen and the biological minor daughter of SPC Cardoza. Decl. of C. Martinez on Behalf of M.C. (Sealed) [Dkt. # 35] at 7 ¶ 1–2. She was two years old at the time of the attack that resulted in Cardoza's death. *Id.* ¶ 3.

- Plaintiff Samantha Ulrich is a U.S. citizen and the biological daughter of U.S. government contractor Corey Dodge. Decl. of S. Ulrich (Sealed) [Dkt. # 35] at 11 ¶ 2–3.

- Plaintiff Hollie Towle is a U.S. citizen and the biological sister of Corey Dodge. Decl. of H. Towle (Sealed) [Dkt. # 35] at 16 ¶ 2–3.

- Plaintiff Tammy Bowden is a U.S. citizen and the biological sister of Corey Dodge. Decl. of T. Bowden (Sealed) [Dkt. # 35] at 21 ¶ 2–3.

- Plaintiff Letha Dodge is a U.S. citizen and the biological mother of Corey Dodge. Decl. of L. Dodge (Sealed) [Dkt. # 35] at 25 ¶ 2–3.

- Plaintiff Ronnie Dodge is a U.S. citizen and the biological father of Corey Dodge. Decl. of R. Dodge (Sealed) [Dkt. # 35] at 30 ¶ 2–3.

- Plaintiff Connor Larson is a U.S. citizen and the stepson of Corey Dodge.  Decl. of C. Larson (Sealed) [Dkt. # 35] at 66 ¶ 1–2.

- Plaintiff Sandra Lee Hackenberg is a U.S. citizen and the adoptive mother of U.S. Army Staff Sergeant Thomas Baysore, Jr..  Decl. of S. Lee Hackenberg (Sealed) [Dkt. # 35] at 34 ¶ 2–3.

- Plaintiff Jennifer Mabus is a U.S. citizen and the adoptive sister of SSG Baysore, Jr..  Decl. of J. Mabus (Sealed) [Dkt. # 35] 40 ¶ 2–3.

- Plaintiff Monica Smith is a U.S. citizen and the half sister of U.S. Army Private First Class Devon Harris. Decl. of M. Smith (Sealed) [Dkt.#35] 45 ¶ 2–3

- Plaintiff Deborah Trimble a U.S. citizen and the biological sister of U.S. Army Private First Class Kevin Trimble.  Decl. of D. Trimble (Sealed) [Dkt. # 35] at 50 ¶ 1–2.

- Plaintiff Anthony Trimble is a U.S. citizen and the biological brother of PFC Trimble.  Decl. of A. Trimble (Sealed) [Dkt. # 35] 55 ¶ 1–2.

- Plaintiff Nancy Ann Morgado is a U.S. citizen and the stepmother of U.S. Army Second Lieutenant Travis Morgado.  Decl. of N. Morgado (Sealed) [Dkt. # 35] at 60 ¶ 2–3.

Plaintiffs request that the Court award solatium damages in the standard *Peterson II* framework for these individuals except D.C., M.C., and Connor Larson.  *See generally* Mem. at § V.C. Because D.C., M.C., and Larson were minors at the time their parental figures were killed, resulting in increased hardship during the critical phases of childhood and adolescence, plaintiffs argue that a 25 percent deviation upward, *i.e.*, an award of $6.25 million rather than $5 million, is warranted.  Mem. at 25.

No amount of money will ever fully compensate the plaintiffs for the losses they suffered because of the Syndicate's attacks.  However, as Congress has recognized, awarding monetary damages to victims of terrorist attacks at least partially redresses their injuries and can provide some measure of justice.  The Court is deeply moved by plaintiffs' declarations attesting to the pain and suffering they each experienced due to the tragic loss of their immediate family members in acts of terrorism, and it finds that each has provided sufficient evidence warranting the standard

*Peterson II* award.  In addition, "courts have recognized the particularly devastating effect that the loss of a parent can have on minors." *Selig v. Islamic Republic of Iran,* 573 F. Supp. 3d 40, 75 (D.D.C. 2021).  Plaintiffs D.C., M.C., and Connor Larson have each experienced substantial hardship as a result of the deaths of their parental figures. Therefore, the Court finds that an upward deviation of 25% is warranted in their cases. The Court will therefore award plaintiffs solatium damages in the following amounts:

- Plaintiff D.C.: $6,250,000
- Plaintiff M.C.: $6,250,000
- Plaintiff Connor Larson: $6,250,000
- Plaintiff Samantha Ulrich: $5,000,000
- Plaintiff Nancy Ann Morgado: $5,000,000
- Plaintiff Letha Dodge: $5,000,000
- Plaintiff Ronnie Dodge: $5,000,000
- Plaintiff Hollie Towle: $2,500,000
- Plaintiff Tammy Boden: $2,500,000
- Plaintiff Sandra Lee Hackenberg: $5,000,000
- Plaintiff Jennifer Mabus: $2,500,000
- Plaintiff Monica Smith: $2,500,000
- Plaintiff Deborah Trimble: $1,250,000
- Plaintiff Anthony Trimble: $1,250,000

## B.      Pre-Judgment Interest

Courts have "discretion, subject to equitable considerations," to award prejudgment interest on compensatory damages, *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 58 (D.D.C. 2012) ("*Oveissi II*"), and the Court will do so here.  As courts in other § 1605A(c) cases

have explained, "an award of prejudgment interest here is appropriate" because "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020), quoting *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 34 (D.D.C. 2014). The D.C. Circuit has approved calculating prejudgment interest using the prime rate, reasoning that it is "*more* appropriate" than the Treasury Bill rate because it is "a market-based estimate" of what the victim would have had to pay to borrow the money and is the available rate for the wrongdoer. *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996) (emphasis in original). Using "the prime rate for each year between the [attack] and the entry of judgment" results in a more precise award than alternative calculation methods. *Id.*

The Court has reviewed plaintiffs' declaration and its supporting exhibit calculating the prejudgment interest awards based on the Federal Reserve's data for the average annual prime rate in each year, considering the date of each attack and the date plaintiffs filed their motion for default judgment. *See* Decl. of Andrew R. Dunlap in Supp. of Mot. [Dkt. # 34-13] ("Dunlap Decl."); Ex. A to Dunlap Decl. [Dkt. # 34-14]. The Court agrees with plaintiffs' methodology, which was also used in *Cabrera*, and it will award plaintiffs pre-judgment interest in the amounts proposed and reproduced below:

| Plaintiff | Solatium Damages | Solatium Damages with Pre-Judgment Interest |
|---|---|---|
| D.C. | $6,250,000 | $10,212,937.46 |
| M.C. | $6,250,000 | $10,212,937.46 |
| Connor Larson | $6,250,000 | $9,488,078.95 |
| Samantha Ulrich | $5,000,000 | $7,590,463.16 |
| Sandra Lee Hackenberg | $5,000,000 | $8,067,804.66 |

| Nancy Ann Morgado | $5,000,000 | $8,421,719.56 |
| Letha Dodge | $5,000,000 | $7,590,463.16 |
| Ronnie Dodge | $5,000,000 | $7,590,463.16 |
| Hollie Towle | $2,500,000 | $3,795,231.58 |
| Tammy Bowden | $2,500,000 | $3,795,231.58 |
| Jennifer Mabus | $2,500,000 | $4,033,902.33 |
| Monica Smith | $2,500,000 | $4,415,885.09 |
| Deborah Trimble | $1,250,000 | $2,151,723.10 |
| Anthony Trimble | $1,250,000 | $2,151,723.10 |

### C.       Punitive Damages

Although the FSIA generally prohibits a court from awarding punitive damages against a foreign state, Congress has provided that punitive damages are available in actions brought under the state-sponsored terrorism exception.  *See* 28 U.S.C. § 1605A(c).  Courts calculate the appropriate punitive damages award based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Oveissi II*, 879 F. Supp. 2d at 56, quoting *Acosta,* 574 F. Supp. 2d at 30. All four factors support awarding punitive damages here.

Iran's provision of material support to the Syndicate's terroristic activities enabled the Syndicate to commit heinous attacks against American service members and civilians; as other courts in this District have recognized, "Iran's intention, in supporting terrorist groups such as the one involved here, is to create maximum harm through terrorist acts." *Acosta*, 574 F. Supp. 2d at

31; Iran's long-standing support for anti-American terrorist groups warrants a large punitive damage award if any semblance of deterrence for future attacks is possible; and "Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism." *Oveissi II*, 879 F. Supp. 2d at 56.

However, courts must be cautious in awarding excessive punitive damages where, as here, punitive damages have already been awarded in prior cases involving the same conduct but different plaintiffs.   Recognizing this, and often lacking specific evidence regarding the amount expended in support of specific attacks, courts in this District have therefore awarded "punitive damages in an amount equal to the total compensatory damages awarded in [each] case," rather than a flat sum or multiplier approach.  *Sheikh*, 485 F. Supp. 3d at 273.  This is because "[a]n amount of punitive damages equal to compensatory damages . . . is commensurate with the character of Defendants' acts and the nature and extent of the harm caused." *Selig*, 573 F. Supp. 3d at 77.

Punitive damages based on compensatory damages are calculated "by reference to the entire compensatory award," including prejudgment interest.  *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 98 (D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens*, 864 F.3d at 751. The Court will therefore award punitive damages in the following amounts, resulting in total damages for each plaintiff identified below:

| Plaintiff | Solatium Damages | Solatium Damages with Pre-Judgment Interest | Punitive Damages | Total |
|---|---|---|---|---|
| D.C. | $6,250,000 | $10,212,937.46 | $10,212,937.46 | $20,425,874.92 |
| M.C. | $6,250,000 | $10,212,937.46 | $10,212,937.46 | $20,425,874.92 |
| Connor Larson | $6,250,000 | $9,488,078.95 | $9,488,078.95 | $18,976,157.90 |
| Samantha Ulrich | $5,000,000 | $7,590,463.16 | $7,590,463.16 | $15,180,926.32 |
| Sandra Lee Hackenberg | $5,000,000 | $8,067,804.66 | $8,067,804.66 | $16,135,609.32 |
| Nancy Ann Morgado | $5,000,000 | $8,421,719.56 | $8,421,719.56 | $16,843,439.12 |
| Letha Dodge | $5,000,000 | $7,590,463.16 | $7,590,463.16 | $15,180,926.32 |
| Ronnie Dodge | $5,000,000 | $7,590,463.16 | $7,590,463.16 | $15,180,926.32 |
| Hollie Towle | $2,500,000 | $3,795,231.58 | $3,795,231.58 | $7,590,463.16 |
| Tammy Bowden | $2,500,000 | $3,795,231.58 | $3,795,231.58 | $7,590,463.16 |
| Jennifer Mabus | $2,500,000 | $4,033,902.33 | $4,033,902.33 | $8,067,804.66 |
| Monica Smith | $2,500,000 | $4,415,885.09 | $4,415,885.09 | $8,831,770.18 |
| Deborah Trimble | $1,250,000 | $2,151,723.10 | $2,151,723.10 | $4,303,446.20 |
| Anthony Trimble | $1,250,000 | $2,151,723.10 | $2,151,723.10 | $4,303,446.20 |

## CONCLUSION

For the foregoing reasons, final judgment on liability will be entered against Iran as to the

27 attacks detailed in this opinion, and the fourteen bellwether plaintiffs will be awarded damages

in the amounts set forth above.  Plaintiffs' remaining claims – both the claims of the other plaintiffs

associated with the 27 attacks and those of plaintiffs injured in other attacks – will be referred to a

Special Master, who will receive evidence and prepare proposed findings and recommendations for the disposition of each claim in a manner consistent with this Opinion.

      A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE: July 30, 2025